**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| CATLIN (SYNDICATE 2003) AT LLOYDS, | |
| Plaintiff, | |
| v. | CIVIL NO.: 11-2093 (FAB/MEL) |
| SAN JUAN TOWING & MARINE SERVICES, INC., | |
| Defendant. | |
| SAN JUAN TOWING & MARINE SERVICES, INC., | |
| Plaintiff, | |
| v. | CIVIL NO.: 11-2116 (FAB/MEL) |
| CATLIN (SYNDICATE 2003) AT LLOYDS, | |
| Defendant. | |

**REPORT AND RECOMMENDATION**

I. **PROCEDURAL POSTURE**

On November 8, 2011, plaintiff Catlin (Syndicate 2003) at Lloyds ("plaintiff" or "Catlin") filed a complaint against defendant San Juan Towing & Marine Services, Inc. ("defendant" or "SJT").  (D.E. 1).[1]  SJT filed a complaint against Catlin on November 16, 2011, in a separate case, followed by an amended complaint and a second amended complaint.[2]  (D.E.

---

[1]  Unless otherwise indicated, citations to docket entries are to the consolidated case docket, No. 11-2093 (FAB/MEL).
[2]  Although SJT is the plaintiff and Catlin is the defendant in Case No. 11-2116 (FAB/MEL) ("member case"), for the sake of consistency and clarity only the party designations of Case No. 11-2093 (FAB/MEL) ("lead case") shall be used throughout the remainder of this report and recommendation.

1; 2 in Case No. 11-2116 (FAB/MEL); (D.E. 50).   The two cases were consolidated on December 22, 2011.  (D.E. 32).

Citing jurisdiction under 28 U.S.C. §§ 1333 (admiralty) and 1332 (diversity), plaintiff's eight claims in the lead case are all admiralty or maritime claims.  (See D.E. 1, ¶¶ 1-3).   In contrast, the two claims in the member case complaint are under the laws of the Commonwealth of Puerto Rico and presented in federal court under diversity jurisdiction.  (See D.E. 50, ¶ 1). While the claims appear to relate to the same insurance contract (see, e.g., D.E. 50, ¶ 26), the parties disagree as to whether federal or state law governs its interpretation.[3]

Pending before the court is defendant's motion for partial summary judgment regarding the issue of whether the object of the insurance contract subject to the instant litigation, a drydock called the Perseverance ("the Perseverance" or "the drydock"), was a vessel for purposes of maritime law.  (D.E. 78).  Plaintiff has filed a response in opposition, and defendant has filed a reply.  (D.E. 81; 90).

## II.    SUMMARY OF UNCONTESTED MATERIAL FACTS[4]

SJT purchased the Perseverance from Formel Marine Services in April 2006.   The drydock was delivered to SJT at Harvey, Louisiana, on or around June 12, 2006.  The purchase and sale agreement, signed by Mark Payne ("Payne"), the marine manager of SJT, identified the Perseverance as a vessel with an Official Number of 1070055.  The terms of the agreement

---

[3] Federal law governs if "the issue at hand is one of 'entrenched federal precedent," such as "[t]he federal maritime law doctrine of *uberimmae fidei*."  Certain Underwriters at Lloyd's, London Subscribing to Policy 200-451-8464 v. Johnston, 124 F. Supp. 2d 763, 769 (D.P.R. 1999).  Otherwise, state law governs the interpretation of a marine insurance policy.  See Sylva v. Culebra Dive Shop, 389 F. Supp. 2d 189, 202 (D.P.R. 2005).

[4] Local Rule 56 "structures the presentation of proof at summary judgment."  Goya Foods, Inc. v. Orion Distributors, Inc., Civ. No. 10-1168 (BJM), 2012 WL 1069191, at *1 (D.P.R. Mar. 29, 2012).  It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Market Inv. v. González Toro, 520 F.3d 58, 63 (1st Cir. 2008), by requiring "a party opposing a motion for summary judgment to accept, deny, or qualify each entry in the movant's statement of material facts paragraph by paragraph and to support any denials, qualifications, or new assertions by particularized citations to the record."  Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 6-7 (1st Cir. 2007).  In accordance with Local Rule 56(e), all proposed facts that are properly supported by record evidence and have not been successfully controverted or qualified by the opposing party have been deemed admitted.

required the seller to provide SJT with "duplicate originals of a U.S. Coast Guard Bill of Sale for the Vessel together with the original Certification of Documentation," among other documents. (D.E. 79-1, at 2).  Both the U.S. Coast Guard Bill of Sale and Certificate of Documentation, which was subsequently renewed by SJT, identified the Perseverance as a "vessel" with an Official Number of 1070055.  The U.S. Coast Guard had no record of the Certificate of Documentation's being exchanged, replaced, deleted, or canceled.  (D.E. 79, ¶¶ 1, 2; D.E. 79-1, at 1, 2; D.E. 81, ¶¶ 1, 2, 21-26; D.E. 91, ¶¶ 21-26).

On August 21, 2006, SJT's Board of Directors completed a certificate of resolution authorizing the mortgage of the Perseverance.  The certificate of resolution, bearing Payne's notarized signature as the secretary of SJT, identified the Perseverance as a "vessel" identified with an Official Number of 1070055.  The mortgage obtained with Banco Popular de Puerto Rico described the Perseverance as a "vessel."  (D.E. 81, ¶¶ 19, 20, 27; D.E. 81-7, at 2; D.E. 91, ¶¶ 19, 20, 27).

The Perseverance arrived in San Juan, Puerto Rico, on or around January 1, 2007.  According to Payne, the marine manager of SJT, "[t]he drydock was specially outfitted and prepared for the voyage to San Juan."  (D.E. 79-2, ¶¶ 1, 4).  The Perseverance had two tow pads to connect it to a towing vessel.  Once the Perseverance arrived in Puerto Rico, most of the temporary modifications required for navigation, except for the raked bow, were removed and were not replaced.  These items included: "wire towing bridle; towing chains; emergency retrieving line; emergency drag float; emergency tow wire; all emergency tow wire attachment clips; towing day shape; plastic enclosure of control area; navigation lights; the 6 braces on each wing wall; all of the sealant on all of the manholes; emergency diesel pump; equipment welded on deck; and the welding of a shore side electrical ground wire to the side of the wing wall and

its attachment to the pier." (D.E. 79-2, ¶ 7). Modifications of the drydock were made, including: "installation of two steel gangways, shore power cable, a pneumatic manifold and an electrical distribution panel." Id. Payne distributed a diagram of the Perseverance, depicting the raked bow and tow pads, to potential buyers. (D.E. 79, ¶¶ 3, 5, 6; D.E. 81, ¶¶ 3, 5, 6, 32, 33; D.E. 81-1, at 36; D.E. 91, ¶¶ 32, 33).

The Perseverance was secured and attached to the southwestern end of the outfitting pier 15 in Miramar, a location adjacent to an apron rented by SJT and which was designated by the Puerto Rico Ports Authority ("PRPA"). It was at this location where the Perseverance eventually sank. It received electrical power from generators located at shore when needed. The generators fed 600 amps of 480 volts to the drydock. A shoreside pneumatic line fed compressed air to the drydock. The dock wing wall was connected directly to a grounding lug on the pier with a three-quarter-inch grounding wire. The Perseverance was accessed by at least one gangway, which was chained to the drydock and to the pier. It was tied to the dock with more than ten three-inch-diameter mooring lines and numerous spring lines to keep it in place. In this area, there were "mooring lines, support equipment and machinery, grounding connection, electricity and compressed air." (D.E. 79-2, ¶ 12). The PRPA charged a flat rate of $525.00 per month based on the square feet of the area occupied by SJT. (D.E. 79, ¶¶ 5, 7-12; D.E. 81, ¶¶ 5, 7-12; D.E. 81-1, at 76).

The Perseverance was not designed or constructed to transport cargo or passengers. It was designed, constructed, and used to provide maintenance and repair services to vessels. At the time of its sinking, the Perseverance was insured as a "port risk." (D.E. 79-5, at 2). The drydock was occasionally moved ten or fifteen feet within its assigned area at the pier. This was

4

accomplished by the use of ropes pulled by either harbor workers or a pickup truck.  (D.E. 79, ¶¶ 13-16; D.E. 79-6, at 2-5; D.E. 81, ¶¶ 13-16).

The Perseverance consisted of a horizontal platform called a pontoon which was 150 feet long, 70 feet wide, and 5 feet tall.  The Perseverance had a superstructure, its "wingwalls."  (D.E. 79-3, at 5).  The wingwalls, two vertical elements, were 120 feet long, 4 feet wide, and 16 feet tall.  The top of the port wingwall was fitted with one semi-sheltered steel control room.  (D.E. 79, ¶¶ 17, 18; D.E. 81, ¶¶ 17, 18, 34; D.E. 91, ¶ 34).

On January 10, 2008, Payne described the Perseverance as a "vessel" in an email written to the prior insurer.  Payne's agent and marine insurance broker, John Toscani ("Toscani"), engaged in the following exchange in his deposition:

Q.      Do you consider that the policy, the package policy, as you say, that you placed for San Juan with [Catlin] was a marine insurance policy?

A.      Yes, I do consider it a marine insurance policy.

Q.      Why?

A.      Because it's marine in nature. It's a floating drydock. There's also a work boat involved. Any performed ship operations to third-party vessels, it's all marine related. It all has to do with marine.

Q.      I have heard floating drydock referred to as a type of vessel. Do you share that view?

A.      Yes.

Q.      Is that why you approached the marine insurance market for coverage for the floating drydock?

A.      Yes.

(D.E. 81-6, at 10).  Toscani also indicated that he approached John Kirchoffer, who worked for Catlin at the time, because he was a marine insurance underwriter and Toscani was "looking to access the marine insurance market for the San Juan account."  Id. at 11.  Toscani represented SJT when he obtained insurance coverage from Catlin.  (D.E. 81, ¶¶ 28-31; D.E. 91, ¶¶ 28-31).

On or around September 4, 2011, SJT reached an agreement to sell the Perseverance to Leevac Shipyards, LLC, a Louisiana-based company.  On September 19, 2011, Payne, on behalf of SJT, signed a "Good Faith Purchase and Sale Agreement" to sell the Perseverance to Leevac Shipyards, LLC, in Louisiana.  (D.E. 81-16, at 7).  Payne replaced the word "undocumented" with "documented" before the phrase "marine construction vessel" in the agreement.  Id.  Payne also added the word "USCG" before "Bills of Sale."  Id. at 8; (D.E. 81, ¶¶ 35, 37, 38; D.E. 91, ¶¶ 35, 37, 38).

When the Perseverance sank on or around September 29, 2011, "[w]elding repairs had been conducted on the wing walls and on the main deck and repairs were being made to the forward rake in preparation for towing."  (D.E. 81-4, at 3).  Mark Payne emailed potential buyers of the Perseverance for scrap on March 7, 2012.  The conditions included, *inter alia*, that the "[d]rydock must be moved from its current location" and that "[s]ale will require a USCG bill of sale and transfer of certificate of documentation."  (D.E. 81-17, at 2); (D.E. 81, ¶¶ 39, 40; D.E. 91, ¶¶ 39, 40).

## III.   ANALYSIS

### A.    Defining "Vessel"

Before analyzing whether a specific object is a vessel for purposes of maritime law, one must have an applicable definition of "vessel."  The U.S. Supreme Court considered "whether a dredge is a 'vessel'" in the context of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq., in Stewart v. Dutra Const. Co., 543 U.S. 481, 484 (2005).

The Supreme Court noted that, although "vessel" was undefined in the LHWCA, it was defined in the Rules of Construction Act, 1 U.S.C. § 3, which "merely codified the meaning that the term 'vessel' had acquired in general maritime law."[5]  Stewart, 543 U.S. at 488-90.  "Under § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."  Id. at 497.

Defendant argues, however, that Stewart does not affect the analysis of whether the Perseverance is a vessel in this case, because Stewart only relates to claims under the Jones Act or the LHWCA.  Defendant specifically cites two cases in support of its assertion that "federal courts have distinguished Stewart from later cases that have come before them."  (D.E. 80, at 2) (citing Cain v. Transocean Offshore USA, Inc., 518 F.3d 295, 303 (5th Cir. 2008); Gautreaux v. Tetra Applied Technologies, LLC, No. 08-4645, 2010 WL 1930925 (E.D. La. May 10, 2010)). Cain merely distinguished between Stewart's analysis of "whether an unconventional watercraft *is* a vessel" and prior Fifth Circuit jurisprudence regarding "when a vessel-to-be *becomes* a vessel"—in other words, "the vessel status of incomplete watercraft."  518 F.3d at 303 (emphasis in original).  Additionally, Cain itself involves the Jones Act and, as such, is inapplicable to the question of whether Stewart applies to a case raising other causes of action.  Furthermore, the Fifth Circuit has applied Stewart to cases not involving the Jones Act or the LHWCA in at least two separate instances.  See In re Silver Slipper Casino Venture LLC, 264 F. App'x 363 (5th Cir. 2008) (holding that a permanently moored casino barge was not a vessel for purposes of 28 U.S.C. § 1333(1)); De La Rosa v. St. Charles Gaming Co., 474 F.3d 185 (5th Cir. 2006) (holding

---

[5] Stewart specifically involved the LHWCA; the Supreme Court noted that it "granted certiorari to resolve confusion over how to determine whether a watercraft is a 'vessel' for purposes of the LHWCA."  543 U.S. at 486. Nevertheless, the opinion also makes it clear that the definition also applies to the Jones Act, 46 U.S.C. § 30104. See 543 U.S. at 494 ("Applying § 3 brings within the purview of the Jones Act the sorts of watercraft considered vessels at the time Congress passed the Act."); see also Holmes v. Atl. Sounding Co., Inc., 437 F.3d 441, 448 (5th Cir. 2006) ("It is clear, then, that Stewart defines 'vessel' for purposes of both the Jones Act and the LHWCA.").

that an indefinitely moored floating casino was not a vessel for purposes of general maritime law).

The district court in <u>Gautreaux</u>, however, specifically stated that "the holdings in [<u>Stewart</u>] and [<u>Holmes v. Atlantic Sounding Company, Inc.</u>, 437 F.3d 441 (5th Cir. 2006),] were limited to the definition of a 'vessel' under the Jones Act and the Longshore Harbors Workers' Compensation Act."  2010 WL 1930925, at *5.  As such, the <u>Gautreaux</u> court concluded, <u>Stewart</u> and <u>Holmes</u> "do not … suggest an expansion of maritime jurisdiction, nor do they contradict the language in [<u>Domingue v. Ocean Drilling & Exploration Co.</u>, 923 F.2d 393 (5th Cir. 1991)]."  <u>Id.</u> Nevertheless, the meaning of <u>Gautreaux</u>'s interpretation of <u>Stewart</u> is not as straightforward as defendant implies.

The issue in <u>Gautreaux</u> was whether a contract to install seal rings on a drill pipe on a moored materials barge was a maritime contract.  According to the <u>Gautreaux</u> court, <u>Domingue</u>, on which the court relied extensively, stood for the proposition that, where "the fact of [a work platform's status as] a 'vessel' was 'nothing more than incidental to [a contract's] purpose," the contract is non-maritime.  <u>Id.</u> at *4.  The language in <u>Gautreaux</u> seemingly limiting <u>Stewart</u> was in response to an argument that <u>Stewart</u> and <u>Holmes</u> held that "the transportation function of a vessel is no longer a determinative factor for maritime jurisdiction."  <u>Id.</u> at *5.  Thus, the court's reasoning in the paragraph concerning <u>Stewart</u> lends no support to the idea that it intended to interpret <u>Stewart</u>'s definition of "vessel" as applying only to claims under the Jones Act or the LHWCA.  Rather, the court in <u>Gautreaux</u> appeared to be concerned with the "expansion of maritime jurisdiction" to include cases involving contracts involving a vessel independent of its function of transportation.  Correspondingly, the <u>Gautreaux</u> court interpreted <u>Stewart</u> as limited to defining the term "vessel."

8

Moreover, the same district court has on several occasions applied Stewart to cases not involving the Jones Act or the LHWCA.  See, e.g., In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010, 808 F. Supp. 2d 943, 949 (E.D. La. 2011) (citing Stewart in support of its determination that a "mobile offshore drilling unit" was a vessel for purposes of establishing admiralty jurisdiction); In re S. Scrap Material Co., LLC, Civ. No. 09-2878, 2010 WL 3171022, at *1 (E.D. La. Aug. 9, 2010) (noting that Stewart "explain[ed the] meaning of 'vessel' in maritime law" and applying its standard); Ingrassia v. Marina del Ray, LLC, Civ. No. 06-2565, 2006 WL 3395162, at *1, *3 (E.D. La. Nov. 22, 2006) (holding that "for purposes of maritime jurisdiction … the Fun Barge does not qualify as a vessel under Stewart").

Although there has not been extensive case law on this question, two circuits have addressed the issue indirectly.  As discussed above, in two separate cases—neither of which involved the Jones Act or the LHWCA—the Fifth Circuit applied Stewart in its determinations that a permanently moored casino barge and a floating casino were not "vessels" for purpose of invoking federal admiralty jurisdiction.[6]  See Silver Slipper Casino Venture, 264 F. App'x 363; De La Rosa, 474 F.3d 185.  The Seventh Circuit applied Stewart in concluding that an indefinitely moored riverboat was a vessel, thus establishing admiralty jurisdiction.  See Tagliere v. Harrah's Illinois Corp., 445 F.3d 1012 (7th Cir. 2006).  Neither circuit held, however, that the Stewart analysis was inapplicable because the claims did not arise under the Jones Act or the LHWCA.

---

[6] A third Fifth Circuit case, involving a LHWCA claim, characterized Stewart as "the Supreme Court's choice to define 'vessel' uniformly across federal maritime statutes."  McLaurin v. Noble Drilling (US) Inc., 529 F.3d 285, 290 n.5 (5th Cir. 2008) (citing Benjamin S. Allums, Stewart v. Dutra Construction Co.: Defining a Vessel in the Wake of the Super Scoop, 80 Tul. L. Rev. 1467, 1478 (2006) ("While this is clearly a substantial change for the Fifth Circuit, the end result of § 3's application will be less so for the rest of the general maritime law, as it merely creates uniformity among the circuits, many of whom already applied § 3.")); see also Sea Vill. Marina, LLC v. A 1980 Carlcraft Houseboat, Hull ID No. LMG37164M80d, Civ. No. 09-3292 (JBS-AMD), 2009 WL 3379923, at *3 (D.N.J. Oct. 19, 2009) (noting that "[t]he United States Code helpfully defines vessel for almost all purposes in maritime law" in 1 U.S.C. § 3).

Outside of the Fifth and Seventh Circuits, several district courts have approached the issue as well, consistently applying Stewart to cases not involving the Jones Act or LHWCA. See, e.g., Delta November, LLC v. Baker, No. 10-10086-CIV, 2011 WL 4501118, at *2 (S.D. Fla. Aug. 23, 2011) (holding that the object in question was a vessel under 1 U.S.C. § 3, thus establishing admiralty jurisdiction under 28 U.S.C. § 1333); Thoma v. Fin. Factors, Ltd., Civ. No. 11-00316 (LEK), 2011 WL 2580781, at *3 n.1 (D. Haw. June 29, 2011) (citing Stewart for the proposition that "a natural born person … is not a 'vessel' for purposes of admiralty jurisdiction"); Richmond Indus. Ctr., Inc. v. The Ferry The Gov. Herbert H. Lehman, No. 10-CV-5586 (NGG)(CLP), 2011 WL 2077575, at *3, *6 (E.D.N.Y. May 13, 2011) (holding that Stewart "counsel[s] that the definition of 'vessel' in 1 U.S.C. § 3 should apply to the Extension Act" and that plaintiff failed to "carr[y] its burden of proving that the Ferry was practically capable of transportation or movement"); Int'l Ship Repair & Marine Services, Inc. v. Estate of Morales-Montalvo, No. 808-CV-1617-T-23AEP, 2010 WL 181575 (M.D. Fla. Jan. 12, 2010) (holding that claimant was unable to establish for purposes of summary judgment that an object was not a vessel under Stewart); Sea Vill. Marina, LLC v. A 1980 Carlcraft Houseboat, Hull ID No. LMG37164M80d, Civ. No. 09-3292 (JBS-AMD), 2009 WL 3379923, at *3-*5 (D.N.J. Oct. 19, 2009) (applying Stewart's "key phrase [of] 'capable of being used as a means of transportation on water'" to determine that floating homes which were not permanently moored were vessels, thus establishing admiralty jurisdiction); Misener Marine Const., Inc. v. Norfolk Dredging Co., No. 404CV146, 2008 WL 5046174, at *2 (S.D. Ga. Nov. 24, 2008) (citing Stewart in support of its holding that a contract involving dredging was a maritime contract because dredges were vessels), aff'd, 594 F.3d 832 (11th Cir. 2010); Colonna's Shipyard, Inc. v. U.S.A.F. General Hoyt S. Vandenberg, 584 F. Supp. 2d 862, 872 (E.D. Va. 2008) (holding that

10

"when affirmative steps that can be objectively measured establish that a long-moored ship will once again be used to transport persons or goods on water, <u>Stewart</u> requires that such ship be deemed a 'vessel'" for admiralty jurisdiction); <u>Crawford v. Elec. Boat Corp.</u>, 515 F. Supp. 2d 282, 290 (D. Conn. 2007) (applying <u>Stewart</u>'s recognition of "'[i]n navigation' … [as] an element of a vessel's status as a watercraft," rather than "a separate requirement from 'vessel,'" in a case under the Suits in Admiralty Act and the Public Vessels Act); <u>Bowoto v. Chevron Corp.</u>, No. C 99-02506 (SI), 2006 WL 2455761, at *3 (N.D. Cal. Aug. 22, 2006) (citing <u>Stewart</u> in support of its holding that "[b]arges constitute vessels for admiralty jurisdiction purposes, whether or not they are self-propelled"); <u>Gross v. Tonomo Marine, Inc.</u>, Civ. No. 02-1317, 2005 U.S. Dist. LEXIS 24323, at *16 (W.D. Pa. July 25, 2005) (recommending that summary motion be granted "because Defendant's crane barge is within" <u>Stewart</u>'s definition of "vessel"), <u>report and recommendation adopted</u>, 2005 U.S. Dist. LEXIS 17668 (W.D. Pa. Aug. 23, 2005).

Finally, the reasoning of <u>Stewart</u> itself does not counsel in favor of a narrow interpretation. Throughout the opinion, the Supreme Court emphasized that the definition of "vessel" now applicable to the LHWCA was consistent with general maritime law. <u>See, e.g.</u>, <u>Stewart</u>, 543 U.S. at 492-95 (noting that its own cases "have continued to construe § 3's definition in light of the term's established meaning in general maritime law," that it previously "confirmed … that § 3 should be construed consistently with the general maritime law," that two of its previous decisions "did no more than construe § 3 in light of the distinction drawn by the general maritime law between watercraft temporarily stationed in a particular location and those permanently affixed to shore or resting on the ocean floor," and that the test it was rejecting was not "consistent with … the established meaning of the term 'vessel' in general maritime law").

As such, <u>Stewart</u> should determine the standard that should be used to determine whether the Perseverance is a "vessel" for purposes of admiralty jurisdiction.[7]

### B.   Whether the Perseverance Is a Vessel

Under <u>Stewart</u>, the Perseverance is a vessel if it is "practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." <u>Stewart</u>, 543 U.S. at 497.  While this determination "is necessarily a fact-intensive inquiry[,] … if the relevant facts are undisputed, the determination may be made as a matter of law," as defendant seeks in this case.   <u>In re Two-J Ranch, Inc.</u>, 534 F. Supp. 2d 671, 680 (W.D. La. 2008).

Before the Perseverance sank, it is undisputed that it was occasionally moved ten or fifteen feet down the wharf, pulled by people or a pickup truck on the shore.  Some courts within the Fifth Circuit have held to pre-<u>Stewart</u> jurisprudence indicating that "comparably limited ranges of movement" which are "purely incidental" are "insufficient to confer vessel status." <u>Scroggs v. Bis Salamis, Inc.</u>, Civ. No. 1:09-CV-1007, 2010 WL 3910563, at *8 (E.D. Tex. Oct. 5, 2010); <u>see also, e.g.</u>, <u>Rushing v. Pride Int'l, Inc.</u>, Civ. No. H-11-0294, 2011 WL 3021043, at *6 (S.D. Tex. July 22, 2011) (distinguishing between "practically capable of maritime transportation" and "practically capable of movement" and holding a watercraft's movement to be "purely incidental"); <u>Moore v. Bis Salamis, Inc.</u>, 748 F. Supp. 2d 598, 606 (E.D. Tex. 2010) (holding that, although the object in question was "capable of a very limited range of movement in order to service several closely-packed wellheads within its designated production area, this

---

[7] Defendant's first argument is that the drydock is not a vessel because it was moored at the time of the incident. This argument, as defendant admits, relies on the contention that "the 'vessel' status of floating drydocks, … unrelated to the Jones Act or LHWCA claims, has not been affected by <u>Stewart</u>." (D.E. 80, at 2).  Applying <u>Stewart</u>, it is insufficient to argue that a watercraft was moored.  <u>See Virginia Marine Res. Comm'n v. Chincoteague Inn</u>, No. 0086-12-1, 2013 WL 68572, at *2 n.2 (Va. Ct. App. Jan. 8, 2013) ("A temporarily moored maritime vessel is a vessel in navigation.").  Rather, a watercraft must be "permanently moored or otherwise rendered practically incapable of transportation or movement."  <u>Stewart</u>, 543 U.S. at 494.

constrained mobility is merely incidental to its primary function as a work platform"); Mizell v.
BP Am. Prod. Co., Civ. No. 3:07-CV-185 (HTW-LRA), 2008 WL 872279, at *3-*4 (S.D. Miss.
Mar. 26, 2008) (holding that an object was not a vessel under the Jones Act even though it was
"capable of movement," because it was limited to "moving only 195 feet" as a hurricane
precaution and such movement "would be only incidental to its primary purpose").

     Nevertheless, these decisions seem incompatible with the language in Stewart.  See
Bunch v. Canton Marine Towing Co., Inc., 419 F.3d 868, 873 (8th Cir. 2005) (noting that
Stewart "specifically eschewed tests for vessel status focused on … a craft's 'primary
purpose'").  Considering whether an object's movement is "only incidental to its primary
purpose," Mizell, 2008 WL 872279, at *3, appears to be in tension with the Supreme Court's
statement that, "[u]nder § 3, a 'vessel' is any watercraft practically capable of maritime
transportation, regardless of its primary purpose," Stewart, 543 U.S. at 495—whether digging the
ocean bottom, as in Stewart, or providing services to vessels, as in this case.  If the fact that
transportation is not a watercraft's primary purpose is irrelevant, it must also be irrelevant that
the watercraft's transportation is merely incidental to its actual primary purpose.  Furthermore,
Stewart contains no minimum requirement or threshold for capability of movement.  It makes no
distinction between voyages over great distances and movements of ten or fifteen feet.  Nor does
it distinguish between the terms "transportation" and "movement."  See, e.g., 543 U.S. at 484
(noting that the vessel "is moved long distances by tugboat" and moved "short distances by
manipulating anchors and cables"); 543 U.S. at 494 (holding that a watercraft is not a vessel
when it is "rendered practically incapable of transportation or movement").

     The court in Two-J Ranch arrived at the same conclusion.  The drydock in Two-J Ranch
was moved only to accommodate tidal changes and only for "a couple of feet in to the bank or a

couple of hundred feet up or down the river." 534 F. Supp. 2d at 680. Despite the limited extent and purpose of the drydock's movement, the Two-J Ranch court rejected the argument that "movement over relatively short distances due to changes in the river level is not the same as movement over great distances or movement across a river for different projects or for customers' needs." Id. Such a distinction "would have us look at the purpose of the watercraft and the reasons why they were used in maritime transportation in order to exempt it from Stewart's definition of 'vessel.'" Id. The court held that such an analysis is impermissible under Stewart and, as such, the drydock was a vessel. Thus, the Perseverance's capability of moving up and down the wharf constitutes practical capability of transportation under Stewart.

Defendant points out that Stewart reaffirmed Cope v. Vallette Dry-Dock Co., 119 U.S. 625 (1887), and Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U.S. 19 (1926), which held that a drydock and a wharfboat attached to the mainland, respectively, were not vessels under 1 U.S.C. § 3. According to the Supreme Court in Stewart, "Cope and Evansville did no more than construe § 3 in light of the distinction drawn by the general maritime law between watercraft temporarily stationed in a particular location and those permanently affixed to shore or resting on the ocean floor." Stewart v. Dutra Const. Co., 543 U.S. 481, 493-94 (2005). Essentially, the drydock in Cope was not a vessel because it "was a fixed structure and therefore an extension of the land." Martin v. Matt Canestrale Contracting, Inc., 658 F. Supp. 2d 668, 681 (W.D. Pa. 2009).

As a case from the late nineteenth century, Cope conforms to the "[h]istorical … exclu[sion]" of drydocks "from the term 'vessel'" due to their "inability to navigate" and their "'more or less permanent[]' attachment to the shore." Int'l Ship Repair & Marine Services, Inc. v. Estate of Morales-Montalvo, No. 808-CV-1617-T-23AEP, 2010 WL 181575, at *2 (M.D. Fla.

Jan. 12, 2010) (quoting 1 Thomas J. Schoenbaum, <u>Admiralty & Mar. Law</u> § 3-6 (5th ed.)); <u>see, e.g.</u>, <u>The Alabama</u>, 19 F. 544, 546 (S.D. Ala. 1884); <u>J. M. L. Trading Corp. v. Marine Salvage Corp.</u>, 501 F. Supp. 323, 324 (E.D.N.Y. 1980) ("The great majority of decisions concerning the 'reach' of admiralty jurisdiction over drydocks have held that drydocks when in use as drydocks are not ships or vessels subject to such jurisdiction.").  Since the time of <u>Cope</u>, however, the drydock has evolved to become "a mobile structure capable of moving long distances." <u>Morales-Montalvo</u>, 2010 WL 181575, at *2.  As such, it "could qualify in admiralty as a vessel." <u>Id.</u>  While, before <u>Stewart</u>, "[c]ourts ha[d] consistently found that a floating drydock is not a 'vessel' within the meaning of admiralty jurisdiction when the drydock is moored and in use as a drydock," they also concluded that a drydock became a vessel when it entered navigable waters. <u>Bunge Corp. v. Freeport Marine Repair, Inc.</u>, 240 F.3d 919, 925 & n.6 (11th Cir. 2001).  But <u>Stewart</u> rejected the idea that a watercraft's status as a vessel depended on whether it was in motion.  A watercraft does not "pass in and out of Jones Act coverage depending on whether it was moving at the time of the accident." <u>Stewart</u>, 543 U.S. at 495-96.  Now, whether a watercraft is "in navigation" is only relevant to the extent that it indicates "whether the craft is 'used, or capable of being used' for maritime transportation." <u>Id.</u> at 496.

In <u>Cope</u>, the drydock was "'moored and lying at [the] usual place' it had occupied for the past 20 years." <u>Stewart</u>, 543 U.S. at 493.  That the drydock appeared to be "permanently moored" was relevant to the extent that it demonstrated that it "was a 'fixed structure.'" <u>Id.</u>  Although, notably, it appears that the Perseverance was never removed from its pier between January 1, 2007, and September 29, 2011, it was occasionally moved within the pier.  As discussed above, this is sufficient to demonstrate that the Perseverance actually was used for transportation within the meaning of 1 U.S.C. § 3 and thus not a "fixed structure" like the

drydock in <u>Cope</u>.  <u>See also</u> <u>Bunch v. Canton Marine Towing Co., Inc.</u>, 419 F.3d 868, 873 (8th Cir. 2005) (holding a cleaning barge to be a vessel where, "[a]lthough [it] was secured in position, strong currents would shift the barge, belying the permanency of its mooring").

The wharfboat in <u>Evansville</u> was "secured by cables to the mainland," was connected by "[l]ocal water, electricity, and telephone lines" to the shore, "evincing a 'permanent location,'" and "was neither 'taken from place to place' nor 'used to carry freight from one place to another.'"  <u>Stewart</u>, 543 U.S. at 493 (quoting <u>Evansville</u>, 271 U.S. at 22).  Similarly, defendant cites <u>Méndez v. Anadarko Petroleum Corp.</u>, 466 F. App'x 316 (5th Cir. 2012), which held that a spar which was permanently moored was not a vessel.  The court in <u>Méndez</u> pointed out that "[d]isconnecting the [spar in question] from the sea floor would make disconnecting" a casino boat's "electrical, water, telephone, and other hookups" from the shore—a process that would take "50 days and $42 million dollars"—"look as easy as unplugging a toaster."  466 F. App'x at 319; <u>see also</u> <u>Washington v. BP Am., Inc.</u>, No. 6:10 CV 1486, 2012 WL 5831800, at *4 (W.D. La. Nov. 16, 2012) (noting that it would cost around $400 million to relocate the watercraft in question, which was secured through an "underwater infrastructure of production lines").  Merely because an object receives utility lines from the shore does not necessitate that it falls outside of the definition of vessel.  No evidence has been presented in this case—undisputed or not—to the effect that the connections to the shore are anything near the magnitude of the aforementioned cases.  Although the drydock did not have standing electricity and had to rely on generators on the shore, the marine manager of SJT testified that they would only rent generators if they were needed.  (D.E. 81-1, at 76).  The connections to shore, when considered in total, must establish that the watercraft is "permanently affixed to shore."  <u>Stewart</u>, 543 U.S. at 493; <u>see also</u> <u>Sea Vill. Marina, LLC v. A 1980 Carlcraft Houseboat, Hull ID No. LMG37164M80d,</u>

Civ. No. 09-3292 (JBS-AMD), 2009 WL 3379923, at *7 (D.N.J. Oct. 19, 2009) ("While the ship-to-shore utilities connections can potentially cause a craft to be permanently moored, this depends on the nature of the connections.").  For example, the court in Smith v. Kanawha River Terminals LLC, 829 F. Supp. 2d 401, 406 (S.D.W. Va. 2011), determined that a transloader barge whose "operations were powered by electricity supplied via an onshore power cable" was a vessel.  In Bd. of Com'rs of Orleans Levee Dist. v. M/V Belle of Orleans, 535 F.3d 1299, 1307 (11th Cir. 2008), the Eleventh Circuit held a watercraft to be a vessel for purposes of establishing admiralty jurisdiction even though it "was moored to a dock by steel cables and ropes [and] received telephone and electric lines from land."  See also Delta November, LLC v. Baker, No. 10-10086-CIV, 2011 WL 4501118, at *2 (S.D. Fla. Aug. 23, 2011) (concluding that a watercraft "connected to shore-side power" was a vessel).  Furthermore, this line of analysis pertains to whether a watercraft remains *capable* of maritime transportation, not whether it was *actually used* for the same.  Here, it is already established that the drydock was used for maritime transportation—even if only in the form of short-distance movements—which is sufficient to meet the definition of vessel in 1 U.S.C. § 3.

The proposition that the Perseverance was a permanent attachment to shore is further controverted by the fact that it had been transported from the Gulf Area to San Juan less than five years earlier and was being prepared to be towed again.  Defendant argues that the standard set forth in Stewart distinguishes between an object which is "capable of doing the transporting" and one which is "capable of … being transported."  (D.E. 80, at 12).  There is no such distinction under Stewart.  "Often the thing being transported is not a shipment of goods or passengers but the superstructure itself, and the vessel need not have propulsion or steering—it need do little more than float, be seaworthy enough to be towed in the navigable waters, and have a

superstructure." Sea Vill. Marina, 2009 WL 3379923, at *3.   Even though its method of movement was by being "towed up and down the river at Two-J's facility to accommodate varying water levels," In re Two-J Ranch, Inc., Civ. No. 04-1891, 2007 WL 4898330, at *4 (W.D. La. Sept. 12, 2007), report and recommendation adopted in part, rejected in part, 534 F. Supp. 2d 671, the district court in Two-J Ranch nonetheless found that the drydock in question was a vessel, see 534 F. Supp. 2d at 680.  See also United States v. Templeton, 378 F.3d 845, 852 (8th Cir. 2004) (holding that a watercraft "was 'capable of use' as a vessel, albeit under tow," even though "it may have been inefficient or expensive to use [it] as a vessel"); Sea Vill. Marina, 2009 WL 3379923, at *2 ("Federal courts only rarely find that a floating watercraft capable of being towed has lost its status as a vessel."); The Alabama, 19 F. 544, 545 (S.D. Ala. 1884) (holding that a dredge which is "moved from place to place where [it] may be employed by being towed … is essentially in its nature a boat or vessel").   That a watercraft has no capability for self-propulsion does not exclude it from the definition of a vessel.  See Stewart, 543 U.S. at 490 (citing with approval The Alabama, 19 F. at 545 (noting that the dredge "ha[d] no means of propulsion of [its] own")); Holmes, 437 F.3d at 449 (concluding that "it was not the Super Scoop's limited means of self-propulsion that rendered it a vessel" in Stewart and holding a watercraft "totally incapable of self-propulsion" to be a vessel).   As such, the fact that the Perseverance required an external force to be moved—whether within the pier or across navigable waters—does not prevent a finding that the Perseverance was actually used for and was capable of transportation on water under 1 U.S.C. § 3.

Defendant points out that the Perseverance "had to be outfitted and prepared for the voyage" from the Gulf Area to San Juan.  (D.E. 80, at 12).   Some courts have held that transportation of a watercraft can be so costly and prolonged as to remove it from the definition

of a vessel.  See, e.g., Moore v. Bis Salamis, Inc., 748 F. Supp. 2d 598, 606 (E.D. Tex. 2010)

("[R]elocating the Thunder Horse would … be a monumental and protracted undertaking.  The

complex melange of drilling equipment descending from the platform to the ocean bottom would

have to be disconnected, and the massive mooring system would have to be removed."); Jordan

v. Shell Oil Co., Civ. No. G-06-265, 2007 WL 2220986, at *2 (S.D. Tex. Aug. 2, 2007) ("Any

contemplated movement of this monstrous facility would be a massive engineering feat requiring

up to two years of engineering and deconstruction.… This structure was extensively modified

when it arrived at its current location and would require extensive modification to engage in

maritime transportation again.").   In other words, the watercraft effectively has become a

permanent fixture of the shore or ocean floor and only theoretically capable of transportation.

The undisputed facts demonstrate that this is not the case here.  Although modifications of the

drydock were made after its arrival in San Juan, it is undisputed that SJT was making

arrangements to sell the drydock in Louisiana and prepare it for towing.  Payne on behalf of SJT

signed a "Good Faith Purchase and Sale Agreement" to sell the Perseverance to a Louisiana firm.

(D.E. 81-16, at 7, 11-12).  SJT "was in the process of working out the sale with [its] bank officer

from Banco Popular de Puerto Rico."  (D.E. 81-4, at *2).  "Welding repairs had been conducted

on the wing walls and on the main deck and repairs were being made to the forward rake in

preparation for towing."  Id. at *3.  The argument that the Perseverance was not practically

capable of being transported is belied by these arrangements conducted by defendant.

In Stewart, the Supreme Court acknowledged the "seeming incongruity" of grouping

unconventional watercraft such as a dredge—and, in this case, a drydock—with "more

traditional seafaring vessels."  543 U.S. at 497.  But "[t]he test for what counts as a vessel is a

liberal one ….”  Bishop v. Chet Morrison Contractors, L.L.C., Civ. No. 3-12-165, 2012 WL 3648412, at *2 (S.D. Tex. Aug. 23, 2012).  In the words of the Fifth Circuit:

> The exotic watercraft that have been deemed vessels and the heavy inquiry that surrounds each analysis of an unconventional craft's status has led even this court to recognize that the "three men in a tub would … fit within our definition [of a Jones Act seaman], and one probably could make a convincing case for Jonah inside the whale."

Holmes v. Atl. Sounding Co., Inc., 437 F.3d 441, 446 (5th Cir. 2006) (quoting Burks v. Am. River Transp. Co., 679 F.2d 69, 75 (5th Cir. 1982)).  The drydock in this case meets the definition of vessel set forth in Stewart.  Because the Perseverance was both actually used and capable of being used for transportation on water, it is considered a vessel for purposes of maritime law.[8]

## IV.  Conclusion

Based on the foregoing analysis, it is recommended that SJT's motion for partial summary judgment (D.E. 78) be **DENIED**.

**IT IS SO RECOMMENDED.**

The parties have fourteen (14) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); Local Rule 72(d); see also 28 U.S.C. § 636(b)(1); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 11th day of January, 2013.

s/Marcos E. López
U.S. Magistrate Judge

---

[8] Plaintiff argues that the Perseverance should be considered a vessel because defendant and its agents repeatedly stated that the drydock was a vessel.  But "[t]he nominal designation of the [watercraft] as a 'vessel' in various documents does not determine the legal question of [its] vessel status ….  Rather the controlling factor is whether the [watercraft] is practically capable of maritime transportation."  Rushing v. Pride Int'l, Inc., Civ. No. H-11-0294, 2011 WL 3021043, at *6 (S.D. Tex. July 22, 2011).