**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| CATLIN (Syndicate 2003) AT LLOYD'S, | |
| **Plaintiff,** | **CIVIL NO.** 11-2093 (FAB) |
| **v.** | Consolidated with |
| SAN JUAN TOWING & MARINE SERVICES, INC., | **Civil No.** 11-2116 (FAB) |
| **Defendant.** | |

**OPINION AND ORDER**

BESOSA, District Judge.

    Before the Court is the Report and Recommendation ("R&R"), (Docket No. 99), regarding defendant San Juan Towing & Marine Services, Inc. ("defendant SJT")'s motion for partial summary judgment, (Docket No. 78).  Having considered the magistrate judge's recommendations; defendant SJT's objections, (Docket No. 103); plaintiff Catlin (Syndicate 2003) at Lloyd ("plaintiff Catlin")'s response, (Docket No. 106); and <u>Lozman v. City of Riviera Beach</u>, 133 S. Ct. 735 (2013),[1] the Court **REJECTS** the recommendations contained in the magistrate judge's R&R, **GRANTS** defendant SJT's motion and **dismisses case number 11-2093 without prejudice.**

_____

    [1] <u>Lozman</u> was decided after the magistrate judge issued his Report and Recommendation.

BACKGROUND

I.   **Procedural History**

On November 8, 2011, plaintiff Catlin filed a complaint against defendant SJT, and SJT then filed a complaint against Catlin in a separate case on November 16, 2011. (Docket No. 1.)[2] Plaintiff Catlin's eight causes of action in Civil No. 11-2093, the lead case, are all admiralty or maritime claims, and jurisdiction rests under 28 U.S.C. §§ 1333 (admiralty) and 1332 (diversity). (See Docket No. 1 at pp. 1-2.)  In Civil No. 11-2116, the member case, jurisdiction rests solely on diversity, however, because the two claims in that case arise under the laws of the Commonwealth of Puerto Rico. (See Docket No. 50 at p. 2.)

The issue in the cases was whether the object of the insurance contract between the parties — a floating dry dock called the *Perseverence* — was a "vessel" for purposes of maritime law. (Docket No. 78.)  Defendant SJT argued that it is entitled to judgment as a matter of law because the floating dry dock does not constitute a vessel pursuant to section 1 U.S.C. § 3 ("section 3") for two alternate reasons. Id. at p. 1. First, case law decided before Stewart v. Dutra Constr. Co., 543 U.S. 481 (2005) indicates

_____

[2] The cases were consolidated on December 22, 2011.  All citations to docket entries, therefore, are to the consolidated case docket, Civil No. 11-2093 ("lead case").  Although SJT is the plaintiff and Catlin is the defendant in Civil No. 11-2116 ("member case"), for the sake of consistency and clarity, only the party designations of Civil No. 11-2093 shall be used throughout the Court's Opinion and Order.

that SJT's floating dry dock was not a vessel at the time of its
sinking because it sank "while moored to the pier." (Docket No. 80
at p. 2.)   Second, even in light of Stewart, the dry dock was not
a vessel at the time of its sinking because "it was not practically
capable of being used as a means of water transportation." Id. at
p. 3.   Plaintiff Catlin responded that the floating dry dock was a
vessel pursuant to section 3 because it had the physical attributes
of a vessel and was capable of transportation by water. (Docket
No. 82.)   Defendant SJT disputed those contentions in its reply,
(Docket No. 90), and the magistrate judge issued a R&R on
January 11, 2013. (Docket No. 99.)   Recommending that the Court
deny defendant SJT's motion, the magistrate judge found:  (1) that
Stewart determines the standard to be used to evaluate whether the
*Perseverence* is a "vessel" for purposes of admiralty jurisdiction;
and (2) that under Stewart's standard, the *Perseverence* meets the
definition of "vessel" because it was actually used and capable of
being used for transportation on water. Id.

On January 25, 2013, defendant SJT filed an objection to the
R&R, informing the Court of a recently decided Supreme Court case,
Lozman v. City of Riviera Beach, 133 S. Ct. 735 (2013), which
addressed the definition of a "vessel" pursuant to section 3.
(Docket No. 103.)   Arguing that Lozman narrows the interpretation
of the definition of "vessel" announced in Stewart, defendant SJT
claims that Lozman "changed the current state of the law" such that

the magistrate judge's findings, which necessarily did not rely on
Lozman, cannot stand. (Docket No. 103 at p. 2.)  Plaintiff Catlin
responded on February 8, 2013 by contending that Lozman "did
nothing more than reaffirm" the analysis in Stewart," and by
maintaining that the *Perseverence* "is essentially a barge, designed
to be towed[, and i]t was clearly capable of transporting cargo and
passengers by water . . . ."   (Docket No. 106 at p. 4.)
Essentially arguing that the law has not changed since Stewart,
plaintiff Catlin requests that the Court accept the magistrate
judge's findings in full.  Id. at p. 6.

## II.  Factual History

Defendant SJT purchased the *Perseverence*, a floating dry dock,
in 2006 from Formel Marine Services.  (Docket No. 79 at p. 1;
Docket No. 81 at p. 1.)   Mark Payne, defendant SJT's marine
manager, signed the purchase and sale agreement, which identified
the *Perseverence* as a vessel with Official Number 1070055, and the
subsequent Coast Guard Bill of Sale and Certificate of
Documentation, which also referred to the *Perseverence* as a vessel
with Official Number 1070055.  (Docket Nos. 79-1; 81-8.)   The
*Perseverence* arrived in San Juan, Puerto Rico on or around
January 1, 2007.  (Docket No. 79-2 at p. 1.)

The *Perseverence* consisted of a horizontal platform called a
pontoon, which measured 150 feet long, 70 feet wide, and 5 feet
tall.  (Docket No. 79-3 at p. 3.)   It had a superstructure — its

"wingwalls" — which consisted of two vertical elements 120 feet long, four feet wide, and sixteen feet tall. Id. at p. 2. The top of the port wingwall was fitted with one semi-sheltered steel control room. Id. at p. 3. The *Perseverence* had a raked bow and two tow pads to connect it to a towing vessel, (Docket No. 79-2 at p. 1; Docket No. 79-3 at pp. 1-2; Docket No. 81 at p. 1), and according to Payne, "[t]he drydock was specially outfitted and prepared for the voyage to San Juan." (Docket No. 79-2 at p. 1.) Upon arrival in San Juan, most of the *Perseverence*'s temporary modifications[3] required for navigation, except for the raked bow, were removed and were not replaced. (Docket No. 79-2 at pp. 1-2.) Additional modifications of the dry dock were then made, including the "installation of two steel gangways, shore power cable, a pneumatic manifold and an electrical distribution panel." Id. at p. 2.

The *Perseverence* was secured and attached to the southwestern end of the outfitting pier 15 in Miramar, a location that was adjacent to an apron designated by the Puerto Rico Ports Authority ("Ports Authority") for rental to defendant SJT. (Docket No. 79-2

---

[3] The temporary modifications included: wire towing bridle; towing chains; emergency retrieving line; emergency drag float; emergency tow wire; all emergency tow wire attachment clips; towing day shape; plastic enclosure of control area; navigation lights; the [six] braces on each wing wall; all of the sealant on all of the manholes; emergency diesel pump; equipment welded on deck; and the welding of shore side electrical ground wire to the side of the wing wall and its attachment to the pier." (Docket No. 79-2 at pp. 1-2.)

at p. 2.)   The area occupied by defendant SJT contained mooring
lines, support equipment and machinery, grounding connection,
electricity, and compressed air.  (Docket No. 79-2 at p. 2.)   At
the pier, the *Perseverence* received electrical power from
generators located on shore that fed 600 amps of 480 volts to the
dry dock when needed.   Id.   A shoreside pneumatic line fed
compressed air to the dry dock, and the wing wall was connected
directly to a grounding lug on the pier with a three-quarter-inch
grounding wire.   Id.   At least one gangway — chained both to the
dry dock and the pier — provided access to the *Perseverence*, which
was tied to the dock with more than ten three-inch-diameter mooring
lines and numerous spring lines.   Id.

The *Perseverence* was designed, constructed, and used to
provide marine maintenance and repair services to vessels.  (Docket
No. 79-2 at p. 3; Docket No. 81 at p. 5.)  "Its intended use [was]
to lift floating equipment for inspection and repair."  (Docket
No. 79-7 at p. 2.)  According to Mr. Payne, the *Perseverence* was
not designed or constructed to transport cargo or passengers.
(Docket No. 79-2 at p. 3.)   At the time that it sank, the
*Perseverence* was insured as a "port risk" and had been non-
operational for almost a year. (Docket No. 79-5 at p. 2.)  Between
the time it arrived in 2007 and when it sank in 2011, the dry dock
was occasionally moved ten or fifteen feet within its assigned area
at the pier.  The movement done for the purpose of returning the

dry dock back to its original position after raising and repairing a vessel, (Docket No. 79-6 at pp. 2–3), and was accomplished by the use of ropes pulled by either harbor workers or a pickup truck. (Docket No. 79.)

On or around September 4, 2011, defendant SJT agreed to sell the *Perseverence* to Leevac Shipyards, LLC, a Louisiana-based company, and on September 19, 2011 Mr. Payne, on behalf of defendant SJT, signed a purchase and sale agreement. (Docket No. 81-16 at p. 7.) When the *Perseverence* sank on or around September 29, 2011, the dry dock was operational; "[w]elding repairs had been conducted on the wing walls and on the main deck and repairs were being made to the forward rake in preparation for towing." (Docket No. 81-4 at p. 3.)

## DISCUSSION

### I.   STANDARDS

#### A.   28 U.S.C. § 636(b)(1)

A district court may refer, *inter alia*, [a] "motion [] for summary judgment" to a magistrate judge for a report and recommendation. Loc. Rule 72(a)(9); <u>see</u> 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b). Any party adversely affected by the report and recommendation may file written objections within fourteen days of being served with the magistrate judge's report. <u>See</u> 28 U.S.C. § 636(b)(1)(C); Loc. Rule 72(d). A party that files a timely objection is entitled to a *de novo* determination of "those portions

of the report or specified proposed findings or recommendations to which specific objection is made." Sylva v. Culebra Dive Shop, 389 F.Supp.2d 189, 191 (D.P.R. 2005) (citing United States v. Raddatz, 447 U.S. 667, 673 (1980)). Failure to comply with this rule precludes further review. See Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992) ("Failure to raise objections to the Report and Recommendation waives the party's right to review in the district court . . . ."). In conducting its review, the court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 33-34 (1st Cir. 2008). Furthermore, a court may accept those parts of a report and recommendation to which the parties do not object. See Hernandez-Mejias v. Gen. Elec., 428 F.Supp.2d 4, 6 (D.P.R. 2005) (citing Lacedra v. Donald W. Wyatt Det. Facility, 334 F.Supp.2d 114, 126 (D.R.I. 2004)).

**B.    Federal Rule of Civil Procedure 56 Standard and Local Rule 56**

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); Loc. Rule 56. In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material" means that a contested fact has

the potential to "affect the outcome of the suit under the governing law." Id. The dispute is "genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence. See id. The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The party must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion. Id.

Once a properly supported motion has been presented, the burden shifts to the non-moving party "to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 252. It is therefore necessary that "a party opposing summary judgment must 'present definite, competent evidence to rebut the motion.'" Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994) (internal citation omitted).

In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that

party's favor." <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).    The   Court   does   not,   however,   "make   credibility determinations   or   weigh   the   evidence."   <u>Talavera-Ibarrondo v. Municipality of San Sebastian</u>, No. 09-1942, 2011 U.S. Dist. LEXIS 63929,  at  *9  (D.P.R.  June  16,  2011)  (citing  <u>Anderson</u>,  477  U.S. at  255).    The  Court  may  safely  ignore,  however,  "conclusory allegations,  improbable  inferences,  and  unsupported  speculation." <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

          The  First  Circuit  Court  of  Appeals  has  "repeatedly . . . emphasized  the  importance  of  local  rules  similar  to  Local  Rule  56 [of  the  District  of  Puerto  Rico]."   <u>Hernandez v. Phillip Morris USA, Inc.</u>, 486 F.3d 1, 7 (1st Cir. 2007).   Rules  such  as  Local Rule  56  "are  designed  to  function  as  a  means  of  'focusing  a district  court's  attention  on  what  is — and  what  is  not — genuinely controverted.'"  <u>Id.</u> (quoting <u>Calvi v. Knox County</u>, 470 F.3d 422, 427 (1st Cir. 2006)).   Local  Rule  56  imposes  guidelines  for  both the  movant  and  the  party  opposing  summary  judgment.   A  party  moving for  summary  judgment  must  submit  factual  assertions  in  "a  separate, short,  and  concise  statement  of  material  facts,  set  forth  in numbered  paragraphs."  Loc. Rule 56(b).   A  party  opposing  a  motion for  summary  judgment  must  "admit,  deny,  or  qualify  the  facts supporting  the  motion  for  summary  judgment  by  reference  to  each numbered  paragraph  of  the  moving  party's  statement  of  facts."  Loc.

Rule 56(c).  Facts which are properly supported "shall be deemed admitted unless properly controverted."  Loc. Rule 56(e); <u>P.R. Am. Ins. Co. v. Rivera-Vazquez</u>, 603 F.3d 125, 130 (1st Cir. 2010).  Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril."  <u>Hernandez</u>, 486 F.3d at 7.

## II.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In its motion for partial summary judgment, defendant SJT argues that the Supreme Court's opinion in <u>Stewart</u> does not provide the accurate standard by which to evaluate the *Perseverence's* vessel status; rather, it would have the Court believe that the case law *prior* to <u>Stewart</u> governs whether the *Perseverence* is a vessel.  (Docket No. 80.)  In the alternative, defendant SJT contends that even under a <u>Stewart</u> analysis, the *Perseverence* is not a vessel because it was practically incapable of being used as a means of water transportation.  <u>Id.</u>  The magistrate judge addressed and rejected defendant SJT's arguments in the R&R, basing his decision on case precedent available to him.  (Docket No. 99.)  Because the Supreme Court issued <u>Lozman</u> after the R&R was issued, however, the Court embarks on an analysis of defendant SJT's and plaintiff Catlin's arguments under a new legal lens.

### A.  Jurisprudence Defining "Vessel" Pursuant to Section 3

As a preliminary matter, the Court agrees with the magistrate judge that <u>Stewart</u> is not limited to cases involving the

Jones Act or the LHWCA.[4]   In light of the Supreme Court's
discussion in Lozman, however, it is clear that Stewart provides
only a glimpse into the standard to be used in determining a
"vessel" pursuant to section 3.   The Supreme Court's decision in
Lozman sheds new light on the concept of a vessel under federal

_____

     [4] In response to defendant's argument that Stewart does not
provide the accurate standard by which to evaluate the dry dock in
this case, the magistrate judge engaged in a lengthy discussion as
to the proper definition of "vessel" pursuant to section 3.   (See
Docket No. 99 at pp. 6-12.)   Surveying extensive case law, the
magistrate judge disagreed with defendant SJT that Stewart only
applies to cases implicating the Jones Act or the Longshoremen and
Harbor Workers Compensation Act ("LHWCA"), and concluded that
Stewart determines the standard used to examine whether the
Perseverence is a vessel for purposes of admiralty jurisdiction.
Id. at p. 12.

     Courts have consistently applied Stewart to cases that did not
arise under the Jones Act or the LHWCA in order to determine
"vessel status" for the purpose of invoking federal admiralty
jurisdiction.   See, e.g., Silver Slipper Casino Venture, 264 F.
App'x. 363 (5th Cir. 2008) (applying Stewart to determine whether
a casino constituted a vessel for purposes of admiralty
jurisdiction); De La Rosa v. St. Charles Gaming Co., 474 F.3d 185
(5th Cir. 2006) (applying Stewart to interpret the definition of
"vessel" for the purposes of general maritime law and admiralty
jurisdiction); Tagliere v. Harrah's Ill. Corp., 445 F.3d 1012 (7th
Cir. 2006) (applying Stewart in concluding that an indefinitely
moored riverboat was a vessel, thus establishing admiralty
jurisdiction).   Indeed, the Supreme Court's recent opinion in
Lozman further supports the proposition that Stewart extends to
admiralty cases beyond those involving the Jones Act and LHWCA.
See 133 S. Ct. 735 (applying Stewart to interpret whether a
floating houseboat constituted a "vessel" pursuant to section 3 in
determining whether admiralty jurisdiction existed for a Federal
Maritime Lien Act claim).   The Court, therefore, rejects defendant
SJT's contention that Stewart is limited to cases under the Jones
Act or the LHWCA.   As discussed below, however, the Supreme Court's
decision in Lozman expands upon Stewart and the concept of a
"vessel," warranting a new analysis of the Perseverence's vessel
status.

Civil No. 11-2093 & 11-2116 (FAB)                                    13

maritime law and, therefore, warrants new consideration of the
*Perseverence's* status and the magistrate judge's findings.  A brief
review of the evolution of case law, originating before Stewart and
progressing through Lozman, sets the historical backdrop against
which the Court must address the *Perseverence's* vessel status.

> **1.    Pre-Stewart Precedent & The Supreme Court's Stewart Opinion**

The Supreme Court first addressed whether a dry dock
constitutes a vessel in Cope v. Vallete Dry-Dock Co., 119 U.S. 625
(1887).  It reasoned that "a fixed structure, such as this dry-dock
is, not used for the purpose of navigation, is not a subject of
salvage service, any more than is a wharf or a warehouse when
projecting into or upon the water.  The fact that it floats on the
water does not make it a ship or vessel . . . ."  Cope, 119 U.S.
at 627.  Rather, "'vessels' are used in a very broad sense, to
include all navigable structures intended for transportation."  Id.
at 629.  The Court reasoned, rather broadly, that "no case can be
found which would construe the term[] ["vessel"] to include a dry-
dock . . . permanently moored or attached to a wharf."  Id. at 630.

In the wake of Cope, lower courts generally excluded
dry docks from the definition of vessel.  See, e.g., Royal Ins. Co.
of Am. v. Pier 39 Ltd. P'ship., 738 F.2d 1035, 1037 (9th Cir. 1984)
("Although some cases hold that a floating dry dock becomes a
vessel when it is in transit from one place of employment to
another, the general rule is that stationary floating dry docks are

not vessels.") (internal citations omitted); In re Two-J Ranch, Inc., 534 F. Supp. 2d 671 (W.D. La. 2008) ("Prior to Stewart, the Fifth Circuit . . . clearly embraced the proposition that, as a matter of law, a floating dry dock is not a vessel when it is moored and in use as a dry dock."); Cook v. Belden Concrete Prods., Inc., 472 F.2d 999, 1000 (5th Cir. 1973) ("Since Cope, . . . it has been clear that a floating drydock is not a 'vessel' . . . .") (internal citations omitted); De Martino v. Bethlehem Steel Co., 164 F.2d 177, 179 (4th Cir. 1947) (citing Cope for the proposition that "a floating dock[] can hardly be considered a vessel").   In 2005, when the Supreme Court decided Stewart, however, it seemingly confined its holding in Cope and proffered a broader understanding of the meaning of "vessel" pursuant to section 3.

In Stewart, the Supreme Court considered whether a dredge, a massive floating platform used during Boston's Big Dig and from which a clamshell bucket excavated silt from the ocean floor onto adjacent scows, constituted a vessel under federal maritime law.   543 U.S. at 484.   The dredge had "certain characteristics common to seagoing vessels, such as a captain and a crew, navigational lights, ballast tanks, and a crew dining area," but it also had limited means of self-propulsion, moved "long distances" only by tugboat, and navigated "short distances" of thirty to fifty feet every couple of hours by manipulating its anchors and cables.   Id. at 484–85.   To address an argument that

prior to Stewart the Supreme Court had adopted a definition of
vessel narrower than that of section 3's text, the Supreme Court
reflected upon its holding in Cope.

       The dry dock in Cope, which had been moored and
stationary for twenty years, was "neither taken from place to place
nor used to carry freight from one place to another." Lozman, 133
S. Ct. at 493 (citing Cope, 119 U.S. at 627). The Supreme Court
distinguished the dry dock as "a fixed structure that had been
permanently moored, rather than a vessel that had been temporarily
anchored," id. (internal quotations omitted), and indicated that
Cope's holding —that the dry dock was not a vessel— "did no more
than construe [section] 3 in light of the distinction drawn by the
general maritime law between watercraft temporarily stationed in a
particular location and those permanently affixed to shore or
resting on the ocean floor." Id. at 493–94. The Supreme Court
also warned that a watercraft's use as a means of water
transportation must be a practical, not merely a theoretical,
possibility, id. at 496, and declared that "[s]imply put, a
watercraft is not 'capable of being used' for maritime transport in
any meaningful sense if it has been permanently moored or otherwise
rendered practically incapable of transportation or movement." Id.
at 494. Accordingly, and contrary to the dry dock in Cope, the
dredge in Stewart constituted a vessel because it was only
temporarily stationary and had not been taken out of service,

permanently anchored, or otherwise rendered practically incapable
of maritime transport.  Id. at 497.

      **2.**    **Post-Stewart & The Supreme Court's Lozman Opinion**

           Lower courts interpreted the Supreme Court's ruling
in Stewart to have broadened the spectrum of section 3 "vessels" to
include a variety of unconventional watercraft.  See, e.g., Holmes
v. Atl. Sounding Co., 437 F.3d 441, 448 (5th Cir. 2006) ("As long
as a water-borne structure is practically capable of being used for
transportation on navigable waters, it is a 'vessel.'"); In re Two-
J Ranch, Inc., 534 F. Supp. 2d 671, 678-79 (W.D. La. 2008) (finding
that, "[c]onsistent with Stewart's expanded definition of that term
'vessel,' a floating barge was a vessel).  In its recent Lozman
opinion, however, the Supreme Court "has sent a shot across the bow
of those lower courts that have 'endorsed the 'anything that
floats' approach' to defining vessels."  Fireman's Fund Ins. Co. v.
Great Am. Ins. Co. of N.Y., 2013 U.S. Dist. LEXIS 11114 (S.D.N.Y.
2013).

           Tasked with determining whether a floating home fell
within the ambit of section 3, the Supreme Court in Lozman reviewed
an Eleventh Circuit Court of Appeals holding that a houseboat was
a vessel because it "was practically capable of transportation over
water by means of a tow, despite having no motive or steering power
of its own."  City of Riviera Beach v. Unnamed Gray, 649 F.3d 1259,
1269 (11th Cir. 2011).  Recognizing that the Eleventh Circuit's

interpretation of the section 3 term "capable" (of being used as a means of transportation) was too broad, the Court remarked:

> Not *every* floating structure is a 'vessel.'  To state the obvious, a wooden washtub, a plastic dishpan, a swimming platform on pontoons, a large fishing net, a door taken off its hinges, or Pinocchio (when inside the whale) are not 'vessels,' even if they are 'artificial contrivances' capable of floating, moving under tow, and incidentally carrying even a fair-sized item or two when they do so.

Lozman, 133 S. Ct. at 740.

Lozman indicates that a floating structure is not necessarily a vessel merely because it has a literal capability of transporting persons or things on water.  Instead, the central question becomes whether a "reasonable observer, looking to the [structure]'s physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water."[5]  Lozman, 133 S. Ct. at 741.  Reiterating its reasoning in Stewart, the Supreme Court explained that it must

---

[5] In enunciating the "reasonable observer test," the Supreme Court upheld its reasoning in Stewart that a watercraft may qualify as a vessel even if it is not primarily used for transportation purposes; or if it is not in motion at the time in question; or if it is attached — albeit temporarily – to land.  See Lozman, 133 S. Ct. at 742.  It explained that the dredge in Stewart was a vessel *in spite* of these characteristics, not *because of* them.  Fireman's Fund Ins. Co., 2013 U.S. Dist. LEXIS 11114; Lozman, 133 S. Ct. at 742 ("[Stewart] say[s] [and] . . . mean[s] that the statutory definition *may* (or may not) apply — not that it *automatically must* apply – where a structure has some other *primary* purpose, where it is stationary at relevant times, and where it is attached – but not permanently attached — to land.") (emphasis in original).  Similarly, the Supreme Court indicated that the lack of a watercraft's ability to self-propel, while not dispositive, "may be a relevant characteristic" to determine if one of its purposes is transportation.  Id. at 741.

apply the capable-of-transporting-persons-or-things-from-one-place-to-another definition "in a practical, not a theoretical, way." Id. at 741 (internal quotations omitted).  It also indicated that no universal set of sufficient conditions exists for a structure to meet the definition of "vessel."    Id. at 742.    The mere considerations, for example, that a structure can float; can proceed under tow; or has shore connections (power cable, water hose, rope lines) that do not render it practically incapable of transportation or movement, are not sufficient in and of themselves.  Lozman, 133 S. Ct. at 740.  Moreover, certain characteristics — while not dispositive — may indeed be relevant to the reasonable observer test — like the fact that a watercraft has a primary purpose other than transportation or that it lacks the ability to self-propel.  Id. at 741.

        Citing extensive legal authority, the Lozman Court provided insight into the meaning of section 3's "capable of being used[] as a means of transportation on water" language.  It pointed out that "the bulk of precedent supports our conclusion," Lozman, 133 S. Ct. at 742, and that "lower court cases also tend, on balance, to support our conclusion."  Id. at 743.  It discussed and compared its holdings in Stewart and Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U.S. 19 (1926) more in depth, identifying a "basic difference" between the structures in those cases that ultimately led to the opposite findings:   The

dredge in Stewart, the Supreme Court reasoned, "was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water, while the wharfboat [in Evansville] was not designed (to any practical degree) to serve a transportation function and did not do so." Id. at 743. As support for that distinction, the Supreme Court cited Cope both as a case "describing [a] 'hopper-barge' as potentially a 'vessel' because it is a 'navigable structure, used for the purpose of transportation," and as a case illustrating that a "floating drydock [was] not a 'vessel' because [it was] permanently fixed to wharf." Id. To bolster its conclusion that to be a vessel, a structure must contain features objectively indicating a transportation function, the Supreme Court also relied on various additional authority: Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 535 (1995) ("A barge [that is] sometimes attached to river bottom to use as a work platform remains a 'vessel' when 'at other times it was used for transportation.'"); Great Lakes Dredge & Dock Co. v. Chicago, 3 F.3d 225, 229 (7th Cir. 1993) ("[A] craft is a vessel if its purpose is to some reasonable degree 'the transportation of passengers, cargo, or equipment from place to place across navigable waters.'"); 1 Benedict on Admiralty § 164, p. 10-6 (7th rev. ed. 2012) ("[M]aritime jurisdiction [is] proper if 'the craft is a navigable structure intended for maritime transportation.'").

_Lozman_, 133 S. Ct. at 743.  Ultimately, however, the _Lozman_ Court
rejected opinions that endorsed the "anything that floats" approach
as "inappropriate and inconsistent with our precedents."   _Id._
at 740, 743.

          The Supreme Court indicated that its reasonable
observer test is to be determined on a case-by-case basis and
acknowledged the test's limitations.  _See_ _Lozman_, 133 S. Ct. at 745
("[O]ur approach is neither perfectly precise nor always
determinative . . . .").  It recognized that "borderline cases will
always exist," but stood by the test as one that "should offer
guidance in a significant number of borderline cases where
'capacity' to transport over water is in doubt."   _Id._

**B.   The Reasonable Observer Test and Defendant SJT's Dry Dock**

          After determining that _Stewart_ provided the applicable
standard for interpreting section 3, the magistrate judge analyzed
the _Perseverence's_ vessel status.  Ultimately he concluded that
"the _Perseverence's_ capability of moving up and down the wharf
constitutes practical capability of transportation under _Stewart_"
because _Stewart_ contained no minimum requirement or threshold for
capability of movement; did not distinguish between the terms
"transportation" and "movement"; and made no distinction between
voyages over great distances and movements of ten or fifteen feet.
(Docket No. 99 at p. 14); _id._ at p. 17 ("[T]he drydock was used for
maritime transportation — even if only in the form of short-

distance movements — which is sufficient to meet the definition of vessel in 1 U.S.C. § 3.").   While such reasoning may have been sound in a pre-<u>Lozman</u> context, the magistrate judge's conclusion cannot stand in light of <u>Lozman</u>, which later addressed each concept.[6]   With the <u>Lozman</u> opinion and historical evolution of section 3 interpretations in mind, the Court turns to the issue of whether the *Perseverence* constitutes a vessel for purposes of federal admiralty jurisdiction.

The parties' statements of uncontested facts do not lead to the conclusion that defendant SJT's dry dock was designed to any practical degree to transport persons or things over water.   Both parties admit that the *Perseverence* was designed, constructed and used to provide marine maintenance and repair services.[7]   (Docket

---

[6] First, the Supreme Court enunciated the reasonable observer test, which requires a structure to be designed to a practical degree "for carrying people or things on water."   <u>Lozman</u>, 133 S. Ct. at 739.   Second, the Supreme Court distinguished "transportation" from "movement" by defining the word "transportation" as the conveyance of things or persons from one place to another, and illuminating that the definition be applied in a "practical, not a theoretical way." <u>Lozman</u>, 133 S. Ct. at 741 (internal quotations and citation omitted).   Third, the Supreme Court regarded as insufficient even movement over significant distances that occurred infrequently, only under tow, and without carrying passengers or cargo.   <u>Id.</u> at 746.

[7] The Supreme Court indicated the impropriety of considering the subjective intent of a structure's owner in a court's review. <u>Lozman</u>, 133 S. Ct. at 744.   It clarified that the reasonable observer test permits "consideration only of objective evidence of a waterborne transportation purpose . . . [by] look[ing] to the physical attributes and behavior of a structure, as objective manifestations of any relevant purpose, and not to the subjective intent of the owner."   <u>Id.</u> at 744-45.

No. 79 at p. 4; Docket No. 81 at p. 5.)  An independent marine surveyor from Merrill Marine Services, Inc. determined the *Perseverence's* "primary function" to be "the dry-docking of boats for repair and refurbishment." (Docket No. 79-3 at p. 3.)  Another marine surveyor, from Marine Consultants, Inc., indicated that "[i]ts intended use [was] to lift floating equipment for inspection and repair." (Docket No. 79-7 at p. 2.)  None of those enumerated designs — lifting, dry-docking, repairing, or refurbishing — even arguably involves transportation, and indeed Mr. Payne confirmed that the dry dock was not designed or constructed to transport cargo or passengers.  (Docket No. 79-2 at p. 3.)  There is nothing in the record, therefore, that the *Perseverence* was designed to any practical degree to convey things or persons from one place to another.  The Supreme Court clarified that a structure may classify as a vessel as long as it has *some* transportation purpose, whether primary or not; if it has *no* transportation function whatsoever, however, then the structure does not fall within section 3's vessel classification.  See <u>Lozman</u>, 133 S. Ct. at 742-43.  Because the Court does not find that the *Perseverence* was designed to any practical degree to transport or carry persons or things over water, it cannot conclude that the *Perseverence* is a vessel according to admiralty law.

        Regardless of the parties' agreement as to the purpose of the *Perseverence's* design, an independent analysis of the dry

dock's physical attributes would not lead a reasonable observer to conclude that the *Perseverence* was designed to any practical degree to transport persons or things over water.  The *Perseverence* lacked the ability to propel itself over water because it required an external force to be moved from Louisiana to Puerto Rico and even to move ten to fifteen feet up and down the Miramar pier.  (Docket Nos. 79; 79-2; 79-3; 79-6; 81); accord Lozman, 133 S. Ct. at 741 (citing the fact that the floating structure "was able to travel over water only by being towed" as relevant evidence that the structure was not "designed by any practical degree to transport persons or things over water").  Nothing demonstrates that the dry dock was equipped with any type of steering mechanism, and indeed neither of Merrill Marine Services, Inc.'s trip & tow surveys, which describe in detail the *Perseverence's* attributes, list those parts.  (See Docket Nos. 79-2; 79-3; 79-7); accord id. (citing as additional evidence that the floating structure "had no rudder or other steering mechanism").  The temporary modifications that were required for navigation during its tow from Louisiana to Puerto Rico, including its navigational lights, had been removed in January 2007 upon *Perseverence's* arrival in Puerto Rico, and the *Perseverence* appears to have lacked any other equipment allowing it to be used for transporting passengers or cargo.  (Docket Nos. 79; 79-2; 79-3; 81); accord Lozman, (noting that whether a structure is "designed to any practical degree" for transportation is relevant

to the inquiry). Furthermore, the *Perseverence's* physical attributes while secured to pier 15 in Miramar do not demonstrate that it was designed for transportation. The *Perseverence* was tied to the pier with more than ten three-inch-diameter mooring lines and numerous spring lines to keep it in place; at least one gangway — which was chained both to the *Perseverence* and the pier — provided access to the dry dock; and the *Perseverence* was only able to receive electricity from power generators and compressed air from a pneumatic line, both of which were located on shore. (Docket No. 79-2); accord Lozman, 133 S. Ct. at 741 (considering as probative evidence that the floating home "had no special capacity to generate or store electricity but could obtain that utility only through ongoing connections with the land").

Admittedly, the *Perseverence* is not devoid of *all* attributes of a vessel. The dry dock, for example, floated, (Docket No. 79 at p. 5; Docket No. 81 at p. 6); contained a raked bow and tow pads to facilitate transit via towing, (Docket No. 79-3 at pp. 1–2; Docket No. 79-2 at 1); was equipped with mooring devices, bollards, and cleats for securing it to the shore or to other vessels, (Docket No. 79-3 at p. 2–5); and had been towed across the ocean from Louisiana to Puerto Rico, (Docket No. 79-2 at p. 1). See Stewart, 543 U.S. at 484 (regarding as probative that the dredge was "moved long distances by tugboat"); see also Holmes v. Atl. Sounding Co., 437 F.3d 441, 449 (5th Cir. 2006) (abrogated

on other grounds, Lozman, 133 S. Ct. at 743) (finding as "objective
characteristics of a vessel" a raked bow; two end tanks where the
rakes are located for flotation; traditional mooring devices, bits
or bollards or cleats; and anchors and land lines used for
mooring).  While arguably sufficient in a pre-Lozman landscape,
however, this evidence falls short of proving that the *Perseverence*
is a vessel in today's post-Lozman world because it does not
indicate that the dry dock was practically designed — or, as
discussed below, regularly or actually used — for transporting
cargo or passengers.  See Fireman's Fund Ins. Co., 2013 U.S. Dist.
LEXIS 11114.

        It cannot be said that the *Perseverence* was regularly or
actually used to transport persons or goods over water.  See
Lozman, 133 S. Ct. at 743 (drawing distinction between a structure
"regularly" used to transport workers or equipment over water, and
one that was not designed to any practical degree to serve a
transportation function "and did not do so"); id. at 745–46
(explaining that section 3 also includes as a "vessel" a structure
that "actually" was used for transportation).  To argue that the
*Perseverence* was capable of, and was actually used for,
transportation, plaintiff Catlin points to the fact that at the
time of its sinking, the *Perseverence* was being prepared for
another open ocean voyage back to Louisiana; that it was not
permanently affixed to the shore; that it could be towed "as and

when needed;" that it did indeed occasionally move ten to fifteen
feet up and down the Miramar pier; and that the docking agreement
defendant SJT signed with the Ports Authority required defendant
SJT to move the *Perseverence* "anywhere in the harbor" where the
Port Authority directed.  (Docket No. 106 at pp. 2–7.)  A common
sense evaluation of the regular and actual uses of the *Perseverence*
in the wharf, however, belies plaintiff Catlin's assertion.

        Between the time it arrived in San Juan in January 2007
and the time it sank in September 2011, the *Perseverence* remained
virtually stationary at a single location — at the southwestern end
of the outfitting pier 15 in Miramar.  (Docket No. 79-2 at p. 1.)
Mr. Payne testified that occasionally "a couple of guys pull [the
*Perseverence*], very slowly, and it moves, or we use a pickup truck"
to shift the dry dock along pier 15.  (Docket No. 79-6 at pp. 2–3.)
He explained, however, that the ten-to-fifteen-foot movement
occurred not for the purpose of transporting a vessel or any other
person or thing on the *Perseverence*, but instead for the purpose of
returning the dry dock to its original position on the pier after
working on a vessel.  Id. at pp. 2–3 ("[W]hen we were sinking the
dry dock to raise the vessel, [the dry dock] goes down.  And when
it comes up, it comes up ten or fifteen feet down the wharf, and
then we move it back . . . .").  Those movements, which were brief,
infrequent, of short distances, and made solely for the purpose of
returning the dry dock to its original position after raising a

vessel for repair, therefore, constitute neither the type nor the amount of transportation sufficient for vessel status under Lozman. See 133 S. Ct. at 742 (citing its holding in Evansville that a wharfboat was not a vessel because "despite the annual movement under tow, the wharfboat was not used to carry freight from one place to another, nor did it encounter perils of navigation to which craft used for transportation are exposed").  Furthermore, the Court is unpersuaded that the *Perseverence* was actually used for transportation in 2007 when, carrying equipment welded to the deck, the dry dock made the thousand-mile trip from Louisiana to Puerto Rico towed by a tugboat.  While the *Perseverence* did traverse the ocean from Louisiana to Puerto Rico, it did so transporting nothing but its own equipment.  Thus, although the *Perseverence* moved by tow once over a large distance and occasionally over distances of approximately ten to fifteen feet, it did not do so regularly or for the purpose of "carrying people or things on water."  Instead, the facts establish nothing more than the *Perseverence* as an artificial contrivance "capable of floating, moving under tow, and incidentally carrying . . . a fair-sized item or two when [it] do[es] so."  See Lozman, 133 S. Ct. at 740.

        The Court agrees with defendant SJT that the *Perseverence* lacked any waterborne transportation purpose, (Docket No. 103 at p. 10); the dry dock was not designed to transport cargo or

passengers over water and was not regularly used to do so, (id. at p. 11); the occasional movement of the dry dock ten to fifteen feet within the Miramar pier does not constitute "transportation" pursuant to Lozman, (id. at pp. 9-10); the dry dock's physical characteristics do not demonstrate that it was designed to any practical degree to transport persons or things over water, (id. at pp. 13-14); and the dry dock was not actually used for water transportation, (id. at pp. 16-17). Applying the standard outlined in Lozman, the Court cannot say that a "reasonable observer, looking to [the *Perseverence's*] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." See Lozman, 133 S. Ct. at 741. The *Perseverence*, therefore, does not qualify as a vessel pursuant to section 3.

## CONCLUSION

Because a reasonable observer, looking to the *Perseverence's* physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water, the dry dock does not constitute a "vessel" under section 3. See Lozman, 133 S. Ct. at 741. Accordingly, the Court lacks jurisdiction over this matter, **GRANTS** defendant SJT's motion for partial summary judgment (Docket No. 78), and **dismisses case number 11-2093 without prejudice.**

Judgment shall be entered accordingly.

Case number 11-2116 survives.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 8, 2013.

                                   s/ Francisco A. Besosa
                                   FRANCISCO A. BESOSA
                                   United States District Judge