**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

|  |  |
|---|---|
| CATLIN (Syndicate 2003) AT LLOYD'S, | |
| **Plaintiff,** | **Civil No.** 11-2093 (FAB) |
| **v.** | Consolidated with |
| SAN JUAN TOWING & MARINE SERVICES, INC., | **Civil No.** 11-2116 (FAB) |
| **Defendant.** | |

**MEMORANDUM AND ORDER**

BESOSA, District Judge.

Before the Court is plaintiff Catlin (Syndicate 2003) at Lloyd's ("plaintiff Catlin")'s motion for reconsideration.  Having considered plaintiff Catlin's motion and memorandum of law (Docket Nos. 114 & 115), as well as defendant San Juan Towing & Marine Services, Inc.'s opposition (Docket No. 118), the Court finds that it enjoys both diversity and admiralty jurisdiction over the complaint.

**I.  PROCEDURAL BACKGROUND**

On September 21, 2012, defendant SJT filed a motion for partial summary judgment, arguing that the object of the insurance contract between the parties — a floating drydock called the *Perseverence* — is not a "vessel" for purposes of maritime law. (See Docket Nos. 78 & 80.)  Plaintiff Catlin responded on October 23, 2012, opposing summary judgment for the sole reason that the *Perseverence* does constitute a vessel.  (Docket No. 82.)

Defendant SJT replied on November 7, 2012, maintaining that the *Perseverence* is not a vessel pursuant to the controlling Supreme Court decisions of <u>Cope v. Vallette Dry Dock Co.</u>, 119 U.S. 625 (1887) and <u>Stewart v. Dutra Constr. Co.</u>, 543 U.S. 481 (2005). (Docket No. 90.)  On January 11, 2013, Magistrate Judge Marcos E. Lopez issued a Report and Recommendation ("R&R") in which he analyzed the *Perseverence* under then-existing Supreme Court precedent; concluded that the *Perseverence* constituted a vessel; and recommended that the Court deny defendant SJT's motion. (Docket No. 99.)

Defendant SJT filed an objection to the R&R on January 25, 2013 and argued that the magistrate judge's conclusions could not stand in light of a recently decided Supreme Court case, <u>Lozman v. City of Riviera Beach</u>, 133 S. Ct. 735 (2013), which addressed the definition of a "vessel" pursuant to maritime law.  (Docket No. 103.)  Plaintiff Catlin responded on February 8, 2013 by contending that <u>Lozman</u> did not change the legal analysis required to determine whether the *Perseverence* is a vessel, and that the Court should accept the magistrate judge's findings in full.  (Docket No. 106.)  On April 8, 2013, the Court issued an opinion and order holding that the *Perseverence* is not a vessel under <u>Lozman</u>; finding that the Court lacked admiralty jurisdiction over Case No. 11-2093; and, therefore, granting defendant SJT's motion for summary judgment. (Docket No. 112.)  <u>Catlin (Syndicate 2003) at Lloyd's v. San Juan</u>

Towing and Mar. Servs. Inc., 2013 U.S.Dist. LEXIS 52307 (D.P.R.) 2013)  Subsequently, it also entered a judgment dismissing Case No. 11-2093 without prejudice for want of admiralty jurisdiction. (Docket No. 113.)

On April 16, 2013, plaintiff Catlin filed a motion for reconsideration of the Court's opinion and order.  (Docket No. 114.)  It first argues that regardless of the *Perseverence*'s vessel status, the Court has admiralty jurisdiction over Case No. 11-2093 because the dispute is over a marine insurance policy. (Docket No. 115 at p. 4.)  In the alternative, plaintiff Catlin argues that the Court should not have dismissed the complaint altogether, because plaintiff Catlin properly pled an alternate basis for subject matter jurisdiction:  diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Id.  In opposition, defendant SJT argues that the insurance policy between the parties is not a maritime contract precisely because the object of that contract – the *Perseverence* – is not a vessel.  (Docket No. 118 at pp. 3–19.) Defendant SJT then concedes, however, that plaintiff Catlin did properly invoke diversity of citizenship jurisdiction in its complaint.  Id. at p. 19.

## II.  DISCUSSION

### A.  Diversity Jurisdiction

The Court acknowledges, and both parties agree, that plaintiff Catlin properly pled diversity jurisdiction in its

complaint.    28  U.S.C.  §  1332(a),  which  covers  diversity
jurisdiction,  requires  that  the  amount  in  controversy  exceed
$75,000, and that all plaintiffs be diverse from all defendants.
28 U.S.C. § 1332(a); see also Exxon Mobil Corp. v. Allapattah
Servs., Inc., 545 U.S. 546, 553 (2005) ("[T]he presence in the
action  of  a  single  plaintiff  from  the  same  State  as  a  single
defendant  deprives  the  district  court  of  original  diversity
jurisdiction over the entire action.").  Courts evaluate whether
there  is  diversity  between  all  plaintiffs  and  all  defendants  by
looking to the parties' domiciles.  Padilla-Mangual v. Pavia Hosp.,
516 F.3d 29, 31 (1st Cir. 2008).   In  the  complaint,  plaintiff
Catlin  alleges  that  it  is  organized  pursuant  to  the  laws  of  the
United Kingdom, its principal place of business is in London, and
it  does  business  in  the  United  States  in  New  York,  New  York.
(Docket No. 1 at p. 2.)  It also alleges that defendant SJT is a
corporation  organized  and  existing  under  the  laws  of  the
Commonwealth of Puerto Rico, with its principal office located in
Puerto Rico.  Id.  For the purposes of diversity jurisdiction,
plaintiff Catlin and defendant SJT are not domiciled in the same
state, and, therefore, are citizens of different states.  Because
plaintiff Catlin also pleads that the matter in controversy exceeds
$75,000, id., the Court finds that diversity jurisdiction exists
over  the  lawsuit.    Accordingly,  the  Court  vacates  its  order
entering judgment dismissing Case No. 11-2093, (Docket No. 113).

**B.   Admiralty Jurisdiction**

Despite the Court's diversity jurisdiction, the question remains whether the case could also be sustained under admiralty jurisdiction because of the involvement of a maritime contract. See Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 23 (2004) (acknowledging that a case may rest on both diversity and admiralty jurisdiction).   For the reasons discussed below, the Court concludes that admiralty jurisdiction does exist.

**1.   Standards**

A federal district court possesses original and exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333 (1) (2013); see also U.S. Const. Art. III, § 2, cl. 1 (extending the federal judicial power to "all [c]ases of admiralty and maritime [j]urisdiction").   In a contract dispute, federal admiralty jurisdiction exists when the subject matter of the contract underlying a case or controversy is maritime in nature.  New England Mut. Marine Ins. Co. v. Dunham, 78 U.S. 1, 30-36 (1870); Acadia Ins. Co. v. McNeil, 116 F.3d 599, 601 (1st Cir. 1997).  Supreme Court precedent "do[es] not draw clear lines between maritime and non-maritime contracts[, however, and] . . . the boundaries of admiralty jurisdiction over contracts — as opposed to torts or crimes — being conceptual rather than spatial, have always been difficult to draw."  Kirby, 543 U.S. at 23.

Because the protection of maritime commerce is the fundamental interest giving rise to maritime jurisdiction, a court must evaluate "whether the nature of the transaction was maritime, that is, whether the contract relates to the navigation, business or commerce of the sea," to determine whether a contract falls within federal admiralty jurisdiction.  P.R. Ports Auth. v. Umpierre-Solares, 456 F.3d 220, 224 (1st Cir. 2006) (internal citations and quotation marks omitted); see also Kirby, 543 U.S. at 24 (reasoning that a court must evaluate "the nature and character of the contract, and that the true criterion is whether it has reference to maritime service or maritime transactions") (internal quotations and citations omitted).  An analysis of whether a contract's "primary objective" has an "essentially maritime nature" and relates to "maritime commerce" is imperative.  See N.H. Ins. Co. v. Home Savings & Loan Co., 581 F.3d 420, 424 (6th Cir. 2009) (quoting Kirby, 543 U.S. at 24-25).  Although the Supreme Court has repeatedly acknowledged the difficulty in defining "an overarching principle or scheme that brings together all of the disparate maritime contract cases under a single unified banner[,] . . . thus far it has offered very little in the way of guidance."  N.H. Ins. Co., 581 F.3d at 426-27.  Instead, the Supreme Court has merely directed lower courts to apply the "conceptual" approach of construing the contract as a whole and "look[ing] for guidance in analogous precedent."  Id. (citing Kossick v. United Fruit Co., 365

U.S. 731, 735 (1961) for the proposition that "[p]recedent and usage are helpful insofar as they exclude or include certain common types of contracts . . . . This is the approach the Supreme Court has prescribed, so it is the approach we must apply."). In general, "to be a maritime contract, the subject matter of the contract must be directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract relate in some preliminary (shoreside) manner to maritime affairs." 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 3-10 (5th ed. 2012).

Courts widely recognize that federal admiralty jurisdiction attaches in actions based upon marine insurance policies. See, e.g., Dunham, 78 U.S. at 30-36 (finding that admiralty jurisdiction exists over policies of marine insurance); Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 313 (U.S. 1955) ("Since the insurance policy here sued on is a maritime contract[,] the Admiralty Clause of the Constitution brings it within federal jurisdiction."); Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54 (1st Cir. 1995) ("The propriety of maritime jurisdiction over a suit involving a marine insurance policy is unquestionable."). "Marine insurance" is a contract (1) of indemnity against a loss to an insurable interest; (2) that is triggered by an accident or fortuity; and (3) that insures against a peril that is maritime in character. 2 Thomas J. Schoenbaum

*Admiralty & Maritime Law* § 19-2 (5th ed. 2012). "Not all insurance controversies with maritime connections, [however,] relate sufficiently to 'the navigation, business or commerce of the sea,' to warrant the invocation of maritime jurisdiction. Inversiones Calmer, S.A. v. C.E. Heath & Co., 681 F. Supp. 100, 102 (D.P.R. 1988) (internal citation omitted). Maritime jurisdiction does not extend, for example, to (1) disputes over procurement of marine insurance, Id., (citing Warner v. The Bear, 130 F. Supp. 549 (D. Alaska 1955)); (2) actions to reform a policy of marine insurance, Inversiones Calmer, 681 F. Supp. at 102 (citing Paul Marsh, Inc. v. Edward A. Goodman Co., Inc., 612 F. Supp. 635 (S.D.N.Y. 1985)); or (3) actions for fraud or deceit with respect to insurance. Inversiones Calmer, 681 F. Supp. at 102 (citing J. Moore, 7A Moore's Federal Practice, para..255[2] [sic], p. 3027 (1983)). It does apply, however, to disputes regarding the interpretation or enforcement of insurance contracts. Inversiones Calmer, 681 F. Supp. at 102 (citing Dunham, 78 U.S. 1; Wilburn Boat Co., 348 U.S. 310). To determine whether an insurance contract gives rise to admiralty jurisdiction, therefore, courts evaluate whether the contract is maritime in nature. See, e.g., Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc., 413 F.3d 307, 315 (2d Cir. 2005) (determining the primary objective of an insurance contract in order to evaluate whether admiralty jurisdiction exists); Commercial Union Ins. Co. v. Detyens Shipyard, Inc., 147

F. Supp. 2d 413 (D.S.C. 2001) (analyzing maritime principles to determine whether insurance coverage of a drydock is a policy of marine insurance and warrants admiralty jurisdiction); N.H. Ins. Co., 581 F.3d at 423-431 (looking to the interests insured and the primary objective of an insurance contract to determine whether it is maritime in nature).

### 2.  Analysis

In its motion for reconsideration, plaintiff Catlin argues that the Court has admiralty jurisdiction over the insurance contract at issue ("the Policy") because it is a marine insurance policy.  (Docket No. 115 at p. 4.)  Contending that marine insurance policies encompass more than just vessels, and that insurance covering losses "incident to a maritime activity is marine insurance," plaintiff Catlin argues that the Policy is a

maritime contract invoking admiralty jurisdiction, regardless of whether the *Perseverence* is a vessel.[1]  Id.

Plaintiff Catlin alleges that "[t]here is no serious dispute that the Policy is [a] marine insurance policy." (Docket No. 115 at p. 7.)  Indeed, both parties refer to the insurance contract at issue as "marine insurance."  (See Case No. 11-2116, Docket No. 2 at p. 1 ("[Defendant SJT] asks this Court to adjudicate and determine the rights of the parties to a contract of marine insurance which is in dispute."); (Case No. 11-2093, Docket No. 39 at p. 1) ("[Plaintiff] Catlin admits only that the contact in dispute is a marine insurance contract.").  In its opposition,

---

[1] The Court rebukes plaintiff Catlin for failing to raise such a relevant claim in a timely manner.  See DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 33 (1st Cir. 2001). "The law is clear that when a dispositive motion is heard before a [] judge, the movant must make all [its] arguments then and there, and cannot later add new arguments at subsequent stages of the proceeding." Maurice v. State Farm Mut. Auto. Ins. Co., 235 F.3d 7, 10 (1st Cir. 2000). The Court finds that the arguments raised in plaintiff Catlin's motion for reconsideration should have been raised in an opposition to defendant SJT's motion before the magistrate judge, because the argument pertains to the dispositive summary judgment motion for want of admiralty jurisdiction.  See Maurice, 235 F.3d at 10-11 ("Because the [party] did not make this argument to the magistrate judge, she cannot make it here."); Me. Green Party v. Me. Sec'y. of State, 173 F.3d 1, 4-5 (1st Cir. 1999) (refusing to review, as unpreserved, an argument not seasonably presented to the magistrate judge); Jardin de las Catalinas Ltd. P'ship. v. Joyner, 861 F. Supp. 2d 12, 16 (D.P.R. 2012) (similar).  In the interests of justice, however, the Court exercises its discretion to entertain plaintiff Catlin's jurisdictional argument.  See Lubricantes Venoco Int'l v. M/V Neveris, 60 F. App'x. 835, 840 (1st Cir. 2003) (citing Fifth Circuit Court of Appeals precedent for the proposition that a district court may "exercise[] its discretion" to consider issues raised for the first time in a post-trial brief).

however, defendant SJT does not directly address or counter
plaintiff Catlin's argument that the Policy is a marine insurance
contract.[2]  Instead, it claims that the contract is not maritime in
nature and "the fact that SJT used the term 'marine insurance' in
its pleadings . . . does not mean that this Honorable Court is
stripped of its powers and duty to protect its limited jurisdiction
. . . ."  (Docket No. 118 at p. 3.)  To determine whether admiralty
jurisdiction extends to the Policy, the Court addresses whether the
insurance contract between the parties is a maritime contract.

### a.   Is The Policy Marine Insurance?

At first glance, the Policy looks like a
typical marine insurance policy, which by definition constitutes a
maritime contract.  The parties regard the Policy as "marine

---

[2] Defendant SJT does, however, maintain that the Court lacks
admiralty jurisdiction because the *Perseverence* is not a vessel —
and therefore that the insurance contract covering the *Perseverence*
is not a maritime contract.  (Docket No. 118.)  Citing St. Paul
Fire & Marine Ins. Co. v. Gulfside Casino P'ship, 2001 WL 1843745
(S.D. Miss. 2001) and Royal Ins. Co. v. Pier 39 Ltd. P'ship, 738
F.2d 1035(9th Cir. 1984).  Defendant SJT reasons that if a
structure is not a vessel, it cannot be a marine interest, and
therefore the Policy covering the *Perseverence* is not marine
insurance.  (Docket No. 118 at pp. 6-9.)  As discussed below, the
Court cannot subscribe to this reasoning, especially in light of
the Supreme Court's holding in Kirby and subsequent precedent
applying the maritime contract standard.

insurance";[3] the Policy is titled "Ocean Marine Insurance Policy;" and the Policy incorporates the American Institute Tug Form, SP23 Protection and Indemnity Form, General Conditions, Catlin Marine General Liability Policy, and Ship Repairer Clauses into the Policy.[4]  (See Docket No. 50-1 at pp. 1-2); Acadia Ins. Co., 116 F.3d at 603 ("[O]cean marine insurance classically comprises both property and liability coverages.") (internal citations omitted); Royal Ins. Co. of Am., 738 F.2d at 1036 (noting that two insurance contracts appear to be typical marine insurance policies because

---

[3] In addition to both parties' reference to the Policy as "marine insurance" in the pleadings, John Toscani, defendant SJT's marine insurance broker, explained that he specifically sought out marine insurance coverage for the *Perseverence* and ultimately considered the Policy to be marine insurance. (Docket No. 80-6 at pp. 29-30.)

[4] Defendant SJT submits that the Drydock Endorsement attached to the Ocean Marine Insurance Policy Declarations "is a wholly separate and independent contract from the original policy to which it is attached," insinuating that the Court should base its analysis not on the Policy as a whole, but instead exclusively on the Drydock Endorsement. (Docket No. 118 at p. 14.)  It points to the Drydock Endorsement's language that "[t]he terms and conditions of this form are to be regarded as substituted for those of Policy No. see declaration to which it is attached [sic], the latter being hereby waived," to encourage a finding that the Drydock Endorsement superceded all of the Policy's terms and that the terms of the original policy have been waived.  (Docket No. 118 at pp. 14-18.)  As a stand-alone policy, defendant SJT contends, the Drydock Endorsement is "a complete contract that insures a structure which is neither a vessel nor a maritime interest," and admiralty jurisdiction does not attach.  Id. at p. 17.  The Court is unpersuaded.  Although it does not consider the *Perseverence* to be a vessel, the Court nonetheless finds admiralty jurisdiction to be warranted because the floating drydock is a maritime interest, as discussed below.

one incorporates the standard American Institute Hull Clauses and the other was drafted on a standard protection and indemnity form).

Moreover, the Policy meets the basic elements of a marine insurance contract.  See 2 Thomas J. Schoenbaum *Admiralty & Maritime Law* § 19-2 (5th ed. 2012) (defining "marine insurance" as (1) a contract of indemnity against a loss to an insurable interest; (2) that is triggered by an accident or fortuity; and (3) that insures against a maritime peril).  The Policy is a contract of indemnity — Syndicate 2003 at Lloyds was the insurer; Catlin Insurance Services, Inc. was the underwriter; and San Juan Towing & Marine Services, Inc. was the insured — for losses to the *Perseverence*, which is an insurable interest. (Docket No. 50-1 at p. 1.).  Furthermore, the contract insures against maritime perils; the Policy's "Business Description" is for "[v]essel [r]epair [and] [m]arine [s]alvage," and the perils insured against include risks that "are of the Waters," id. at p. 5, as well as:

> the Seas, Rivers, Lakes, Harbours, Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart or Counter Mart, Suprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners, Explosions, Riots, or other causes of whatsoever nature arising either on shore or otherwise, causing Loss of or injury to the [drydock].

Id. at p. 54.

Finally, the Policy extends "Hull, Protection & Indemnity including Collision & Towers Liability, Marine General

Liability including Ship Repairers Liability, Equipment," insurance
to the *Perseverence*, id. at p. 1, and the Drydock Endorsement
includes at least hull and collision insurance. See id. at p. 54.
Courts generally hold that hull, protection and indemnity, and
general liability marine insurance contracts involve maritime
interests and fall within the clear scope of admiralty
jurisdiction. Molina v. TL Dallas (Special Risks) Ltd., 547 F.
Supp. 2d 102, 109 (D.P.R. 2008) (citing Am. E. Dev. Corp. v.
Everglades Marina, Inc., 608 F.2d 123 (5th Cir. 1979) (hull);
Morewitz v. W. of Eng. Ship Owners Mut. Prot. & Indem. Ass'n.
(Lux.), 62 F.3d 1356 (11th Cir. 1995) (protection and indemnity);
Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc., 413 F.3d
307, 316-323 (2d Cir. 2005) (general liability)). Defendant SJT
has not cited any statutory or case law, nor has the Court been
able to find any, which supports its conclusion that the insurance
Policy for hull, protection and indemnity, and marine general
liability coverage does not constitute marine insurance.
Accordingly, the Policy, including the Drydock Endorsement, appears
to be a marine insurance contract.

**b.    Is the Policy a Maritime Contract?**

Simply because the Policy resembles a typical
marine insurance contract, however, does not mean that admiralty
jurisdiction necessarily attaches. In an abundance of caution, the

Court turns to the issue of whether the Policy insuring the *Perseverence* is a maritime contract.

The Supreme Court in <u>Kirby</u> indicated that a court must evaluate the nature and character of the contract to determine whether it has reference to maritime service or maritime transactions. 543 U.S. at 24. The nature of a transaction is maritime when the contract's "primary objective" has an "essentially maritime nature" and relates to "maritime commerce." <u>Kirby</u>, 543 U.S. at 24–25. In other words, if the contract "relates to the navigation, business or commerce of the sea," it is maritime. <u>Umpierre-Solares</u>, 456 F.3d at 224.

Courts have consistently required that, for an insurance policy to constitute a maritime contract, the interest(s) insured, and not merely the risk(s) insured against, must be maritime in character. <u>Acadia</u>, 116 F.3d at 603 (finding admiralty jurisdiction because the insurance policy "insures a maritime interest (the boat) and insures primarily (if not exclusively) against risks associated with marine ventures"); <u>N.H. Ins. Co.</u>, 581 F.3d at 424 (reasoning that a contract is not necessarily maritime in nature by virtue of its relation to boats and marinas); <u>Folksamerica</u>, 413 F.3d 307 (determining whether a contract constitutes marine insurance by considering the risks insured against and the interests insured); <u>Royal Ins. Co.</u>, 738 F.2d at 1036 ("For an insurance policy to be within admiralty

jurisdiction, the interests insured, and not simply the risks insured against, must be maritime.  For example, a beach front home might be insured against damage from 'perils of the sea,' but insurance of this sort on real property almost certainly is outside admiralty jurisdiction.").  The Court regards such an analysis into maritime interests and risks as useful to ascertain an insurance contract's "primary objective" and nature.  Given the Supreme Court's counsel that lower courts consider precedent in analyzing whether an insurance policy constitutes a maritime contract, Kossick, 365 U.S. at 735, the Court considers (1) whether the *Perseverence* is a maritime interest, and (2) whether the interests insured against in the Policy are maritime in nature, in order to determine whether the Policy as a whole constitutes a maritime contract.

    **1.   Is The *Perseverence* A Maritime Interest?**

The interest insured in this case is the *Perseverence*, a floating drydock.  (Docket Nos. 115 & 118.)  Both parties agree that the case of Commercial Union Ins. Co. v. Detyens Shipyard, Inc., 147 F. Supp. 2d 413 (D.S.C. 2001) presents a portrait similar to this case, insofar as it involved a dispute over whether insurance coverage of a drydock was maritime in nature.  Plaintiff Catlin points to the fact that the Detyens court construed the exact policy form that was used to insure the *Perseverence* — the American Institute of Marine Underwriters

Drydock Form 107 — to argue that the Court should find the Policy maritime in nature. (Docket No. 115 at p. 9.)

                    The Court agrees with Plaintiff Catlin that the *Perseverence* is a maritime interest and that <u>Detyens</u> is persuasive authority. First, a drydock's engagement in routine vessel repairs constitutes traditional maritime activity. Analyzing whether the policy insured a maritime interest, the <u>Detyens</u> court reasoned:

> The interest insured in this case is Drydock Number 1, a drydock that was used in maritime business or commerce to repair ships and barges. "It is axiomatic that the routine repair of vessels is a crucial maritime activity." <u>Sea Vessel, Inc. v. Reyes</u>, 23 F.3d 345, 351 (11th Cir. 1994). Moreover, contracts to repair or perform extensive reconstruction of a ship are within the admiralty jurisdiction of federal courts. <u>See</u> <u>New Bedford Dry Dock Co. v. Purdy (The Jack-O-Lantern)</u>, 258 U.S. 96, 99–100 (1922); <u>see also</u> <u>Sea Vessel, Inc.</u>, 23 F.3d at 351 ("The routine repair of a vessel in a drydock on navigable waters bears a significant relationship to a traditional maritime activity such that admiralty jurisdiction attaches."). As such, drydocks play an integral role in the operation and maintenance of ships and other vessels — a crucial maritime activity. Thus, it would be anomalous to find that the interest insured, i.e., Drydock Number 1[,] was anything other than a marine interest.

147 F. Supp. 2d at 419. Both Supreme Court and circuit court of appeals case law support the <u>Detyens</u> holding and lead to the conclusion that a floating drydock's engagement in routine vessel repairs is a traditional maritime activity. In <u>Sisson v. Ruby</u>, 497 U.S. 358, 367 (1990), the Supreme Court held that "storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity.'" Relying

on _Sisson_, the Eleventh Circuit Court of Appeals found that routine
vessel repair clearly constitutes "maintenance," and, therefore,
that the routine repair of vessels is a crucial maritime activity.
_In re Sea Vessel_, 23 F.3d 345, 350-51 (11th Cir. 1994).
Furthermore, the Supreme Court has ascertained "no difference in
character as to repairs made upon a vessel whether they are made
while she is afloat, while in dry dock, or while hauled up on land.
The nature of the service is identical in the several cases, and
the admiralty jurisdiction extends to all." _Exxon Corp. v. Central_
_Gulf Lines, Inc._, 500 U.S. 603, 613 (1991) (citing _North Pacific_
_S.S. Co. v. Hall Bros. Marine Railway & Shipbuilding Co._, 249 U.S.
119, 128 (1919)).

        Second, both parties acknowledge that the
_Perseverence_ was designed, constructed, and used to provide marine
maintenance and repair services to vessels. (Docket No. 79-2 at p.
3; Docket No. 81 at p. 5.)  "Its intended use [was] to lift
floating equipment for inspection and repair," (Docket No. 79-7 at
p. 2), and it was indeed used in that manner, as workers admitted
to shifting the drydock ten-to-fifteen feet back along the pier
after the drydock had been used to raise and repair a vessel.
(Docket No. 79-6 at pp. 2-3.)  Furthermore, the Policy defendant
SJT obtained to insure the drydock described the business as
"[v]essel [r]epair, [m]arine [s]alvage." (Docket No. 50-1 at
p. 1.) As Plaintiff Catlin argues, therefore, the _Perseverence_ was

engaged in "an integral role in the operation and maintenance of ships and other vessels — a crucial maritime activity."  147 F. Supp. 2d at 419.

Defendant SJT claims in opposition that Detyens is "easily and fundamentally distinguishable" from this case because the floating drydock in Detyens, unlike the *Perseverence*,[5] "was a fully operational structure working in the furtherance of maritime commerce."[6]  (Docket No. 118 at p. 10.)  To examine the issue of "whether an insurance policy covering a moored drydock which operates to repair ships and barges is a policy of marine insurance," the Detyens court indeed referenced the drydock's operational status.  See 147 F. Supp. 2d at 419 (finding a drydock to be a maritime interest because the drydock "was used

---

[5] At the time the *Perseverence* sank, it was insured as a "port risk," had not been operational for almost a year, and was under repair.  (Docket No. 79-5 at p. 2; Docket No. 118-1 at 16:14-21, 19:19-20:1, 29:8-12, & 34:3-6; Docket No. 118-2 at 110:6-9, 112:5-10, 113:10-15.)

[6] Defendant SJT also relies on Royal Ins. Co., 738 F.2d 1035 and St. Paul Fire & Marine Ins. Co. v. Gulfside Casino P'ship, 2001 WL 1843745 (S.D. Miss. 2001) — an unreported case — to argue that because the *Perseverence* is not a vessel, it cannot be a marine object, and in turn, an insurance contract covering it is not encompassed within admiralty jurisdiction.  (Docket No. 118 at pp. 5-9.)  The Court does not regard those cases as persuasive authority on the question of maritime interests.  See Kirby, 543 U.S. at 24 ("To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute . . . . Instead, the answer depnds upon the nature and character of the contract.").  In light of Kirby, therefore, the *Perseverence*'s non-vessel status pursuant to 1 U.S.C. § 3 does not *ipso facto* preclude it from qualifying as a maritime interest.

in maritime business or commerce to repair ships and barges," and because "drydocks play an integral role in the operation and maintenance of ships and other vessels — a crucial maritime activity").  The Court does not find defendant SJT's distinction, however, to be conclusive.  In Kirby, the Supreme Court directed lower courts to consider a contract "as a whole" to evaluate its nature and character, and to analyze the "true criterion" of whether it is related to maritime service or maritime transactions. Kirby, 543 U.S. at 24.  The Court finds that the *Perseverence* was designed, constructed, and used to provide marine maintenance and repair services to vessels — a maritime service — and as discussed below, the Policy's "primary objective" is maritime — to insure the drydock against risks inherent to the vessel repair and marine salvage business.  There is no indication that a court's analysis should turn only on quantitative criteria like the amount of time a structure actually engaged in the repair of vessels, and without further authority so indicating, the Court rejects defendant SJT's contention that the *Perseverence*'s "port risk" and non-operational statuses render the Policy non-maritime in nature.

> **2.   Does The Policy Insure Against Maritime Risks?**

As discussed above, the Policy insured the *Perseverence* against maritime perils.  The Drydock Endorsement covers the "assist[ance] [of] vessels and/or craft in all situations and to any extent[,] [i]ncluding all risks of docking,

undocking, or moving in harbour and going on or off gridiron or graving docks . . . ." (Docket No. 50-1 at p. 54.) It also covers loss or damage to the *Perseverence*'s hull or machinery; it provides insurance if the *Perseverence* "come[s] into collision with any other Ship or Vessel;" it covers "loss or damage however occurring to the property insured caused by or arising through vessels entering or lying in or leaving [the *Perseverence*];" and it identifies as "Adventures and Perils":

> the Seas, Rivers, Lakes, Harbours, Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart or Counter Mart, Suprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners, Explosions, Riots, or other causes of whatsoever nature arising either on shore or otherwise, causing Loss of or injury to the [drydock].

Id. at pp. 54-55. Defendant SJT relies on the mere facts that the *Perseverence* is not a vessel and was a non-operational port risk to conclude that the Policy's risks "are not exclusively maritime" in nature. (Docket No. 118 at p. 11.) In light of various authority demonstrating that similar insurance contracts do involve maritime interests, however, see, e.g., Am. E. Dev. Corp. v. Everglades Marina, Inc., 608 F.2d 123 (5th Cir. 1979) (hull insurance); Morewitz v. W. of Eng. Ship Owners Mut. Prot. & Indem. Ass'n (Lux.), 62 F.3d 1356 (11th Cir. 1995) (protection and indemnity policy); Folksamerica, 413 F.3d at 316-323 (general liability insurance)), defendant SJT's conclusion is one that the Court declines to draw.

Although the Policy covers a slew of additional perils that do not at first glance independently exude an exclusively maritime connection,[7] the Policy's forms and endorsements, as a whole, do primarily insure against maritime risks.  The American Institute Tug Form, for example, (1) insures against the "Waters, . . . Assailing Thieves, Jettisons, Barratry of the Master and Mariners and all other like Perils that shall come to the Hurt, Detriment or Damage of the Vessel;" (2) provides for loss or damage directly caused by "[a]ccidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons;" and (3) provides protection in the event that the insured "come[s] into collision with any other vessel, craft or structure, floating or otherwise . . . ."  (Docket No. 50-1 at p. 5.)  The Protection and Indemnity Form also insures against liability for loss of or damage to other vessels, craft, or property or freight of those vessels or craft both caused and not caused by collision with the *Perseverence*.  Id. at pp. 10-11.  The American Institute Ship Repairers Liability Clauses protect

---

[7] The various forms and endorsements incorporated into the Policy provide coverage for additional perils.  See, e.g., the Protection and Indemnity form, (Docket No. 50-1 at pp. 10-15 (protecting against liability from loss of life, injury or illness, medical expenses, cargo requiring refrigeration, etc.); the Marine General Conditions, id. at pp. 16-21 (covering against damage caused by capture, seizure, arrest, restraint or detainment or taking of the *Perseverence*); and Commercial Marine Liability Coverage Form, id. at pp. 29-45 (protecting against liability for bodily injury and property damage).

Civil No. 11-2093 & 11-2116 (FAB)                              23

defendant SJT from liability "for physical loss of or damage to watercraft and their equipment, cargo and other interests on board, occurring only while such watercraft are in the care, custody or control of the Insured for the purpose of repair . . . ." Id. at p. 46.  Finally, the Marine Equipment Floater Endorsement covers tools and equipment "used in the operation of [defendant SJT]'s business," id. at p. 50, which the Policy explicitly identifies as "[v]essel [r]epair [and] [m]arine [s]alvage."  Id. at p. 1. Although the Policy covers incidental non-maritime elements, the primary nature and character of the Policy, as gleaned from viewing the contract as a whole, is maritime.  See Folksamerica, 413 F.3d at 315.

          The Court finds that the primary objective of the Policy is to provide insurance to defendant SJT for loss to the *Perseverence*, which engaged in "an integral role in the operation and maintenance of ships and other vessels — a crucial maritime activity."  See Detyens, 147 F. Supp. 2d at 419.  The language contained in the Policy as a whole demonstrates the maritime nature and subject matter of the contract.  The Policy insuring the *Perseverence*, therefore, is a maritime contract and falls within the Court's admiralty jurisdiction.

**III. CONCLUSION**

     Because the insurance Policy at issue between the parties resembles marine insurance, and because the Policy insures a

Civil No. 11-2093 & 11-2116 (FAB)                                    24

maritime interest against maritime risks, it is a maritime contract warranting admiralty jurisdiction.  Plaintiff Catlin's complaint also properly pled diversity jurisdiction.  Accordingly, the Court vacates its judgment dismissing Case No. 11-2093 without prejudice, (Docket No. 113).  The Clerk will reopen Case No. 11-2093.

**IT IS SO ORDERED**.

San Juan, Puerto Rico, May 13, 2013.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
United States District Judge