IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CATLIN (Syndicate 2003) at
LLOYD'S,

    **Plaintiff,**

          **v.**

SAN JUAN TOWING & MARINE
SERVICES, INC.,

    **Defendant.**

**CIVIL NO.** 11-2093 (FAB)

    Consolidated with

**Civil No.** 11-2116 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

    Before the Court are Catlin (Syndicate 2003) at Lloyd's ("Catlin")'s motion for summary judgment, (Docket No. 134), and San Juan Towing & Marine Services, Inc. ("SJT")'s motion for summary judgment, (Docket No. 136). Having considered Catlin's motion and memorandum of law, (Docket No. 135); SJT's opposition, (Docket No. 140); and Catlin's reply, (Docket No. 146); the Court **GRANTS IN PART AND DENIES IN PART** Catlin's motion for summary judgment. Having also reviewed SJT's motion and memorandum of law (Docket No. 138); Catlin's opposition, (Docket No. 142); and SJT's reply (Docket No. 150); the Court **GRANTS IN PART AND DENIES IN PART** SJT's motion for summary judgment.

## I.   Background

### A.   Financial History Relating to SJT and the Dry Dock *Perseverence*

On August 27, 2006, SJT — a Puerto Rico corporation in the Ship Repair business based in San Juan, Puerto Rico — purchased a floating drydock called the *Perseverence* for $1,050,000 from Formel Marine Services.  (Docket Nos. 79 at 1; 81 at 1; 134-1 at 1; 139 at 1.)  Around that same time, SJT obtained a line of credit with a limit of $1,540,000 from Banco Popular de Puerto Rico ("Banco Popular").  (Docket Nos. 134-1 at 2; 139 at 1.)  The line of credit was used to pay for, and was secured by, the drydock. Id.  In 2008, SJT began having difficulty making payments on the Banco Popular loan, and in September 2009, SJT asked Banco Popular for a "moratorium" on payments of the loan principal.  (Docket Nos. 134-1 at 2; 139 at 2.)  Banco Popular granted the moratorium, which permitted SJT to only pay the interest and not repay principal on the loan.  (Docket Nos. 134-1 at 3; 139 at 2.)  SJT stopped operating the drydock in 2008 or 2009 because there was no business for it.  (Docket Nos. 134-1 at 2; 139 at 2.)  In 2009, SJT decided to sell the drydock because there was no business for it, and it advertised the *Perseverence* for sale for $1,350,000. (Docket Nos. 134-1 at 3; 139 at 2.)  SJT had a net operating loss of $147,557 in 2009.  (Docket Nos. 134-1 at 3; 139 at 2.)  SJT had an operating loss of $177,675 in 2010, and the value of equity in SJT to its sole shareholders, Mark and Jayne Payne ("Mr. Payne" and

"Mrs. Payne," respectively), in 2010 was negative $274,000. (Docket Nos. 134-1 at 1 & 3; 139 at 2.)  At the end of 2010, SJT also had two unsecured lines of credit with a total balance of $140,449, and Mrs. Payne was using a personal line of credit secured by her residence to pay SJT's operating expenses. (Docket No. 139 at 2.)  The 2010 year-end balance on Mrs. Payne's personal credit loan was $183,940.  (Docket Nos. 134-1 at 4; 139 at 2.)

During January 2011, SJT continued to advertise the drydock for sale for $1,350,000.  (Docket Nos. 134-1 at 4; 139 at 2.)  On January 3, 2011, Hendry Corporation offered to purchase the drydock for $700,000, and Mr. Payne, reporting the offer to Banco Popular, stated, "It seems to me that the [$700,000] offer I am attaching is very close to reality."  Id.  Over the course of that month, SJT and Hendry Corporation bargained over the selling price of the *Perseverence*.  On January 21, 2011, SJT offered to sell the drydock to Hendry for $850,000; Hendry responded to SJT's counteroffer on January 21, 2011 with $775,000, and on January 29, 2011, SJT offered to sell the drydock to Hendry for $800,000. (Docket Nos. 134-1 at 5, 139 at 2-3.)  Hendry did not ultimately purchase the *Perseverence*.

From 2006 to 2011, SJT had insured the drydock with RLI Insurance Company ("RLI").  (Docket No. 134-1 at 5; 139 at 3.)  In 2006, SJT had hired the services of Marine Consultants, Inc. to perform a condition and valuation survey of the drydock.  (Docket

Nos. 139 at 9; 147 at 1.)   In that survey, which was dated
April 17, 2006, the *Perseverence* was valued at $1,500,000.   Id.
After purchasing the drydock on August 27, 2006, SJT modified it so
that it could be towed from Louisiana to Puerto Rico.   Id.   Marine
Consultants, Inc. then issued another condition and valuation
report on November 21, 2006, in which it valued the drydock
at $1,750,000.   Id.   The increase in value of the drydock from one
report to another was due to the value added to the drydock by the
modifications made to it.   Id.   The hull coverage for the drydock
placed with RLI began in 2006, with a declared hull value of
$1,750,000.   Id.   Mr. John Kirchhofer was the underwriter in charge
of the SJT file with RLI.   (Docket Nos. 139 at 10; 147 at 3.)
Mr. Kirchhofer handled SJT's account at RLI up until he left RLI to
work at Catlin, in January 2011.   Id.   On February 9, 2011, RLI
advised SJT that it was cancelling the insurance mid-term, and on
February 14, 2011, RLI issued a Notice of Cancellation/Nonrenewal,
which stated the reason as "Loss History."   (Docket No. 134-1 at 5;
139 at 3.)   In April 2011, SJT advertised the drydock for sale for
$800,000; Banco Popular approved the advertisement before it ran.
(Docket Nos. 134-1 at 6; 139 at 3.)

       Mr. John Toscani was the insurance broker for SJT who
placed the marine insurance coverage for SJT with Catlin.   (Docket
No. 134-1 at Ex. 12, p. 20.)   His relationship with SJT began
roughly in 2002, and he ceased working with SJT shortly after the

*Perseverence* sank and SJT submitted its insurance claim to Catlin. Id. at pp. 20 & 25. In 2011, Mr. Toscani "placed a package policy consisting of hull, P&I, ship repairs, legal, general liability and contractor's equipment" for SJT with Catlin, and he considered it a marine insurance policy. Id. at pp. 28-20. In placing the SJT account, Mr. Toscani communicated with Mr. John Kirchhofer at Catlin. Id. at p. 30. Mr. Kirchhofer had moved from RLI to Catlin and was working as a marine underwriter in Catlin's marine department. (Docket Nos. 134-1 at 6; 139 at 3.) All communications between Catlin and SJT, prior to the issuance of the insurance policy covering the *Perseverence*, were made through SJT's broker and were limited to phone and e-mail conversations. (Docket No. 137 at 2; 141 at 2.) On April 12, 2011, Mr. Toscani e-mailed Mr. Kirchhofer regarding insurance coverage for SJT. (Docket No. 134-1 at Ex. 18.) The e-mail advised that the drydock was "currently up for sale" and included a copy of the "SRLL/CGL Hull P&I policy with RLI, which depicted the *Perseverence*'s value at $1,750,000. Id. Mr. Toscani did not provide Catlin with a copy of RLI's notice of cancellation. Id. On April 18, 2011, Mr. Kirchhofer sent Catlin's marine coverage quote via e-mail, and SJT accepted Catlin's quote on April 25, 2011. Id. at Ex. 19; Docket Nos. 134-1 at 9; 139 at 4. The Ocean Marine Insurance Policy No. HLO-3464-0411 ("the Policy") became effective April 29, 2011. (Docket No. 50-1.)

Endorsement 5 to the Policy provided coverage for the *Perseverence*. (Docket Nos. 50-1 at 54-56; 134-1 at 12; 139 at 8.) Endorsement 5 identifies the perils insured against:

**DRYDOCK**

. . . .

> TOUCHING THE ADVENTURES AND PERILS which we, the said Assurers, are contended to bear and take upon us, they are of the Seas, Rivers, Lakes, Harbours. Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart of Counter Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners, Explosions, Riots, or other causes of whatsoever nature arising either on shore or otherwise, causing Loss of or injury to the Property hereby insured, and of all other Perils, Losses, and Misfortunes that have or shall come to the Hurt, Detriment, or Damage of the said Dock, &c., or any part thereof.

(Docket Nos. 50-1 at 54; 134-1 at 12-13; 139 at 8.)

On May 17, 2011, SJT advised Damco Marine Management, Inc. that the drydock was still for sale for $800,000. (Docket Nos. 134-1 at 10; 139 at 5.) On June 5, 2011, Mr. Richard Ortego — Vice-President and General Manager Repair of Leevac Shipyards, LLC, a Lousiana-based company — traveled to Puerto Rico to look at the drydock. (Docket Nos. 137 at 2; 141 at 5.) Mr. Ortego has experience inspecting, preparing, and using floating drydocks. When he visited Puerto Rico, he inspected the *Perseverence*. (Docket Nos. 137 at 3; 141 at 5.) Spending half a day between the drydock and SJT's premises, Mr. Ortego talked to Mr. Payne about the maintenance given to the drydock; entered into about half of

the drydock's holds; crawled around the holds and inspected them and the valves for decay, damage, and general conditions; and determined that the drydock was "suitable for purchase." (Docket Nos. 137 at 4; 141 at 6-10.)   When Mr. Ortego returned to Louisiana, he gave his report to Leevac's owner and recommended the purchase of the *Perseverence*; negotiations for the sale of the drydock then began between Leevac and SJT.   Id.   On or around September 4, 2011, SJT agreed to sell the *Perseverence* to Leevac, (Docket No. 81-16 at 7), and on September 19, 2011, SJT accepted Leevac's offer to purchase the drydock for $700,000 when Mr. Payne, on behalf of SJT, signed a purchase and sale agreement.   (Docket Nos. 134-1 at 10; 139 at 5.)

**B.   The *Perseverence* Sinks**

On September 28, 2011, SJT was ballasting the drydock in its back portion in order to raise its front portion and perform repairs on the front.   (Docket Nos. 137 at 7; 141 at 14.)   The ballasting process included the use of two 175-cubic-feet water tanks (each holding up to 5 tons of water) and a 6,000- to 7,000-pound concrete block.   Id.   Before leaving work at noon to attend his son's school function, Mr. Payne gave instructions to SJT's welders.   (Docket Nos. 137 at 8; 141 at 15.)   Around 3:30 p.m., Mr. Jose Monge, SJT's foreman, also gave instructions to the employees to pick up all of their cables and to make sure they shut off the hose, which was filling up at least one of the water tanks.

Id.  Late in the evening between September 28 and September 29, 2011, the *Perseverence* sank while at its berth at Pier 15 in Miramar.  (Docket Nos. 134-1 at 11; 139 at 7; 137 at 6; 141 at 13.) Neftali Padilla, a tug captain in the employ of Puerto Rico Towing, was returning to PRT's dock after providing towage services at San Juan Harbor when he saw the drydock sinking at its berth.  Id.  The drydock's back portion was completely underwater, and its front part was partially underwater.   Id.   Captain Padilla called Mr. Payne's cell phone to inform Mr. Payne that the drydock was sinking, and approximately 10 minutes later, at midnight, Captain Padilla called Mr. Payne again to inform him that the drydock was completely underwater.   Id.   Fifteen to twenty minutes later, Mr. Payne arrived at the pier.  (Docket Nos. 137 at 8; 141 at 16.) Captain Padilla and Mr. Payne took a look at the sunken drydock together from the pier.   (Docket Nos. 137 at 9; 141 at 16.) Captain Padilla noticed that a ball valve on the y-connector at the water main next to the drydock was in the open position.   Id. There was a fire hose connected to the portion of the y-connector with the open ball valve, and by looking at the surface of the water, Captain Padilla could see that water was coming out of the fire hose.  Id.  He called Mr. Payne over to point his observations out to Mr. Payne, and Mr. Payne closed the ball valve to which the fire hose was connected.  Id.  At that time, anybody with access to

the pier had access to the water main valve next to the drydock.
(Docket Nos. 137 at 9; 141 at 17.)

At the time of its sinking, the drydock was scheduled to
be inspected by a surveyor appointed by Banco Popular, and SJT owed
$1,348,178 to Banco Popular on its line of credit secured by the
drydock.  (Docket Nos. 134-1 at 11–12; 139 at 8.)  Divers were sent
down by salvors after the drydock sank.  Id.  On November 3, 2011,
the drydock was successfully refloated.  (Docket Nos. 137 at 6; 141
at 13.)  After being refloated, the drydock spent the last month of
2011's hurricane season — which typically runs from June 1 to
November 30 in Puerto Rico — as well as the entire 2012 hurricane
season, floating at its berth at Pier 15 before being sold for
scrap in December 2012.  Id.

## II.  **Summary Judgment Standard**

The Court may grant a motion for summary judgment "if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(a).  A fact is "material" if it has the potential
to "affect the outcome of the suit under the governing law."  Id.
A dispute is "genuine" when it "could be resolved in favor of
either party."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d
6, 19 (1st Cir. 2004).

The party moving for summary judgment has the initial burden
of "demonstrat[ing] the absence of a genuine issue of material

fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The party must demonstrate this absence with definite and competent evidence.  See Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  It must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion. Id. (citing Fed.R.Civ.P. 56(c)).  Once a properly supported motion has been presented, the burden shifts to the non-moving party "to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted).

If the non-moving party establishes uncertainty as to the "true state of any material fact, the movant's efforts should be deemed unavailing." See Lopez & Medina Corp. v. Marsh USA, Inc., 694 F.Supp.2d 119, 123 (D.P.R. 2010) (citing Suarez v. Pueblo Int'l., 229 F.3d 49, 53 (1st Cir. 2000)).  It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 252.  It is therefore necessary that "a party opposing summary judgment must 'present definite, competent evidence to rebut the motion.'" Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994) (internal citation omitted).  In making this assessment, the Court must take the entire record in the light most favorable to the nonmoving

party and draw all reasonable inferences in its favor. <u>Farmers Ins. Exch. v. RNK, Inc.</u>, 632 F.3d 777, 779-80 (1st Cir. 2011). The Court does not, however, "make credibility determinations or weigh the evidence." <u>Anderson</u>, 477 U.S. at 255. The Court may safely ignore "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." <u>Ahern v. Shinseki</u>, 629 F.3d 49, 54 (1st Cir. 2010).

The First Circuit Court of Appeals has "repeatedly . . . emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." <u>Hernandez v. Phillip Morris USA, Inc.</u>, 486 F.3d 1, 7 (1st Cir. 2007). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is - and what is not - genuinely controverted.'" <u>Id.</u> (quoting <u>Calvi v. Knox County</u>, 470 F.3d 422, 427 (1st Cir. 2006)). Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment. A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56(c). Facts which are properly supported "by record citations as required by this rule, shall be deemed admitted unless

properly controverted." Loc. Rule 56(e).  The Court may, however, "disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." Loc. Rule 56(e).  "The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."  Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril."  Hernandez, 486 F.3d at 7.

### III. SJT's Motion for Summary Judgment Against Catlin

On November 8, 2011, Catlin filed a complaint against SJT alleging eight causes of action.  (Docket No. 1.)  SJT argues that summary judgment is warranted as to each cause of action.  The Court addresses each cause of action in turn.

#### A.   Catlin's *Uberrimae Fidei* Claims

In its first cause of action, Catlin alleges that SJT breached its duty of utmost good faith and thus violated the doctrine of *uberrimae fidei*[1] pursuant to federal admiralty law by

---

[1] The First Circuit Court of Appeals roughly defines *uberrimae fidei* as "of the utmost good faith."  Comm. Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006).  Treatises define marine insurance as "a contract 'uberrimae fidei,' requiring the utmost good faith by both parties to the contract."  Thomas J. Schoenbaum, 2 ADMIRALTY & MAR. LAW § 19-14 (5th ed.).  Pursuant to the *uberrimae fidei* doctrine, the insured must "disclose to the insurer all known circumstances that materially affect the insurer's risk, the default of which . . . renders the insurance contract voidable by the insurer."  Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54–55 (1st Cir. 1995).

failing to disclose "material information about the risk when
seeking the [insurance] coverage and during the Policy period."
(Docket No. 1 at 4.)  Catlin's second cause of action also alleges
a violation of the duty of utmost good faith and *uberrimae fidei* by
claiming that SJT "misrepresented, concealed or omitted material
facts it had a duty to disclose when seeking coverage."  <u>Id.</u>  As a
result of those alleged breaches by SJT, Catlin argues that the
Policy insuring the Perseverence is void *ab initio*.  <u>Id.</u>  SJT seeks
summary judgment on Catlin's first and second causes of action,

Civil No. 11-2093 & 11-2116 (FAB)                                    14

claiming that the *uberrimae fidei* doctrine is not applicable to

this case.[2]  (Docket No. 138.)

### 1.   Does Admiralty or State Law Govern?

Although the *Perseverence* is not a "vessel" under

maritime law, (see Catlin (Syndicate 2003) at Lloyds, v. San Juan

---

[2]  For the first seven pages of its opposition brief, SJT
argues that Catlin's argument regarding the "overvaluation" of the
*Perseverence*'s value must be discarded as a threshold matter
because it was "never pleaded."  (Docket No. 140 at 1-8.)   It
claims that Catlin's complaint does not allege an overvaluation
claim and that Catlin waited too long to raise the argument in the
Joint Case Management Memorandum dated May 2012.  Id.  SJT also
argues that Catlin's allegation of intentional concealment or
misrepresentation of the drydock's value involves allegations of
fraud, which Catlin failed to timely raise pursuant to Fed. R. Civ.
P. 9(b).  Id. at 2-7.  Claiming unfair prejudice, SJT alleges that
Catlin has waived its first two causes of action.  Id. at 6-7.  The
Court disagrees.

First, and as mentioned above, Catlin's complaint did include
two *uberrimae fidei* causes of action due to SJT's alleged
concealment, omissions, and misrepresentation of material facts.
(Docket No. 1 at 4-5.)  Catlin's responses to SJT's First Set of
Interrogatories — which requested that Catlin "[e]xplain the basis
for each contention by which [Catlin] claim[s] there is no coverage
under the Policy for the Claim . . . " — were sufficient to inform
SJT of Catlin's theory for those claims; on April 3, 2012, Catlin
specifically identified "the value of the drydock" as a fact
"material to the risk insured" that SJT failed to disclose when
seeking coverage of the *Perseverence*.  (Docket No. 147-1 at 6.)
Second, *uberrimae fidei* does not require a showing of fraud, and
thus SJT's argument that Catlin's pleading is insufficient pursuant
to Rule 9(b) is misplaced.  See A/S Ivarans Rederei v. P.R. Ports
Auth., 617 F.2d 903, 905 (1st Cir. 1980) ("Whether the
nondisclosure of a known fact material to a marine risk was
intended or not is beside the point; such nondisclosure voids the
policy."); 37 Am. Jur. 2d Fraud and Deceit § 9 (2010) ("Breach of
fiduciary duty or contract *uberrimae fidei* is usually called
'constructive fraud,' whereas the term 'legal fraud' is generally
used to characterize a misrepresentation made with knowledge of its
falsity.").

Towing & Marine Services, Inc., 2013 U.S. Dist. Lexis 52307 (D.P.R.
2013) (Besosa, J.) (Catlin I), at Docket No. 112), the Court
previously found that admiralty subject matter jurisdiction exists
because the Policy at issue is a marine insurance policy.  (See
Catlin (Syndicate 2003) at Lloyds, v. San Juan Towing & Marine
Services, Inc., 2013 U.S. Dist. Lexis 69255 (D.P.R. 2013) (Besosa,
J.) (Catlin II), at Docket No. 121.)  The Court stands by that
determination, because "[t]he propriety of maritime jurisdiction
over a suit involving a marine insurance policy is unquestionable."
Giragosian, 57 F.3d at 54.  Whether admiralty law controls over
state law in a lawsuit over which the Court enjoys admiralty
jurisdiction, however, is a discrete and "enigmatic" question.
Albany Ins. Co. v. Wisniewski, 579 F. Supp. 1004, 1013 (D.R.I.
1984) (Selya, J.).  In Wilburn Boat Co. v. Fireman's Fund Ins. Co.,
348 U.S. 310, 313 (1955), "the Supreme Court chartered a course
away from explicit application of admiralty law for maritime
insurance contracts."  St. Paul Fire & Marine Ins. Co. v. Halifax
Trawlers, Inc., 495 F. Supp. 2d 232, 237 (D. Mass. 2007); see
Wilburn Boat, 348 U.S. at 313 ("Since the insurance policy here
sued on is a maritime contract[,] the Admiralty Clause of the
Constitution brings it within federal jurisdiction.  But it does
not follow, as the courts below seemed to think, that every term in
every maritime contract can only be controlled by some federally
defined admiralty rule.  In the field of maritime contracts . . .

the National Government has left much regulatory power in the States.").  While the rules of admiralty law generally supersede local authority, a "gray area" exists with respect to maritime contracts.  Halifax Trawlers, 495 F. Supp. at 237.  The First Circuit Court of Appeals has held that in a case involving a marine insurance contract, state law will apply unless an established maritime rule controls the disputed issue, *and* that rule is materially different from state law."  Pesante, 459 F.3d at 37 (internal quotation omitted).[3]  A district court must determine, therefore, whether to employ "the channel markers of Wilburn Boat to deduce whether federal admiralty law or state insurance law will control the litigation."  Wisniewski, 579 F. Supp. at 1013.

### a.   Does a Well Established Maritime Rule Exist?

Presented twice with the issue, the First Circuit Court of Appeals has yet to take an authoritative stance on whether *uberrimae fidei* is an established rule of maritime law.  See Pesante, 459 F.3d at 38 ("While we have never actually decided the issue, it is true that we have questioned whether *uberrimae fidei* is an established rule of maritime law."); Giragosian, 57 F.3d at 54, 54 n.3 ("[I]t is debatable whether the doctrine can

---

[3] The determination of subject matter jurisdiction over the case is a separate and distinct concept from which law — admiralty or state law — governs issues at litigation.  Thus, Catlin's contention that SJT asks the Court "to contradict itself" and find that the Puerto Rico Insurance Code governs the dispute, (Docket No. 142 at 10), is off the mark.

still be deemed an 'entrenched' rule of law . . . . We need not undertake this analysis [of whether to apply *uberrimae fidei*] however . . . .”). As a sister district court has pointed out, the lack of binding precedent from the First Circuit Court of Appeals as to the applicability of the *uberrimae fidei* doctrine in this circuit leaves the Court with “a cloudy choice-of-law analysis.” Good Bus Corp. v. Markel Am. Ins. Co., 2012 U.S. Dist. LEXIS 118106 at *12 (D.P.R. 2012) (Casellas, J.) (citing Pesante, 459 F.3d at 38 and Cent. Int'l. Co. v. Kemper Nat'l. Ins. Cos., 202 F.3d 372, 373 (1st Cir. 2000)). Even despite the lack of a clear stance on the issue by the First Circuit Court of Appeals, however, “the number and ratio of courts endorsing the doctrine weigh in favor of [the] conclusion [that *uberrimae fidei* is an established rule of maritime law].” Halifax Trawlers, 495 F. Supp. 2d at 238.

        The majority of circuits are in agreement that *uberrimae fidei* controls in maritime insurance disputes. AGF Marine Aviation & Transp. v. Richard C. Cassin Cit Group/Sales Fin., Inc., 544 F.3d 255, 262–63 (3rd Cir. 2008). “In the lion's share of federal cases, where the issue of non-disclosure is raised by an insurer seeking to vitiate a policy of maritime coverage, the traditional rule of *uberrimae fidei* has been applied.” Halifax Trawlers, 495 F. Supp. 2d at 238; see also Commercial Union Ins. Co. v. Detyens Shipyard, Inc., 147 F. Supp. 2d 413, 423 (D.S.C. 2001) (“The majority of courts faced with the application of

*uberrimae fidei* to a marine insurance policy[] have found that utmost good faith applies."); <u>Certain Underwriters at Lloyd's v. Johnson</u>, 124 F. Supp. 2d 763, 769 (D.P.R. 1999) (Castellanos, J.) ("A vast host of federal district courts have very recently spoken on this subject and there is near unanimity of agreement that the time-honored doctrine of *uberrimae fidei* . . . continues to be[4] a correct statement of the law of American marine insurance."); <u>Port Lynch, Inc. v. New Eng. Int'l. Assurety, Inc.</u>, 754 F. Supp. 816, 821 (W.D.Wa. 1991) ("In almost all the federal cases where the issue of misrepresentation or nondisclosure has been raised as a defense to coverage under a marine insurance policy, courts have applied the general rule of marine insurance, requiring full disclosure of all material facts by the insured and holding policies void *ab initio* where the insured fails to comply with this duty.").

The only circuit to disavow the doctrine of *uberrimae fidei* as "not entrenched federal precedent" is the Fifth Circuit Court of Appeals.  <u>See</u> <u>Albany Ins. Co. v. Anh Thi Kieu</u>, 927 F.2d 882 (5th Cir. 1991).  The Fifth Circuit's position, however, has been heavily criticized and "contradicts the general sentiment

---

[4] The *uberrimae fidei* doctrine dates back centuries; in 1766, Lord Mansfield recognized the duty underlying *uberrimae fidei*, stating: "Good faith forbids either party, by concealing what he privately knows, to draw the other into a bargain from his ignorance of that fact, and from his believing to the contrary." Schoenbaum at § 19-14 (citing <u>Carter v. Boehm</u>, (1766) 3 Burr. 1905)).

in scholarly literature."[5]  Moreover, a leading treatise has
clarified that "the principle of good faith is alive and well
despite the Fifth Circuit's decision in Anh Thi Kieu," and that
"[t]he duty of good faith is well established as the federal
maritime law rule in marine insurance." Schoenbaum at § 19-14 n.1.
The Court thus subscribes to the Ninth Circuit Court of Appeals'
conclusion that "[i]ronically, were it not for the Anh Thi Kieu
decision itself, there would be little cause at all to doubt that
*uberrimae fidei* is indeed firmly entrenched maritime law." Inlet
Fisheries, 518 F.3d at 652; id. at 653 ("Not surprisingly, no other
circuit has followed Anh Thi Kieu in the sixteen years since it was
decided.  In our view, in the face of 200 years of precedent, it
takes more than a single circuit case and spotty citation in recent
years to uproot an entrenched doctrine.").  Having weighed the
Fifth Circuit Court of Appeals' opinion against opposing authority
from other circuits and legal scholars, the Court holds that the
*uberrimae fidei* doctrine constitutes a well-entrenched federal

---

[5] The Third Circuit in AGF Marine Aviation, 544 F.3d at 263
cites an arsenal of authority supporting that position: Certain
Underwriters at Lloyds v. Inlet Fisheries, Inc., 518 F.3d 645,
652-53 (9th Cir. 2008); Thomas J. Schoenbaum, Admiralty and Maritime Law
297 (4th ed. 2004); Graydon S. Staring & George L. Waddell, *Marine
Insurance,* 73 Tul. L. Rev. 1619, 1651 (1999); Mitchell J. Popham &
Chau Vo, *Misrepresentation and Concealment in Marine Insurance
Contracts: An Analysis of Federal and State Law Within the Ninth
Circuit*, 11 U.S.F. Mar. L.J. 99, 108-12 (1998-1999); Thomas J.
Schoenbaum, *The Duty of Utmost Good Faith in Marine Insurance Law:
A Comparative Analysis of American and English Law,* 29 J. Mar. L. &
Com. 1, 11-13 (1998).

precedent, even in the face of the First Circuit Court of Appeals

apparent hesitation to hold it does not.  Pursuant to Wilburn Boat,

the Court must next determine whether the federal rule materially

differs from state law.

> **b.    Does The *Uberrimae Fidei* Doctrine Materially
> Differ From Puerto Rico Law?**

SJT devotes much of its briefs to arguing that

the Puerto Rico Insurance Code applies to the case for the

following reasons:  (1) the First Circuit Court of Appeals in

Guerrido v. Alcoa S.S. Co., 234 F.2d 349, 355 (1st Cir. 1956)

recognized a congressional grant of power to the Puerto Rico

legislature to contravene federal maritime law,[6] (Docket No. 138

at 4-7); (2) section 1101 of the Puerto Rico Insurance Code

---

[6] In 1956, the First Circuit Court of Appeals in Guerrido
discussed the historical application of maritime law to the
Commonwealth of Puerto Rico.  To argue that the maritime doctrine
of *uberrimae fidei* does not apply to the Policy at issue, SJT
relies on the Guerrido Court's following conclusion:

> [T]he rules of the admiralty and maritime law of the
> United States are presently in force in the navigable
> waters of the United States in and around the island of
> Puerto Rico **to the extent that they are not locally
> inapplicable . . . because they have been rendered
> inapplicable to these waters by inconsistent Puerto Rican
> legislation.**

234 F.2d at 355; Docket No. 138 at 5.

("section 1101")[7] does not include drydocks in the definition of "ocean marine insurance" and because the Policy covers a drydock, the Policy is not "ocean marine insurance," P.R. Laws Ann. tit. 26

---

[7] Section 1101 provides, in pertinent part:

(1)  The applicable provisions of this chapter shall apply to insurances other than ocean marine and foreign trade insurances as defined in subsection (2) . . . .

(2)  For the purposes of subsection (1) of this section and this title, "ocean marine and foreign trade insurances" shall include only:

  (a)  Insurances upon vessels, crafts, hulls, and of interests therein or with relation thereto.

  (b)  Insurance of marine builders' risks, marine war risks, and contracts of marine protection and indemnity insurance.

  (c)  Insurance of freights and disbursements pertaining to a subject of insurance coming within this definition.

  (d)  Insurance of personal property and interests therein, in course of exportation from or importation into any country, or in course of transportation coastwise, including transportation by land, water, or air from point of origin to final destination, in respect to, appertaining to, or in connection with, any and all risks or perils of navigation, transit or transportation, and while being prepared for and while awaiting shipment, and during any delays, storage, trans-shipment or reshipment incident thereto.

§ 1101, <u>id.</u> at 8-9; (3) section 405[8] of the Puerto Rico Insurance

Code "specifically includ[es] insurance policies for drydocks

within the scope of Chapter 11 of the Puerto Rico Insurance Code,"

---

[8] Section 405 provides, in pertinent part:

Marine and transportation insurance is:

(1)   Insurance against loss of or damage to:
. . .
(d) Bridges, tunnels and other
instrumentalities of transportation
and communication (excluding
buildings, their furniture and
furnishings, fixed contents and
supplies held in storage); piers,
wharves, docks and slips, and other
aids to navigation and
transportation, **including dry docks**
and marine railways, dams and
appurtenant facilities for the
control of waterways.

(emphasis added).

P.R. Laws Ann., tit. 26 § 405, id. at 7-9; (4) section 1110[9] of the Puerto Rico Insurance Code, which addresses representations made in applying for insurance, contravenes the doctrine of *uberrimae fidei*, Laws of P.R. Ann. tit. 26 § 1110, id. at 9-13; and (5) the Puerto Rico legislature — through section 1110 — has thus exercised its right to create contravening state law, which must control over general maritime law in this case, id. at 9-13.  Although it finds SJT's argument creative, the Court is unpersuaded and must reject SJT's contention that Puerto Rico law governs the Policy.

---

[9] Section 1110 provides:

Misrepresentations, omissions, concealment of acts, and incorrect statements shall not prevent a recovery under the policy unless:

(1)  Fraudulent; or

(2)  material either to the acceptance of the risk, or to the hazard assumed by the insurer, or

(3)  the insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

When the applicant incurs in any of the actions enumerated in subsections (1), (2) and (3) of this section, the recovery shall only be prevented if such actions or omissions contributed to the loss that gave rise to the action.

While it is true that the Puerto Rico Federal Relations Act continues to confer to the Commonwealth the ability to enact inconsistent regulations with the rules of admiralty and maritime law, see United States v. Zenon-Encarnacion, 185 F. Supp. 2d 127, 130 (D.P.R. 2001) (Dominguez, J.) (citing Guerrido, 234 F.2d at 355), the Puerto Rico legislature has declined to do so in the area of maritime insurance contracts.  Lloyd's of London v. Pagan-Sanchez, 539 F.3d 19, 25 (1st Cir. 2008).  Citing thirteen provisions of the Puerto Rico Insurance Code — including Section 1101 — the First Circuit Court of Appeals explicitly acknowledged that "the Puerto Rico legislature has expressed its intent to exclude maritime insurance contracts from its statutory provisions governing the interpretation and construction of insurance contracts." Pagan-Sanchez, 539 F.3d at 25; Cf. Zenon-Encarnacion, 185 F. Supp. 2d at 130 ("Since Congress gave the Legislature of Puerto Rico full power to provide compensation for marine workers injured in Puerto Rican waters to the exclusion of the remedies against their employers provided by the American maritime law, Puerto Rico did just that.").  The First Circuit Court of Appeals' decision in Pagan-Sanchez thus forecloses SJT's arguments that (1) section 405 brings insurance contracts covering drydocks under Chapter 11's purview; and that (2) "the Puerto Rican Legislature has exercised its legislative power in contravention with general maritime law, in the specific case of insurance

policies for drydocks." This Court previously held that the Policy at issue is a marine insurance policy. (Catlin II at Docket No. 121.) Accordingly, the Policy is excluded from Chapter 11 of the Puerto Rico Insurance Code, and the federal doctrine of *uberrimae fidei* applies.

**2. Did SJT Violate *Uberrimae Fidei* as a Matter of Law?**

In its complaint, Catlin alleges that SJT "misrepresented, concealed or omitted material facts it had a duty to disclose when seeking coverage." (Docket No. 1 at 4.) The doctrine of *uberrimae fidei* implicates two distinct but closely related aspects: non-disclosure and misrepresentation. Schoenbaum, § 19-14 at p. 408. Premised on the belief that the "assured is in the best position to know of any circumstances material to the risk [and] must reveal those facts to the underwriter," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir. 1986), "the strict maritime rule of *uberrimae fidei* [provides that] an insured must make full disclosure of all material facts of which the insured has, or ought to have, knowledge . . . even though no inquiry be made." Grande v. St. Paul Fire & Marine Ins. Co., 436 F.3d 277, 283 (1st Cir. 2006) (internal quotations and citations omitted). "The obligation to disclose [also] includes the duty not to misrepresent." Wisniewski, 579 F. Supp. at 1014 (internal citation omitted). The duty of utmost good faith thus "places a high burden on the assured." Schoenbaum, § 19-14 at

p. 412.  When the insured fails to disclose to the insurer all
circumstances known to it and unknown to the insurer, which
materially affect the risk, the policy is voidable at the option of
the innocent party.  King v. Aetna Ins. Co., 54 F.2d 253, 254 (2d
Cir. 1931).  The same is true for a material misrepresentation by
the insured.  Wisniewski, 579 F. Supp. at 1015.  It is of no
consequence whether the insured's misrepresentation or non-
disclosure occurred "due to fraud, negligence, accident, or
mistake."  Schoenbaum, § 19-14 at p. 412; see also Wisniewski, 579
F. Supp. at 1015 ("If a policy of marine insurance is issued upon
false and material representations, the absence of fraud or of an
intent to deceive will not save the contract from rescission.");
Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U.S. 485, 510-511 (1883)
("It is the duty of the assured to place the underwriter in the
same situation as himself; to give to him the same means and
opportunity of judging of the value of the risks; and when any
circumstance is withheld, however slight and immaterial it may have
seemed to himself, that, if disclosed, would probably have
influenced the terms of the insurance, the concealment vitiates the
policy.").

      An insured's representations about, and/or
concealment of, the true value of the object to be insured directly
pertains to the subject matter of the risk, and thus "overstating
value is one of the most frequent subjects of breach of the duty of

good faith." Schoenbaum, § 19-14 at p. 413 n. 44. The over-valuation of an insured object by the insured is a misrepresentation of a material fact that voids the policy, and failure to disclose material information regarding the subject matter of the risk similarly vitiates the policy. See King, 54 F.2d at 255 ("[C]oncealment of an overvaluation so excessive as to make the risk speculative vitiates the policy. The valuation of a vessel at sixteen times what she had just cost the insured likewise makes the risk speculative; the insured has less incentive to protect her than he would had he paid a sum some where [sic] near commensurate with the stated value."); Bella S.S. Co. v. Ins. Co. of N. Am., 5 F.2d 570, 572 (4th Cir. 1925) ("No reasonable insurer will knowingly take an insurance risk when it is to the interest of the insured that the property should be lost."); Smith v. Cont'l. Ins. Co., 2001 U.S. Dist. LEXIS 4999 *12–13, 15 (D. Md. 2001) (finding a policy void *ab initio* because the insured's misrepresentation of a vessel's value as $32,000 when it had been (1) purchased five years earlier for $16,000 and (2) estimated at $100 a year earlier in a bankruptcy petition was material, and because the insured's failure to disclose those earlier prices was also material); Albany Ins. Co. v. Horak, 1993 U.S. Dist. LEXIS 9500, *27–28 (E.D.N.Y. 1993) (holding that the purchase price and cost of repairs are both relevant to risk valuation, and that an insured's nondisclosure of a $57,000 purchase price one year before

obtaining $350,000 insurance coverage was material and voided the policy *ab initio*); Hartford Ins. Co. v. Garvey, 1988 U.S. Dist. LEXIS 17300, 17-18 (N.D. Cal. 1988) ("The over-valuation of the insured vessel by the insured is a misrepresentation of a material fact and voids the policy, because it increases the risk, provides an inducement to insurance fraud, and changes the object of the insurance from indemnity to an outright gamble at stakes greatly favoring the insured.") (citations omitted); Wisniewski, 579 F. Supp. at 1015-17 (finding a $1.5 million insurance policy void *ab initio* due to (1) the insured's misrepresentations of material fact that the fair market value was $2.25 million when it had purchased the vessel a month earlier for $69,000, and (2) the insured's non-disclosure of the price paid for the vessel, which constituted "concealment of material fact"); Ionides v. Pender, (1874) L.R. 9 Q.B. 531, 538-39 (finding overvaluation so great as to make risk speculative is material to rational underwriters and therefore must be disclosed). Thus, if the Court determines that SJT — whether fraudulently, negligently, accidentally, or by mistake — overstated the *Perseverence*'s value and/or concealed material information regarding the subject matter of the risk while seeking insurance coverage from Catlin, the Policy will be void *ab initio*.

Due to remaining genuine disputes of material fact, however, the Court cannot at this stage determine whether SJT indeed misrepresented or concealed material information when it

applied to insure the *Perseverence* with Catlin.  Both parties admit that SJT put the *Perseverence* up for sale between 2009 and the time it sank in September, 2011, but they disagree as to (1) the appropriate value of the drydock when Catlin issued the Policy, and (2) whether, when, and to what degree information regarding the *Perseverence*'s value was ever disclosed to Catlin.  Although the *Perseverence* was initially advertised for $1,350,000 in 2009, SJT acknowledged to Banco Popular in January 2011 that a $700,000 offer is "very close to reality."  SJT also claims, however, that "the amounts in the advertisements do not reflect what may have been the fair market value of the dry dock, prior to the inception of the policy . . . because SJT was not a willing seller."  (Docket No. 140 at 9.)  Moreover, Catlin specifically asserts that SJT failed to disclose that "at the time SJT requested $1,750,000 in coverage from Catlin, the drydock was being advertised for sale with an asking price of $800,000."  (Docket No. 141 at 3.)  Yet Mr. Toscani in his April 12, 2011 e-mail to Mr. Kirchhofer explicitly revealed that the drydock was "currently up for sale," albeit without including the advertising price in the e-mail.  The e-mail also indicates that Mr. Toscani and Mr. Kirchhofer had spoken on the telephone and had discussed both the insurance coverage and the fact that the *Perseverence* was up for sale at that time.  Catlin's *uberrimae fidei* misrepresentation claim cannot properly be decided as a matter of law, therefore, because

conflicting evidence exists as to (1) what the true fair market value of the *Perseverence* was at the time SJT sought insurance coverage from Catlin; and (2) the value that SJT represented to Catlin that the *Perseverence* was worth.

Furthermore, the parties do not agree on material facts underlying the issue of whether SJT concealed from Catlin material information regarding the *Perseverence*'s risk.  Catlin claims that SJT did not disclose that it had offered to sell the drydock for $800,000 in January 2011 or that it considered $700,000 to be the market value for the drydock.  Evidence potentially demonstrates, however, that Catlin may have already understood the risks of insuring the *Perseverence* through Mr. Kirchhofer, who had been the underwriter in charge of the SJT file with a previous insurer, RLI.  In his deposition, for example, Mr. Kirchhofer admitted that he did not ask Mr. Toscani about the loss history of the drydock, and that he "had familiarity with the risk." (Docket No. 141-2 at 6-7.)  Mr. Toscani's April 12, 2011 e-mail also indicates that Mr. Kirchhofer was aware that the *Perseverence* was "currently up for sale" just days before Catlin issued the marine insurance policy.  The extent of Mr. Kirchhofer's — and thus Catlin's — knowledge about the *Perseverence*'s risk and value implicates the "weighting of evidence," and a trial — as opposed to summary judgment — is thus the proper arena to gauge a witness' credibility.  See Reliance Nat'l. Ins. Co. (Europe), Ltd., 246 F.

Supp. 2d at 127.  Furthermore, the question of whether the insured
concealed a material circumstance is an issue for the trier of
fact.  Wisniewski, 579 F. Supp. at 1016 (citing King, 54 F.2d
at 255 and 2 J. Arnould, Law of Marine Insurance and Average (10
British Shipping Laws) § 637 (15th ed. 1961)).  Because the facts
as presented are in dispute as to whether or not SJT complied with
the *uberrimae fidei* doctrine's representation and disclosure
requirements, SJT's motion for summary judgment on Catlin's first
and second causes of action is **DENIED**.  See Detyens Shipyard, 147
F. Supp. 2d at 424.

> **B.  Catlin's Denial of Insurance Coverage**

In its alternative seventh cause of action, Catlin claims
that the drydock coverage under the Policy applies only to certain
"named perils," and that because the claim SJT submitted was not
due to an enumerated peril, SJT's claim is not covered.  (Docket
No. 1 at 6.)  SJT, in contrast, claims that the Policy was an "all
risk" policy that covers its loss.  A named perils policy provides
coverage that is limited to the specific perils insured against,
while an all risk policy is insurance in which "all losses
attributable to external causes are covered," subject to specific
exclusions.  N.W. Mut. Life Ins. Co. v. Linard, 498 F.2d 556, 561
(2d Cir. 1974); By's Chartering Serv., Inc. v. Interstate Ins. Co.,
524 F.2d 1045, 1047 n. 2 (1st Cir. 1975).  Whether a policy is a
named perils policy or an all risk policy is significant to the

legal standard used to determine coverage.  If a court regards a policy as a "named perils" policy, "then [the] plaintiff has the burden of coming forward with a preponderance of competent evidence that the sinking of the [object] was caused by a covered occurrence." Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co., 2005 WL 2334385, 2005 A.M.C. 2601 at *4 (1st Cir. 2005) (unreported) (citing Linard, 498 F.2d at 561).  On the other hand, "an all risk policy places the burden on the insured to establish only the existence of the all risk policy and its loss.  Then the burden shifts to the insurer to show that the coverage of the loss comes within one of the exceptions." Miller Marine, 2005 WL 2334385 at *4 (citing Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co., 505 F.2d 989, 999 (2d Cir. 1974)).  Thus, under a named perils policy, SJT as the insured would have to show that its loss arose from a covered peril.  In contrast, under an "all risk" policy, SJT need only establish the existence of the all risk policy and a loss, and to deny coverage Catlin would have to demonstrate that the loss falls within one of the exceptions to coverage.  To determine as a matter of law whether Catlin properly denied coverage for SJT's loss, the Court must address (1) whether the Policy at issue is an all risk or named perils policy, and (2) what proximately caused SJT's loss.

      **1.**    **All Risk Policy v. Named Perils Policy**

Endorsement 5 outlines the coverage for the *Perseverence*:

> TOUCHING THE ADVENTURES AND PERILS which we, the said Assurers, are contended to bear and take upon us, they are of the Seas, Rivers, Lakes, Harbours. Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart of Counter Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners, Explosions, Riots, or other causes of whatsoever nature arising either on shore or otherwise, causing Loss of or injury to the Property hereby insured, and of all other Perils, Losses, and Misfortunes that have or shall come to the Hurt, Detriment, or Damage of the said Dock, &c., or any part thereof.

(Docket No. 134-2 at 67.)  The parties take issue with the meaning of the second half of the coverage provision.  SJT claims that the phrases "causes of whatsoever nature arising on shore or otherwise" and "all other [p]erils, [l]osses, and [m]isfortunes" reflect an all risk policy.  (Docket No. 138 at 17.)  Catlin disagrees, arguing that the phrase "all other [p]erils, [l]osses, and [m]isfortunes" must not be read to render the entire [p]erils clause superfluous, and that pursuant to the doctrine of *ejusdem generis*, the Policy covers only the enumerated "perils of the sea" and "similar perils."  (Docket No. 135 at 25–26 ("To ignore the lengthy description of covered [p]erils articulated in the clause

would effectively render the entire clause a 'literary embellishment.'") (citing <u>Feinberg v. Ins. Co. of N. Am.</u>, 260 F.2d 523, 527-29 (1st Cir. 1958))). Fatalistically, Catlin does not justify how "other causes of whatsoever nature arising either on shore or otherwise" supports its conclusion that the Policy is a named perils policy.

The Court finds that the Policy covering the *Perseverence* constitutes an all risk policy, not a named perils policy. Two cases that interpret nearly identical coverage provisions[10] as Endorsement 5 at issue here, <u>Int'l. Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 944 F. Supp. 886 (M.D. Fla. 1996) and <u>Mellon v. Fed. Ins. Co.</u>, 14 F.2d 997 (S.D.N.Y. 1926), are particularly persuasive to the Court's conclusion. The phrases "other causes of whatsoever nature arising either on shore or otherwise" and "all other perils, losses, and misfortunes," — especially coupled together — indicate an expansive range of coverage against all risks, not a limited coverage of named risks. Literary embellishment, after all, "has no place in an insurance policy. On the contrary[,] it is the universally accepted rule that words used in such a document must be presumed to have been used on purpose to convey some meaning." <u>Feinberg</u>,

---

[10] Most importantly, the coverage provisions in those cases included the clauses "other causes of whatsoever nature arising either on shore or otherwise" and "all other perils, losses, and misfortunes" that are at issue in this case.

260 F.2d at 527.  Just as International Ship reasoned, therefore, "[a]ny time an insurer decides to draft an insurance policy which provides coverage for 'other causes of whatsoever nature' and 'all other perils, losses, and misfortunes,' it intends to provide 'all risk' coverage to its insured, not simply a covered 'perils' policy."  944 F. Supp. at 892.  International Ship and Mellon thus held — and this Court agrees — that policies including the clauses "or other causes of whatsoever nature arising either on shore or otherwise, causing injury to the property hereby insured and of all other perils, losses, and misfortunes" are not named perils policies, but rather are all risk policies.

        The legal authority upon which Catlin relies is consistent with that holding.  Many of the cases and treatises address the historical nature of the "all other [p]erils" language typically included in marine insurance policies and also point out the English courts' conclusion that "all other [p]erils" is *ejusdem generis*, "intended to incorporate only perils of the same nature" and indicative of a named perils policy.  (See sources cited in Docket No. at 22-28.)  While those cases provide consistent legal precedent, they are inapposite to this case for failing to shed light on the impact of the *dual* coverage provisions "other causes of whatsoever nature arising either on shore or otherwise" *and* "all

other perils, losses, and misfortunes."[11]   Other cases, moreover,
can be distinguished for the subtle but major difference in the
policy language construed; several cases interpret marine insurance
contracts as named perils policies due to the inclusion of the word
"like" before the "perils, losses and misfortunes" clause.  <u>See,</u>
<u>e.g.</u>, <u>Feinberg</u>, 260 F.2d 523 (addressing whether the plaintiff
suffered a "like" peril, loss or misfortune within the meaning of
the insurance policy's "all other like perils, losses and
misfortunes" provision); <u>Linard</u>, 498 F.2d 556 (construing a policy
which included the word "like" in the concluding clause covering
"other . . . [p]erils, [l]osses and [m]isfortunes" as a named
perils policy).   In light of such precedent, the Court must
disagree with Catlin's argument that "precedents do [sic] not

---

[11] Catlin cites <u>Underwriters at Lloyd's v. Labarca</u>, 260 F.3d
3 (1st Cir. 2001) and <u>Lanasa Fruit S. S. & Importing Co. v.</u>
<u>Universal Ins. Co.</u>, 302 U.S. 556 (1938) to support its contention
that Endorsement 5 is a named perils policy.  The Court does not
find these cases apposite to the threshold question of whether the
Policy is an all risk or named perils policy, however, because
neither case directly addresses or analyzes that issue.   In
<u>Labarca</u>, the First Circuit Court of Appeals referenced the scope of
the "perils of the sea" concept but noted that the marine insurance
policy at issue did not contain a "perils of the sea" clause.  260
F.3d at 8-9.  Although the <u>Lanasa</u> case did involve a typical
"perils of the sea" clause — "all other perils, losses, and
misfortunes" — the Supreme Court's analysis centered on whether a
sea peril, stranding, was a proximate cause of the insured's loss,
not on what type of marine insurance contract was at issue.  <u>See</u>
<u>generally</u> 302 U.S. 556.  Accordingly, the Court does not regard
those cases as binding authority for the proposition that policies
with "other causes of whatsoever nature arising either on shore or
otherwise . . . and of all other perils, losses, and misfortunes"
language constitute named perils policies.

recognize a distinction" between perils clauses that include the words "like perils" and those that do not, (Docket No. 134 at 28), and that "distinguishing between [p]erils clauses referring to 'all other perils' and those incorporating 'all other *like* perils' ignores both the language and precedent," (Docket No. 135 at 27).

The Court agrees with SJT that the wording included in Endorsement 5 "reflects Catlin's intent to offer all risk coverage as opposed to coverage for named perils and perils similar to those listed in the clause." (Docket No. 138 at 17.)  It also agrees with Catlin's contention that "if 'all risk' coverage was intended, it would have been much simpler and easier to say 'all risk'" instead of including language that resembles typical named perils coverage.  (Docket No. 135 at 28.)  Catlin may have *intended* for Endorsement 5 to be "based on a traditional form consistently construed for over a century" as a named perils policy, (Docket No. 142 at 20), but ultimately, the effect of the "causes of whatsoever nature arising either on shore or otherwise" and "all other perils, losses and misfortunes" language indicates an intent

to provide more than mere named perils coverage.[12]  Accordingly, the

Court holds that the Policy insuring the *Perseverence* is an all

risk insurance policy.

### 2.   Proximate Cause of SJT's Loss

Under an all risk policy, the insured must show that

the loss or damage suffered was fortuitous.  Dow Chem. Co., 635

F.2d at 386 ("[A]n all risk policy will be allowed for all

fortuitous losses not resulting from misconduct or fraud . . . .");

Linard, 498 F.2d at 561 n.5 ("Even an 'all risks' policy is subject

to the proposition that the damage must have been due to some

*fortuitous* circumstance or casualty.")  (internal citations

---

[12]  The Court finds that the "other causes of whatsoever nature
arising either on shore or otherwise" and "all other perils"
language clearly indicates an all risk policy.  As such, it is the
duty of the Court to apply the words' ordinary meaning and not to
favor either party in construction.  See Lloyd's of London v.
Pagan-Sanchez, 539 F.3d 19, 23 (1st Cir. 2008) ("It is a well
settled rule that clear and unambiguous clauses must be accepted as
the expression of the intent of the parties, and enforced by the
courts as written.")  (internal quotations and citation omitted).

Even if the Court was persuaded by Catlin's argument that the
Policy's "all other perils" language was designed to mirror a named
perils policy, however, it would regard the inclusion of the "other
causes of whatsoever nature arising either on shore or otherwise"
language as rendering the Policy coverage ambiguous.  Accordingly,
it would construe the Policy in favor of the insured, SJT.  See
Littlefield v. Acadia Ins. Co., 392 F.3d 1, 8 (1st Cir. 2004) ("If
an insurance policy provision is susceptible to more than one
reasonable interpretation, and an interpretation provides coverage,
the policy contains an ambiguity and will be construed against the
insurer.")  (internal citation omitted).  Ambiguities in a contract
should be construed against the party who drafted it.  Gonzalez v.
Coop. Seguros de Vida de P.R., 117 D.P.R. 659 (1986) (citing Laws
P.R. Ann. tit 31 § 3478 and holding that ambiguities in a contract
should be construed against the drafting party).

omitted); <u>Texas E. Transmission v. Marine Office-Appleton & Cox Corp.</u>, 579 F.2d 561, 564 (10th Cir. 1978) ("[R]ecovery under [an all risks] policy will generally be allowed, at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured . . . . No case has been found denying the above proposition . . . ."). Accordingly, SJT bears the initial burden of establishing that a loss occurred to the *Perseverence* and that it was due to some fortuitous event or circumstance.

The Court finds that genuine issues of material fact remain as to the proximate cause of SJT's loss. SJT has submitted an explanation of how the sinking of the *Perseverence* occurred: that "somebody left the fire hose and the manholes at the drydock's deck open, even though Mr. Payne and SJT's foreman gave clear instructions to the contrary, and the drydock sank by its back portion." (Docket No. 138 at 20.) It supports this contention with facts attested to by Mr. Payne and Captain Padilla from their observations of the submerged drydock on the night of September 28-29, 2011. Relying on the conflicting testimony of SJT's foreman, Mr. Monge — who was on site during the ballasting operations on September 28, 2011 — Catlin argues that the circumstances of the sinking are disputed issues of fact. Catlin nevertheless offers its own explanation of the cause of SJT's loss: the drydock sank because of its "deteriorated, wasted condition."

SJT disagrees, arguing that "[w]hatever corrosion the drydock had was not the cause of its sinking." Id. at 21.

The evidence here "tend[s] to support conflicting inferences" of why the *Perseverence* sank. See Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 207 (1st Cir. 2006). The testimony of Captain Padilla and Mr. Payne supports the inference that the drydock sank due to the running water from the fire hose and open manholes on the drydock's deck. Testimony from Catlin's expert that wasted bulkheads throughout the drydock allowed water ingress and progressive flooding, however, also supports a conclusion that the drydock sank as a result of its poor condition. Because the determination about the proximate cause of SJT's loss can go both ways, the Court declines to resolve the issue at this time. See Montfort-Rodriguez, 504 F.3d at 228; Montfort-Rodriguez v. Rey-Hernandez, 504 F.3d 221, 229 (1st Cir. 2007) ("Summary judgment cannot be predicated on so vacillatory a record.") (citation and internal quotations omitted). Accordingly, it is remains unclear whether SJT's damage occurred due to some *fortuitous* circumstance or casualty that is covered under the all risk policy, and summary judgment is **DENIED** as to Catlin's alternative seventh cause of action. (Docket No. 142 at 16.) The Court also **DENIES** SJT's motion for summary judgment of Catlin's alternative sixth cause of action on those grounds.

**C.   Catlin's Third, Fourth, Fifth, and Eighth Causes of Action**

SJT argues that Catlin's alternative third,[13] fourth,[14] and eighth[15] causes of action implicate the doctrine of seaworthiness. (See Docket No. 1 at 5-7.)  Generally, the implied warranties of seaworthiness are "premised on the notion that, because the insured is best able to foresee the nature, extent, and necessities of the specific voyage, the insured is also best able to have the vessel adequately prepared for the voyage."  Emp's. Ins. of Wausau v. Occidental Petroleum Corp., 978 F.2d 1422, 1433 (5th Cir. 1992). In the legion case of The Caledonia, the Supreme Court explained that "every person who proposes to any insurers [sic] to insure his ship against sea perils, during a certain voyage, impliedly warrants that his ship is, in every respect, in a suitable condition to proceed and continue on that voyage and to encounter all common perils and damages with safety."  157 U.S. 124, 131 (1895).

---

[13] The alternative third cause of action alleges a breach of the Absolute Warranty of Seaworthiness that renders coverage of the drydock void ab initio.  (Docket No. 1 at 5.)

[14] The alternative fourth cause of action alleges that the Perseverence was not in a serviceable or seaworthy condition in violation of the Policy conditions, which renders the Policy void ab initio.  (Docket No. 1 at 5.)

[15] The alternative eighth cause of action alleges a violation of the Negative Implied Warranty of Seaworthiness that renders coverage of the drydock unenforceable.  (Docket No. 1 at 6-7.)

Seaworthiness, as discussed above, applies only to vessels. See In re McAllister Towing of Virginia, Inc., 2000 A.M.C. 2164, 2168 (E.D.Va. 2000); Detyens Shipyard, 147 F. Supp. 2d at 421-22. Because there are no warranties of seaworthiness on a non-vessel, and the Court previously held that the *Perseverence* is not a vessel pursuant to federal admiralty law, (Docket No. 112 at 28), the Court **GRANTS** SJT's motion for summary judgment on Catlin's alternative third, fourth, and eighth causes of action and **DISMISSES** those claims. See Detyens, 147 F. Supp. 2d at 421-22.

Catlin's alternative fifth cause of action is that SJT failed to comply with a "Condition of Coverage" under the Policy — to "provide routine and necessary maintenance to the Drydock." (Docket No. 1 at 5.)  To the extent that this cause of action relies upon the seaworthiness clauses of the Policy, (Docket No. 50-1 at 7), this claim is also **DISMISSED**.

### E.   SJT'S Claims for Attorneys' Fees, Punitive Damages, and Demand for a Jury Trial

#### 1.   Attorneys' Fees

The "American system" generally requires each party to pay its own attorneys' fees unless a statute or contract permits recovery. Mullane v. Chambers, 333 F.3d 322, 337-38 (1st Cir. 2003). Puerto Rico law grants attorneys' fees in certain circumstances, and, pursuant to such law, the First Circuit Court of Appeals allows attorneys' fees in diversity cases, where

appropriate.  Templeman v. Chris Craft Corp., 770 F.2d 245, 250
(1st Cir. 1985) (citing Pan Am. World Airways, Inc. v. Ramos, 357
F.2d 341, 342 (1st Cir. 1966)).  In admiralty cases, however — even
when the Court could hear the case through diversity jurisdiction
— the Court does not apply Puerto Rico law regarding attorneys'
fees; rather the Court applies admiralty law.  Id.; see also
Clarendon Am. Ins. Co. v. Fernandez-Rodriguez, 1999 AMC 2885
(D.P.R. 1999) (stating "[a]lthough attorneys' fees are awarded in
admiralty cases for disputes which are normally not the subject of
admiralty, the case at bar [sic] does not hinge on an aspect which
remains unaddressed by maritime law, but rather on an allegation of
a breach of a maritime insurance contract.").  "Under admiralty
law, a court has inherent power 'to assess attorneys' fees when a
party has acted in bad faith, vexatiously, wantonly, or for
oppressive reasons.'"  Id. (quoting Gradmann & Holler GMBH v.
Cont'l. Lines, S.A., 679 F.2d 272, 274 (1st Cir. 1982) (internal
quotations omitted)).

        In its opposition for summary judgment, SJT contends
that attorneys' fees are recognized by the current state of Puerto
Rico law.  (Docket No. 140 at 12-13.)  This case, however, is an
allegation of a breach of a maritime insurance contract, and,
accordingly, the Court applies admiralty law in deciding whether an
award of attorneys' fees would be appropriate.  The Court does not
find that either party has acted "in bad faith, vexatiously,

wantonly, or for oppressive reasons." Accordingly, Catlin's motion to strike SJT's demand for attorneys' fees is **GRANTED**.

### 2. Punitive Damages

Catlin demands that the Court strike SJT's request for punitive damages because Puerto Rico law governs whether punitive damages are available in a maritime insurance action, and punitive damages do not exist under Puerto Rico law. (Docket 135 at p. 22.) SJT failed to respond to Catlin's motion to strike punitive damages.

As noted above, admiralty law controls this case. When causes of actions arise under admiralty law, federal law — rather than state law — controls the damages issue. Protectus Alpha Nav. Co., Ltd. v. N. Pac. Grain Growers, Inc., 767 F.2d 1379, 1385 (9th Cir. 1985) (citing Pizani v. M/V Cotton Blossom, 669 F.2d 1084, 1088 n. 2 (5th Cir. 1982)). "The common law tradition of punitive damages extends to maritime claims." Atl. Sounding Co., Inc. v. Townsend, 557 U.S. 404, 414 (2009); see also S. Port Marine, LLC v. Gulf Oil Ltd. P'ship., 234 F.3d 58, 65 (1st Cir. 2000) (finding that punitive damages for reckless conduct are traditionally available under the general maritime law). Punitive damages are appropriate in maritime cases "for wanton, willful, or outrageous conduct." See Atl. Sounding, 557 U.S. at 409.

Because admiralty law controls the Policy at issue and punitive damages are available under admiralty law, the Court

finds that punitive damages cannot be barred as a remedy in this case.   Accordingly, Catlin's motion to strike SJT's demand for punitive damages is **DENIED.**

### 3.   **Jury Trial**

When a plaintiff identifies his or her claim as an admiralty or maritime claim, the plaintiff does not have a right to a trial by jury.  Matter of Armatur, S.A., 710 F. Supp. 404, 406 (D.P.R. 1989); Fed.R.Civ.P. 38(e).   When a defendant brings a counterclaim to a plaintiff's admiralty claim, and it is so intertwined with the main action that the resolution of both claims hinges on the same factual determinations, the defendant's counterclaim cannot be heard by a jury.  Clarendon Am. Ins. Co., 1999 AMC at 2885 (citing Harrison v. Flota Mercante Grancolombiana, S.A., 1979 AMC 824, 848-49 (5th Cir. 1978)); see also Royal Ins. Co. of Am. v. Hansen, 125 F.R.D. 5, 9 (D. Mass. 1988) (quoting Ins. Co. of N.A. v. Virgilio, 574. F. Supp. 48, 51 (S.D. Cal. 1983)) (holding that a defendant's counterclaim — that is based on the breach of the same maritime insurance contract as the main claim — cannot be granted a jury trial because the resolution of the defendant's claim would dispose of all or part of the plaintiff's action.   "The net result would be to resolve the case in a jury trial despite the plaintiff's 9(h) election.").

As in Clarendon and Royal Ins. Co. of Am., SJT's counterclaim stems from the same marine insurance contract as the

main claim.  The resolution of the counterclaim and the main claim
thus hinges on determining the same facts.  Granting SJT's request
for a jury trial would, therefore, dispose of all or part of
Catlin's action by jury despite Catlin's 9(h) election.
Accordingly, SJT's counterclaim cannot be heard in a trial by jury,
and Catlin's motion to strike SJT's demand for trial by jury is
**GRANTED**.

## IV.  Conclusion

For the reasons discussed above, the Court **GRANTS IN PART** and
**DENIES IN PART** SJT's motion for summary judgment.  Summary judgment
is **DENIED** as to Catlin's first, second, sixth and seventh causes of
action.  Summary judgment is **GRANTED** as to Catlin's alternative
third, fourth, fifth, and eighth causes of action under the
doctrine of seaworthiness, and those causes of action are
**DISMISSED**.  Catlin's motion to strike SJT's demand for attorneys'
fees is **GRANTED**.  Catlin's motion to strike SJT's demand for
punitive damages is **DENIED**.  Catlin's motion to strike SJT's demand
for trial by jury is **GRANTED**.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, July 30, 2013.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
United States District Judge