**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| CATLIN (Syndicate 2003) AT LLOYD'S | Case No.: 11-2093 (FAB) |
| Plaintiff | |
| vs. | |
| SAN JUAN TOWING & MARINE SERVICES, INC. | COMPLAINT FOR DECLARATORY JUDGMENT IN ADMIRALTY |
| Defendant | |

<u>**SJT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

**COMES NOW,** defendant, SAN JUAN TOWING & MARINE SERVICES, INC. (hereinafter referred to as "SJT"), by and through the undersigned attorneys, and respectfully states and prays as follows:

**INTRODUCTION**

The above captioned cases were tried by this Honorable Court from August 12 to 15, 2013. Once both parties presented their respective cases, this Honorable Court requested the filing of simultaneous post trial briefs containing proposed determinations of fact and conclusions of law within fifteen days of the filing of the trial transcript.  See Trial Transcript, Volume 4 at 88.

**I. PROPOSED FINDINGS OF FACT**

1.    John Competiello is the Marine Claims Manager for Catlin in the United States.  <u>See</u> Trial Transcript, Volume 1, at 14:12-24.

2.    Mr. Competiello and his unit handled all the claims reported under the policies that are issued by the Marine Underwriters in the United States.  <u>See id.</u> at 15:2-4.

3.    Mr. Competiello has been employed in the marine insurance market for approximately twenty five (25) years.  <u>See id.</u> at 15:13-15.

1

4.    The sinking of the dry-dock was reported on September 30, 2011.  See id. at 16:12-18.

5.    Mr. Competiello called Noble Denton.  See id. at 16:21-23.

6.    Noble Denton arranged surveys throughout the world.  See id. 17:14-15.

7.    Noble Denton became Mr. Competiello's eyes and ears on the scene to tell him what happened, what needed to be done, what damages were estimated for the structure, and also to vet the bills.  See id. at 16:24-25; 17:1-3; 48:5-11.

8.    Noble Denton reported to Mr. Competiello, as they attended the floating dry-dock incident.  See id. at 18:8-10.

9.    Mr. Competiello received several reports from Noble Denton.  See id. at 26:8-10.

10.   Mr. Competiello involved Catlin's underwriting department in the handling of the claim.  See id. at 29:1-6.

11.   Resolve is a company engaged in salvage.  See id. at 30:5-6.

12.   In addition to getting written reports from Noble Denton, Mr. Competiello also received verbal reports from them, specifically from Mr. John Poulson.  See id. at 30:10-14.

13.   Mr. Competiello believed that the issues presented in Noble Denton's reports and photos were more underwriting than claims issues.  See id. at 31:4-6.

14.   Mr. Competiello consulted with John Kirchhofer, the underwriter of San Juan Towing's account.  See id. at 31:12-15.

15.   In consultation among John Kirchhofer, Mr. Competiello and legal counsel, the Policy was rescinded.  See id. at 31:16-21.

2

16.     The rescission letter is Joint Exhibit No. 2.  See id. at 31:22-24.

17.     There were claims issues raised in this letter.  See id. at 32:2-3.

18.     Mr. Competiello reviewed the claim section of the letter before it was issued to San Juan Towing and agreed with it.  See id. at 32:10-14.

19.     The inception date of Catlin's Policy was April 29th, 2011.  See id. 33:5-7.

20.     Mr. Competiello does not know whether all the damage he saw on the pictures he was shown during his direct examination resulted from the actual sinking of the dry-dock.  See id. at 33:8-12.

21.     Mr. Competiello does not know if part of the structural damage resulted from the actual refloating efforts of San Juan Towing.  See id. at 33:13-24.

22.     Mr. Competiello is not an expert in metallurgy.  See id. at 34:17-20.

23.     Mr. Competiello does not know if the structural damage that he saw in the photographs shown to him during his direct examination occurred was caused by the salvage efforts of San Juan Towing.  See id. at 34:23-25; 35:1.

24.     Mr. Competiello does not know if the structural damage, the breaking of members and the breaking of bulkheads occurred also as a result of the refloating efforts of Resolve.  See id. at 35:2-6.

25.     Resolve broke bulkheads in the dry-dock's internal tanks.  See Exhibit 37.

26.     During his direct examination, Mr. Competiello was not shown photographs of the damage caused by Resolve, but rather the damage that Catlin contends was made by wastage.  See id. at 38:7-11.

3

27.    There are no photographs of the holes that were made as part of the refloating efforts. See id. at 38:12-16.

28.    Resolve had to make penetrations between the Number 1 and Number 2 wingwall tanks.  See id. at 38:18-24.

29.    Mr. Competiello admits that valves within the dry-dock internal tanks are used to transfer water from one tank to another.  See id. 39:16-25; 40:1-2.

30.    Mr. Competiello admitted that the dry-dock's valves were in the open position when the dry-dock was refloated.  See id. at 40:3-6.

31.    Mr. Competiello admits that if the valves are open and one tank is full, the water would go into the other tank where the valve is open.  See id. at 40:25; 41:1-3.

32.    Mr. Competiello admits that if the valves are open between the tanks and one of the tanks is filled, water is going to migrate from that tank into the other tank.  See id. at 42:3-6.

33.    Mr. Competiello admits that if the valve was open and is close to the bottom of the tank, even if the walls between the tanks have some holes in it, water would have still flowed from one tank to another.  See id. at 42:12-16.

34.    Mr. Competiello admits that there is no condition and valuation survey of the dry-dock in the claims file.  See id. at 43:9-11.

35.    Mr. Competiello admitted that he did not know what was the actual condition of the dry-dock on April 2011.  See id. at 44:24-25;45:1.

36.    Mr. Competiello admitted that he did not know the value of the dry-dock as of April 2011.  See id. at 45:2-4.

4

37.  Noble Denton recommended to San Juan Towing that Resolve be hired as salvor. See id. at 46:1-25; 47:1-6.  Trial Exhibit YY.

38.  Noble Denton signed off on all daily reports submitted by Resolve.  See id. at 48:13-23; Trial Exhibits S-U, CC, 29-32, 36-48,163-76.

39.  Catlin never questioned Resolves' job, or ever expressed that Resolve did a bad job. See id. at 52:6-9.

40.  Mr. Competiello does not recall whether Resolve's charges were ever considered excessive by Catlin.  See id. at 52:10-12.

41.  Damage may be sustained by the structure during the sinking and during the refloating operations. See id. at 54:7-10.

42.  The photographs shown to Mr. Competiello were taken six months after the inception of the Policy.  See id. at 55:12-14.

43.  These pictures were taken after the dry-dock have sunk and was under water for thirty days.  See id. at 55:15-19.

44.  Mr. Competiello admitted that he did not know whether there was any damage suffered by the dry-dock as the result of the sinking.  See id. at 55:20-23.

45.  San Juan Towing spent a couple of weeks trying to refloat the dry-dock.  See id. at 56:2-4.

46.  Mr. Competiello did not know whether the damage shown on the pictures was caused by the preparation for the refloating by Resolve or by the salvage operation conducted by Resolve.  See id. at 56:5-14.

47.  Mr. Competiello did not know whether any valves on the dry-dock were open or closed when the dry-dock sank.  See id. at 56:21-23.

48.   Mr. Competiello admitted that he did not know how the holes on Trial Exhibit No. 40 came to be.  See id. at 62:22-25; 63:1.

49.   Mr. Competiello did not know if those holes were there on April 2011.  See id. at 63:2-4.

50.   Mr. John Kirchhofer is employed by Catlin in the Marine Department.  See id. at 66:16-21.

51.   Mr. Kirchhofer is Catlin's Senior Underwriter for Commercial Hull Liability Business.  See id. at 67:13-16.

52.   Mr. Kirchhofer has been involved in underwriting marine insurance since 1996.  See id. at 67:19-21.

53.   Mr. Kirchhofer has been underwriting marine hull risks since 2000, that is, for thirteen years.  See id. at 68:21-23.

54.   Mr. Kirchhofer joined Catlin in January 2011.  See id. at 68:25.

55.   Prior to joining Catlin, Mr. Kirchhofer worked for RLI Insurance.  See id. at 69:1-2.

56.   Mr. Kirchhofer first became involved with San Juan Towing's account when he was employed at RLI between 2005 and 2006.  See id. 69:4-9.

57.   Frenkel was the insurance broker representing San Juan Towing.  See id. at 69:20.

58.   Mr. John Toscani of Frenkel was the individual broker handling the account.  See id. at 69:16-22; Trial Exhibit 19.

59.   Mr. Kirchhofer admitted having dealt with Mr. Toscani prior to April 12, 2011, which is the date of the e-mail admitted as Trial Exhibit 19.  See id. at 69:23-25.

60.   Trial Exhibit 19 was the first approach in relation to San Juan Towing's account at Catlin.  <u>See id.</u> at 70:2-4.

61.   Trial Exhibit 19 was regarded by Mr. Kirchhofer as a submission in which a broker requests a coverage quote for a particular risk from an underwriter.  <u>See id.</u> at 70:5-10.

62.   The email submission of April 12, 2011 indicates that Mr. Kirchhofer had a phone conversation with Mr. Toscani.  <u>See id.</u> at 70:18-21; Trial Exhibit 19.

63.   Mr. Toscani did not talk to Mr. Kirchhofer about the dry-dock's condition.  <u>See id.</u> at 72:21-23.

64.   Mr. Kirchhofer never asked Mr. Toscani about the dry-dock's condition.  <u>See id.</u> at 72:24-25.

65.   Mr. Kirchhofer underwrote San Juan Towing's dry-dock originally in 2005-2006, and during the time he worked at RLI, sometimes through another underwriter who reported to him.  <u>See id.</u> 74:24-25; 75:1-8.

66.   When Mr. Kirchhofer originally underwrote the risk at RLI in the year 2005-2006, a survey was provided describing the condition of the dry-dock.  <u>See id.</u> 75:9-15.

67.   After that policy year, there were no surveys conducted even though the Policy was renewed every twelve months.  <u>See id.</u> at 75:16-18.

68.   Catlin does not have a standard written application form.  <u>See id.</u> at 76:1-4.

69.   Other companies for which Mr. Kirchhofer worked had standard written application form, such as CNA and MOAC.  <u>See id.</u> at 76:5-8.

70.   Trial Exhibit No. 20 represents a quote issued by Mr. Kirchhofer.  <u>See id.</u> at 77:15-17.

71.   Trial Exhibit No. 21 represents John Toscani's request to Mr. Kirchhofer to bind coverage effective April 29th, 2011.  See id. at 77:20-23.

72.   Mr. Kirchhofer complied and bound coverage.  See id. at 77:24-25.

73.   As a result, a Policy was issued by Catlin which has been identified as Joint Trial Exhibit No. 1.  See id. at 78:1-6.

74.   During the exchanges between Mr. Toscani and Mr. Kirchhofer, Mr. Toscani told him that the dry-dock Perseverance was up for sale.  See id. at 78:7-12.

75.   Mr. Kirchhofer was not told the sales price.  See id. at 78:12-17.

76.   On April 2011, coverage was quoted and bound on a port risk status.  See id. at 81:12-15.

77.   On September 2011, a quote for operational risk status was requested and provided but not bound.  See id. at 82:6-15.

78.   When the account was submitted to Mr. Kirchhofer, it was disclosed that the dry-dock was for sale, but no price was revealed to him.  See id. 98:22-23.

79.   Mr. Kirchhofer never arranged for a survey of the dry-dock Perseverance.  See id. at 99:13-14.

80.   Mr. Kirchhofer explained that no survey was arranged because the dry-dock was underwritten as a port risk non-operating and that it was up for sale, thus, from an underwriting perspective, that represented a lesser risk to underwriters.  See id. at 99:15-25:100:1-8.

81.   Mr. Kirchhofer was aware of the loss history and claims on the policy issued by RLI to San Juan Towing.  See id. 101:25; 102:1-4; 103:17-20.

82.   Mr. Kirchhofer first became aware of the claim involving the sinking of the Perseverance at the end of September 2011.  See id. at 106:8-10.

83.   Mr. Kirchhofer received a notification from Mr. Toscani that the dry-dock had sunk and he forwarded that information to Catlin's claims department, Mr. John Competiello.  See id. at 106:11-14.

84.   Mr. Kirchhofer admitted that he did not specifically read Noble Denton's advices. See id. at 106:21-22.

85.   Joint Exhibit No. 2 is Catlin's rescission letter signed by Mr. Kirchhofer.  See id. at 113:8-12.

86.   Mr. Kirchhofer restates that no condition and valuation survey was commissioned because the dry-dock was being insured on a port risk non-operating status, which implied a lesser risk.  See id. at 115:15-22.

87.   The Policy issued by Catlin was never amended to reflect a change in the operational status of the dry-dock, the dry-dock never ceased to be non-operational.  See id. at 117:19-23.

88.   Calling a structure a port risk and non-operational is basically saying the same thing. See id. at 117:24-25; 118:1-7.

89.   The dry-dock was a non-operational port risk at the time of the sinking.  See id. at 118:8-9; 124:10-13.

90.   The concept of utmost good faith works both ways.  The insurer also has a duty of utmost good faith towards an insured.  See id. at 118:17-20.

91.   Mr. Kirchhofer never asked for the sales price of the dry-dock when Mr. Toscani informed him that the dry-dock was up for sale.  See id. at 119:7-11.

92.    Mr. Kirchhofer does not know what was the fair market value of the dry-dock by April 2011.  <u>See id.</u> at 119:16-19.

93.    A condition and valuation survey is a tool that may be used to determine fair market value.  <u>See id.</u> at 119:20-23.

94.    By April 2011, even though Mr. Toscani told him that the dry-dock was for sale, Mr. Kirchhofer did not request a condition and valuation survey of the dry-dock.  <u>See id.</u> at 119:24-25; 120:1-3.

95.    Mr. Kirchhofer never commissioned a study on comparable sales for dry-docks similar to the dry-dock subject of this case during the course of this litigation.  <u>See id.</u> at 123:2-5.

96.    Mr. Kirchhofer did not consult with any economic expert in terms of how the fair market value of the dry-dock could be calculated as of April 2011.  <u>See id.</u> at 123:6-9.

97.    Mr. Kirchhofer admitted that his opinion as to the fair market value of the dry-dock was based on the emails that had been discussed during the course of his examination. <u>See id.</u> at 123:10-14.

98.    Mr. Kirchhofer is not a corrosion expert.  <u>See id.</u> at 123:15-16.

99.    Mr. Kirchhofer does not have a degree in chemistry.  <u>See id.</u> at 123:17-18.

100.    Mr. Kirchhofer does not hold a degree in marine engineering.  <u>See id.</u> at 123:19-20.

101.    Mr. Kirchhofer does not hold a degree in naval architecture.  <u>See id.</u> at 123:21-22.

102.    Mr. Kirchhofer did not commission a condition and valuation survey report when San Juan Towing requested a quote for the insurance coverage of the dry-dock in an operational status.  <u>See id.</u> at 123:23-25; 124:1-5.

103.    Mr. Kirchhofer did not request Mr. Toscani to seek a condition and valuation report in view of Mr. Toscani's request for a quote in which the dry-dock would be operational.  See id. at 124:6-9.

104.    The dry-dock never ceased to be non-operational.  See id. at 124:10-13.

105.    Mr. Kirchhofer admits that the pictures that were shown to him during his examination reflect the condition of the dry-dock after it was refloated in late October, early November 2011.  See id. at 124:14-19.

106.    Mr. Kirchhofer was not shown any pictures regarding the condition of the dry-dock by April 2011.  See id. at 124:20-22.

107.    While working at RLI, prior to working with Clatin, Mr. Kirchhofer was the person in charge of San Juan Towing's file.  See id. at 124:24-25; 125:1-4.

108.    Mr. Kirchhofer admitted that even though when RLI initially underwrote the risk of the dry-dock a survey was provided, that it did not happen when Catlin underwrote the dry-dock.  See id. at 125:5-13.

109.    Even though Mr. Toscani told Mr. Kirchhofer that the dry-dock was up for sale when he requested that coverage be bound, Mr. Kirchhofer did not ask for a price.  See id. at 125:14-18.

110.    Mr. Kirchhofer admitted that, even though insurance companies such as CNA and MOAC had written insurance applications, Catlin did not.  See id. at 125:19-24.

111.    In this case, no written insurance application was given by Catlin to either Mr. Toscani or to San Juan Towing directly.  See id. at 125:25; 126:1-3.

112.    Mr. Kirchhofer admitted that even though Mr. Jonathan Lacorazza may have been handling San Juan Towing's file at some point in time while he was working at RLI,

Mr. Lacorazza reported to him at all times.  <u>See id.</u> at 126:4-13; Exhibits BBB-OOOO.

113.    Mr. Kirchhofer was senior to Mr. Lacorazza.  <u>See</u> Trial Transcript, Volume 1, at 126:14-15.

114.    Mr. Kirchhofer remained in charge of San Juan Towing's file at RLI up until the time he left RLI in January 2011.  <u>See id.</u> at 126:16-18.

115.    Mr. Kirchhofer admits that loss history is basically the claims record.  <u>See id.</u> at 126:20-22.

116.    Loss history would show how many claims are made and how many losses are reflected in a particular file.  <u>See id.</u> at 126:23-25.

117.    Loss history is an important fact in risk assessment.  <u>See id.</u> at 127:1-3.

118.    While Mr. Kirchhofer was working at RLI, loss history was always taken into consideration whenever RLI wanted to renew San Juan Towing's policy.  <u>See id.</u> at 127:4-7.

119.    When San Juan Towing, through Mr. Toscani, requested coverage from Catlin, Mr. Kirchhofer never asked Mr. Toscani about loss history.  <u>See id.</u> at 127:8-11.

120.    No one at Catlin requested information about the loss history from Mr. Toscani.  <u>See id.</u> at 127:12-14.

121.    The only person working or handling the insurance procurement of San Juan Towing through Mr. Toscani was Mr. Kirchhofer.  <u>See id.</u> at 127:15-18.

122.    Since Mr. Kirchhofer was in charge of San Juan Towing's file while he was working at RLI, when he started working at Catlin, he was already familiar with San Juan Towing's dry-dock as an insurable risk.  <u>See id.</u> at 127:19-23.

123.   Trial Exhibit No. 16 is the Notice of Cancellation and Nonrenewal from RLI.  See id. at 127:24-25.

124.   The reason for the cancellation of RLI's policy was loss history.  See id. at 128:4-6.

125.   Trial Exhibit No. 16 makes no mention of corrosion, wastage, the condition of the dry-dock or anything about the value of the dry-dock.  See id. at 128:7-16.

126.   Mr. Kirchhofer was familiar with the risk because during all the time he was employed by RLI he was the person in charge of San Juan Towing's file.  See id. at 129:6-7.

127.   Mr. Kirchhofer was aware of which claims were brought forth against San Juan Towing and which were brought to RLI requesting indemnity.  See id. at 129:10-13.

128.   Mr. Kirchhofer kept in touch or was kept abreast of claims by the claims department, even though he was a member of the underwriting department of RLI.  See id. at 129:14-17.

129.   Mr. Kirchhofer was aware of the claims involving the dry-dock owned by San Juan Towing during the time he was working at RLI. See id. at 129:18-22.

130.   Mr. Kirchhofer was familiar with San Juan Towing's loss history.  See id. at 131:15.

131.   Mr. Kirchhofer had a recollection of San Juan Towing's claim history, and he did not request the claims history from Mr. Toscani.  See id. at 132:10-12.

132.   Mr. Kirchhofer never expressed any concerns to Mr. Toscani about the physical condition of the dry-dock prior to the inception of the Policy.  See id. at 135:8-11.

133.   Mr. Kirchhofer was the one who decided to underwrite the dry-dock as a risk while he was at Catlin.  See id. at 135:12-14.

13

134.  Mr. Kirchhofer did not ask for anything that Mr. Toscani failed to provide either written or verbal.  See id. at 135:15-18.

135.  Mr. Kirchhofer reached the decision to underwrite the dry-dock based on an email from Mr. Toscani and a phone call he held with Mr. Toscani.  See id. at 135:19-22.

136.  Mr. Kirchhofer never informed anyone at Catlin that he was familiar with the dry-dock as a risk.  See id. at 135:23-25.

137.  When Catlin issued the quote to insure the dry-dock, all the requested information had been submitted.  See id. at 136:1-4.

138.  By April 2011, Catlin had no underwriting guidelines.  See id. at 136:5-7.

139.  Underwriting guidelines are established by companies to set out what their risk appetite will be, what the pricing will be, and their risk selection.  It is basically a list of what risks they would assume.  See id. at 136:12-17.

140.  As of this date, Catlin is in the processing of developing marines underwriting guidelines.  See id. at 137:5-7.

141.  Mr. Kirchhofer never contacted San Juan Towing directly; everything was done through Mr. Toscani.  See id. at 137:8-10.

142.  Joint Exhibit No. 2 was written in conjunction with Mr. Carbin and Mr. Competeillo.  See id. at 137:21-22.

143.  This was the first time Mr. Kirchhofer had to sign a letter that was written in conjunction with other people.  See id. at 137:23-25; 138:1.

144.  Mr. Kirchhofer had no personal knowledge as to the condition of the dry-dock after it was refloated, and his only knowledge was based on the reports sent by Noble Denton to Catlin.  See id. at 138:2-6.

14

145.    Mr. Kirchhofer never flew to Puerto Rico to actually watch or see the dry-dock after it was refloated.  See id. at 138:7-9.

146.    All the information that Mr. Kirchhofer has about the condition of the dry-dock was what was sent to him by Catlin's people at Puerto Rico, Noble Denton.  See id. at 138:10-13.

147.    Mr. Kirchhofer had no concerns as to the condition of the dry-dock up to January 2011, when he was in charge of San Juan Towing's file at RLI.  See id. at 138:14-17.

148.    Mr. Kirchhofer never considered the dry-dock as non-insurable while he was working at RLI.  See id. at 138:18-21.

149.    Mr. Kirchhofer admitted that he based his assertions as to wastage, as well as his decision to rescind the Policy, on Noble Denton's comments.  See id. at 138:22-25; 139:1.

150.    Yet Mr. Kirchhofer did not read Noble Denton's advices.  See id. at 139:2-7.

151.    Mr. Kirchhofer had no idea of the condition of the dry-dock by April 2011.  See id. at 139:19-21.

152.    Whatever Mr. Kirchhofer knew about the condition of the dry-dock was after its refloating.  See id. at 139:22-24.

153.    Mr. Kirchhofer does not know how much wastage there should be for the duty of the insured to inform that condition to the underwriter to be triggered.  See id. at 140:3-6.

154.    Mr. Kirchhofer does not know whether Noble Denton performed any chemical tests on the dry-dock after it was refloating.  See id. at 140:7-10.

155.    Noble Denton's opinion regarding the condition of the dry-dock after it was refloating was based on visual inspection.  See id. 140:11-16.

15

156.   The floating dry-dock was subjected to steel renewal work two months before Mr. Kirchhofer left his employment at RLI and joined Catlin.   <u>See id.</u> at 141:10-25; 142;1-19; Exhibits PPPP, QQQQ, RRRR.

157.   Mr. Kirchhofer has no idea why RLI's policy was cancelled and he had nothing to do with the cancellation. <u>See id.</u> 142:24-25; 143:1-2.

158.   Mr. Kirchhofer stopped working at RLI and then he went to Catlin and provided insurance to the same dry-dock. <u>See id.</u> at 143:3-6.

159.   At no time during Mr. Kirchhofer's employment at RLI did any issue give rise to any concern over the condition of the dry-dock. <u>See id.</u> at 144:6-8.

160.   There is nothing about the valuation of the dry-dock in Joint Exhibit No. 2. <u>See id.</u> at 144:10-17.

161.   Mr. Kirchhofer has no comparable sales or any other way to determine the fair market value of the dry-dock by April 2011.  Yet he expected San Juan Towing to inform him about it. <u>See id.</u> at 144:20-24.

162.   There was only one floating dry-dock at Puerto Rico. <u>See id.</u> at 145:8-14.

163.   On the other hand, in New Orleans there could be 200 similar floating dry-docks. <u>See id.</u> at 145:15-17.

164.   Mr. Kirchhofer is not aware of whether Catlin is questioning the salvage cost of this claim. <u>See id.</u> at 145:24-25; 146:1-3, 14-19.

165.    Besides the issues of the purported wastage and the insurable value of the dry-dock, there are no other grounds for Catlin to claim a breach of the utmost good faith duty. <u>See id.</u> at 146:21-25.

166.   Mr. Kirchhofer did not know how rusted the dry-dock was on April 2011.  <u>See id.</u> at 147:25; 148:1-2.

167.   Mr. Kirchhofer qualified the dry-dock's heavy weather damage suffered while it was in transit from Louisina to Puerto Rico as a large loss.  <u>See id.</u> at 153:17-24.

168.   The heavy weather damage suffered by the dry-dock took place while the dry-dock was insured by RLI.  <u>See id.</u> at 153:25; 154:1-2.

169.   Mr. Kirchhofer testified that after there was a claim by San Juan Towing under Catlin's Policy, a lot of questions came on to him regarding the valuation.  <u>See id.</u> at 156:6-9.

170.   Those questions never came up before the Policy's inception date.  <u>See id.</u> at 156:10-12.

171.   During 2010, Mr. Richard Thompson, a surveyor working for CSL North America, conducted a survey of the dry-dock Perseverance.  <u>See id.</u> at 162:2-21.

172.   Trial Exhibit QQQQ is a copy of Mr. Thompson's Report.

173.   CSL was hired by RLI.  <u>See id.</u> at 163:6-7.

174.   Mr. Thompson entered the number 4 compartments of the dry-dock for purposes of his inspection.  <u>See id.</u> at 163:14-16.

175.   The number 4 compartments are the last three tanks at the stern of the dry-dock.  <u>See id.</u> at 164:2-3.

176.   Mr. Thompson did not conduct an inspection of the entire dry-dock.  <u>See id.</u> at 164:4-6.

177.   Mr. Thompson limited his inspection to the number 4 tanks.  <u>See id.</u> at 164:7-8.

17

178.   Mr. Thompson took the photographs in Trial Exhibit QQQQ during his inspection. <u>See id.</u> at 164:9-17.

179.   The mention of the number 3 starboard compartment in Trial Exhibit QQQQ is an error, since Mr. Thompson never entered the number 3 tanks.  <u>See id.</u> at 165:6-22.

180.   The claim attended by Mr. Thompson was for a deballasting problem with the drain, a clogged structure during the deballasting, which damaged the number 4 starboard side of the dry-dock. <u>See id.</u> at 170:6-9.

181.   Mr. Thompson was hired and paid by RLI. <u>See id.</u> at 175:24-25.

182.   Mr. Thompson was hired to determine the nature, cause and extent of damage, and report those findings to the underwriters. <u>See id.</u> at 176:4-7.

183.   Out of the dry-docks' 12 tanks, Mr. Thompson only went into 3.  <u>See id.</u> at 176:11-13.

184.   Mr. Thompson had no idea what was the condition of the other 8 tanks of the dry-dock or the condition of the bow rake. <u>See id.</u> at 176:14-20.

185.   Mr. Thompson's survey was limited to the 3 aft tanks of the dry-dock.  <u>See id.</u> at 177:10-12.

186.   Mr. Thompson issued three reports to RLI.  <u>See id.</u> at 178:12-13; Exhibits PPPP, QQQQ, RRRR.

187.   Mr. Thompson did not mention any concern about excessive wastage on any of those 3 reports to RLI. <u>See id.</u> at 178:14-16.

188.   Mr. Thompson did not mention or even hint at the dry-dock having lost watertight integrity in his reports. <u>See id.</u> at 178:17-19.

189.    There is no mention in any of Mr. Thompson's reports of heavy wastage.  See id. at 180:3-5.

190.    Mr. Thompson does not know if the wastage he saw in the number 4 tanks that was unrelated to the claim was ever repaired.  See id. at 180:6-9.

191.    Mr. Thompson did not inspect the dry-dock once all the repairs were finished.  See id. at 180:22-24.

192.    Apart from attending to the repairs of the claim that was presented to RLI, Mr. Thompson did not find it necessary to report to the underwriters any other condition about the dry-dock.  See id. at 181:17-21.

193.    Mr. Thompson never conducted any test on the wastage of the steel.  See id. at 182:2-4.

194.    Mr. Thompson did not conduct any audio gauging of the steel.  See id. at 182:5-6.

195.    Mr. Jonathan Lipuscek conducted a survey of the dry-dock Perseverance in 2006, when San Juan Towing purchased it, while he was working for a company called Marine Services Consultants.  See id. at 183:25; 184:1-9; Exhibit FFFFF.

196.    Mr. Lipuscek described the condition of the dry-dock at the time he did the survey as a fairly good condition.  See Trial Transcript, Volume 1 at 184:10-13.

197.    At that point, Mr. Lipuscek put a value on the dry-dock.  See id. at 184:14-15; Exhibit FFFFF at 000646.

198.    Mr. Lipuscek did not know the condition of the dry-dock as of April 2011.  See Trial Transcript, Volume 1 at 193:4-6.

199.    Mr. Lipuscek does not know whether the condition depicted on the pictures shown to him by Catlin's counsel was the condition of the dry-dock by April 2011.  <u>See id.</u> at 193:7-10.

200.    In his experience as a marine surveyor, Mr. Lipuscek testified that it was true that when a structure like the dry-dock sinks, it bends and buckles and the structural members may break.  <u>See id.</u> 193:11-17.

201.    Mr. Charles Munsch's main employment is as a Professor at the State University of New York.  <u>See</u> Trial Transcript, Tuesday, August 13, 2013 at 14:24-25; 15:1-4.

202.    On any given year, Mr. Munsch is involved in between 0 and 3 as an expert.  <u>See id.</u> at 15:15-17.

203.    Mr. Munsch has worked as an expert in several cases during the last 4 or 5 years.  <u>See id.</u> at 16:1-3.

204.    Mr. Munsch has testified in depositions during the past 4 years.  <u>See id.</u> at 16:4-9.

205.    Mr. Munsch has testified in court during the last 4 years.  <u>See id.</u> at 16:10-11.

206.    Mr. Munsch is not a member of the National Association of Corrosion Engineers.  <u>See id.</u> at 22:21-23.

207.    Four out of five publications in Mr. Munsch's *curriculum vitae* deal with container lashing and containerships.  <u>See id.</u> at 23:11-15.

208.    Mr. Munsch has two patents that also deal with shipping containers lashing and locking equipment.  <u>See id.</u> at 23:20-22.

209.    Mr. Munsch inspected a dry-dock in March 2012.  <u>See id.</u> at 24:7.

210.   Mr. Munsch used his inspection of March 2012 to determine the wastage on the floating dry-dock as of April 2011.  See id. at 25:24-25; 26:1-2.

211.   Prior to this trial, Mr. Munsch had never been admitted by a court of law as an expert to determine the level or degree of corrosion and wastage on a metal structure not at the time of his inspection but months or years before his physical inspection.  See id. at 26:4-9.

212.   The instance case was the first time in which Mr. Munsch's theory or method of determining corrosion after an inspection almost a year after the incident was done. See id. at 26:21-25.

213.   Mr. Munsch does not know whether his theory or technique has ever been subject to peer review.  See id. at 27:4-6.

214.   Mr. Munsch has no knowledge of whether his theory or technique about determining the degree of wastage a year before has ever been subject to publication.  See id. at 27:7-10.

215.   Mr. Munsch admitted that he was the only one who knows what the rate of error of his theory was.  See id. at 27:25; 28:1-2.

216.   Mr. Munsch has no knowledge of the level or degree of acceptance of his theory or technique within the discipline of corrosion study and prevention.  See id. at 28:4-7.

217.   Mr. Munsch inspected the dry-dock on March 25 and 26 of 2012, which is 11 months after the dry-dock was insured by Catlin.   See id. at 85:2-5.

218.   That is the only time Mr. Munsch inspected the dry-dock.  See id. at 85-6-7.

219.   Mr. Munsch inspected the dry-dock after it had sunk and it had been refloated.  See id. 85:11-13.

21

220.    The dry-dock suffered damages as the result of the sinking.  See id. at 85:14-16.

221.    The dry-dock suffered damages as the result of the sinking that it did not have before
        it sank.  See id. at 89:3-5.

222.    Mr. Munsch's inspection did not include an underwater inspection of the hull.  See id.
        at 91:14-16.

223.    There are no opinions in Mr. Munsch's report about the watertight integrity of the
        hull.  See id. at 92:6-8.

224.    After the dry-dock was refloated, it never sank again while San Juan Towing had it in
        its possession.  See id. at 93:1-5.

225.    Mr. Payne wanted to ballast the dry-dock so as to raise its front portion.  See id. at
        95:23-25; 96:1; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9; 210:6-25; 211:1-
        14.

226.    San Juan Towing wanted to do some repairs on the rake bow.  See Trial Transcript,
        Tuesday, August 13, 2013 at 96:2-3; Exhibit 28 at 195:9-25; 196:1-2; 198-207;
        209:7-9; 210:6-25; 211:1-14.

227.    In order to do that, Mr. Payne took two empty tanks and one concrete block, and he
        placed them on the aft portion of the deck.  See Trial Transcript, Tuesday, August 13,
        2013 at 96:5-8; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9; 210:6-25; 211:1-
        14.

228.    The concrete block was placed on the center of the deck, and the empty external
        tanks were placed to each side of the concrete block.  See Trial Transcript, Tuesday,
        August 13, 2013 at 96:9-12; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9;
        210:6-25; 211:1-14.

22

229.   The intent was to fill those external tanks with water and then use the weight of the two tanks filled with water and the weight of the concrete block to raise the bow so that repairs could be performed.  See Trial Transcript, Tuesday, August 13, 2013 at 97:17-24; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9; 210:6-25; 211:1-14.

230.   Once the external water tanks were full and the concrete block was placed there, it was not enough and water had to be pumped into the internal tanks to add additional ballast.  See Trial Transcript, Tuesday, August 13, 2013 at 98:2-6; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9; 210:6-25; 211:1-14.

231.   Mr. Payne did not want to use the internal tanks of the dry-dock and he first tried to ballast it with these external tanks and concrete block because the dry-dock did not have electricity from the pier and he could not operate the internal pumps of the dry-dock.  See Trial Transcript, Tuesday, August 13, 2013 at 98:8-13; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9; 210:6-25; 211:1-14.

232.   When Mr. Payne realized after filling up the water tanks and the concrete block that it was not enough weight, he had to resort to pumping additional water but now into the internal tanks of the dry-dock.  See Trial Transcript, Tuesday, August 13, 2013 at 98:14-18; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9; 210:6-25; 211:1-14.

233.   The tanks that he put water in were tanks number 4 center, number 4 port and number 4 starboard.  See Trial Transcript, Tuesday, August 13, 2013 at 98:19-21; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9; 210:6-25; 211:1-14.

234.   He placed about two-and-a-half feet of water into those tanks.  See Trial Transcript, Tuesday, August 13, 2013 at 98:22-24; Exhibit 28 at 195:9-25; 196:1-2; 198-207; 209:7-9; 210:6-25; 211:1-14.

235. Under Mr. Munsch's trim and stability calculations, if the dry-dock aft tanks were only half full, the dry-dock would not have sunk.  See Trial Transcript, Tuesday, August 13, 2013 at 99:20-23.

236. Assuming that the watertight bulkheads were in fact watertight, if the number 4 tanks were filled completely, you still would not have enough weight for the dry-dock to sink.  See id. at 100:3-7.

237. Mr. Munsch's opinion with regards to why a barge sank is premised on the fact that a water hose was left open pumping water into the dry-dock.  See id. at 100:8-11.

238. Some of the watertight bulkheads of the floating dry-dock have valves in them.  See id. at 100:23.

239. Those valves are intended to allow water to go from one tank to another when they are opened.  See id. at 100:24-25; 101:1.

240. The valves can be operated by using a panel with 17 valves in it that requires electricity to be operated.  See id. at 101:2-6.

241. Mr. Munsch did not check the location and condition of those 17 valves to see if they were open or closed during his inspection in March 2012.  See id. at 101:7-10.

242. Mr. Munsch admits that at least one of the valves was partially open.  See id. at 101:15-16.

243. Two of the photographs Mr. Munsch showed one valve partially open and another valve fully open.  See id. at 102:1-3.

244. Mr. Munsch admitted that Mr. Camuccio inspected the valves to check which ones were opened and which ones were closed.  See id. at 102:10-13.

245.   If the fire hose was kept running to fill the number 4 tanks, and the valves were open and there was watertight integrity, the water would still have migrated or moved from the number 4 tanks into the other tanks.  See id. at 104:5-25.

246.   Even if the dry-dock had watertight integrity in all of its bulkheads, if the valves were open, the dry-dock would have sunk anyway.  See id. at 104:25; 105:1-25; 106:1-10.

247.   If the valves were open and there was watertight integrity, the dry-dock would have sunk but it would have sunk by listing first and then going down by the bow.  See id. at 106:22-24.

248.   There is no direct testimony or report that says that those valves were closed before the dry-dock sank.  See id. at 108:10-12.

249.   The valves are operated pneumatically by the dry-dock's systems.  See id. at 108:20-22.

250.   In order to operate the dry-dock's systems, the dry-dock needs an electrical supply from shore or from a generator.  See id. at 108:23-25; 109:1.

251.   The system that would operate the valves after the sinking could not operate the valves because it was damaged due to being under water after the sinking.  See id. at 109:2-8.

252.   From the date of the sinking to the date of Mr. Munsch's inspection, the valves could not be operated with the dry-dock's control panel.  See id. at 109:21-24.

253.   Mr. Payne did not want use the internal tanks because in order for him to use the internal tanks to pump the water out, he would have needed to rent a big generator and put it on the dock to supply 440 volts to the dry-dock, because the place where

the dry-dock is located does not have a supply of electricity from shore.  <u>See id.</u> at 110:15-25.

254.    Mr. Munsch has no evidence from anything that he has seen that the salvors or anybody else either opened or closed the valves after the sinking. <u>See id.</u> at 111:1-4.

255.    Mr. Munsch blames all of the shifting of water from one tank to the other solely on the loss of watertight integrity but not on the fact that some of the valves, or all of the valves were open. <u>See id.</u> at 111:6-10.

256.    In arriving to his conclusions, Mr. Munsch relies on two technical papers: on is called A Technical Note, the Effect of Environmental on the Corrosion of Metals and Seawater by Howard Porte dated July 1967, and the other one is a paper called Corrosion in Seawater by Steven Dexter from the University of Delaware. <u>See id.</u> at 116:24-25; 117:1-12.

257.    In arriving to his conclusions, Mr. Munsch did not mention the salinity or chlorinity of the waters surrounding the dry-dock as part of his analysis. <u>See id.</u> at 117:18-20.

258.    Mr. Munsch did not determine whether there were any rivers flowing into the area near the dry-dock. See id. at 118:11-13.

259.    Therefore, Mr. Munsch, did not consider the effect of a river discharge, if in fact, a river was discharging near the dry-dock. <u>See id.</u> at 118:14-17.

260.    Mr. Munsch did not measure the salinity variations in the water around the dry-dock. <u>See id.</u> at 118:19-25; 119:1-7.

261.    Mr. Munsch did not measure the temperature of the water in the water surround the dry-dock. <u>See id.</u> at 120:7-9.

262.   Mr. Munsch did not measure the temperature of the water in the waters where the dry-dock was located in Louisiana before it was owned by San Juan Towing.  See id. at 120:10-13.

263.   Mr. Munsch does not have any comparative table of the temperature of the water in Louisiana versus the temperature of the water in Puerto Rico as part of his analysis. See id. at 120:14-17.

264.   Mr. Munsch did not determine the solubility of oxygen with regards to his analysis of the corrosion of the dry-dock.  See id. at 121:11-13.

265.   Mr. Munsch did not mention all the variables that have been mentioned in his report. See id. at 122:1-4.

266.   Mr. Munsch did not measure the concentrations of carbon dioxide and pH with regards to this specific dry-dock.  See id. at 122:9-11.

267.   Mr. Munsch did not analyze the waters surrounding the dry-dock for pollutants.  See id. at 122:14-16.

268.   Mr. Munsch did not test the muck or sediments at the bottom of the dry-dock's internal tanks to see if they had any type of pollutants.  See id. at 123:14-16.

269.   Mr. Munsch did not study any biological organisms growing around the dry-dock. See id. at 123:22-25; 124:1-4.

270.   Mr. Munsch did not measure or obtain any information about the flow velocities of the water in the waters surrounding the dry-dock.  See id. at 124:13-20.

271.   Mr. Munsch admitted that he did not look into all the variables discussed by Mr. Dexter in his corrosion and seawater technical paper, which are: salinity and chlorinity, the effect of the river discharge, salinity variations, temperature of the

water, dissolved oxygen, dissolved carbon dioxide and pH, effect of pollutants, biological organisms and flow of velocity.  See id. at 124:24-25;125:1-9.

272.  Mr. Thompson's reports were limited to the claim, and he did not mention anything to the underwriters about any other additional impressive damage that he saw.  See id. at 129:4-12.

273.  With the valves open, the dry-dock would have sunk irrespective of the fact that it had watertight integrity or not, though it would have sunk by listing or heeling to one side first.  See id. at 131:21-25; 132:1-2.

274.  Mr. Munsch's opinion of the condition of the dry-dock on April 2011 is based on his inspection carried almost a year after the dry-dock was insured.  See id. at 132:3-6.

275.  And after the dry-dock had sunk.  See id. at 132:7-8.

276.  And after the dry-dock was refloaded.  See id. at 132:9-10.

277.  The metal samples taken from the dry-dock were tested for two things:  chemical content of the steel and its tensile strength.  See id. at 133:6-7.

278.  The steel tested to be what was said in documents and from the original sale, and it was what was expected, and the tensile strength was within the line of what would have been expected to be.  See id. at 133:11-14.

279.  Whether or not water would reach the height of the valve depends on the flow of the water, the amount of the water that is being pumped in, and the side of the holes, whatever holes there may have been, if there were any, below the valve.  See id. 143:15-20.

280.   The water would flow initially to the bottom holes.   The level of the water would have to increase to above the valve before it flowed through the valve.   See id. at 143:20-22.

281.   Mr. Munsch did not do any calculations to determine what were the size of the holes and the amount of water that could flow from those alleged holes that he contend were in the bottom part of the bulkhead.   See id. at 143:23-25; 144:1-2.

282.   Mr. Robert Camuccio was hired by San Juan Towing to evaluate how the dry-dock sank over the mechanism of sinking and to take a look at the cost estimate to determine whether or not the cost estimate for repairs was realistic.   See Trial Transcript, August 14th, 2013, at 57:4-9.

283.   Mr. Camuccio visited the dry-dock twice, once on March 9th, 2012 and again on March 27th, 2012.   See id. at 57:12-17.

284.   Among the things that Mr. Camuccio did as part of his investigation prior to rendering his report, he interviewed Mr. Mark Payne, he looked at the Resolve float plan and revised float plan and their daily logs, he looked at the surveys from when the vessel was initially going to be moved from Louisiana, he looked at the surveys from CSL, he looked at a declaration from Mr. Richard Ortego, and he looked at a declaration from Captain Neftalí Padilla.   See id. at 57:10-24.

285.   Mr. Camuccio divided his report in two sections, one is the mode of the sinking and the other one is the analysis of the damage survey.   See id. at 59:2-5.

286.   Mr. Camuccio concluded that the cause of the sinking of the dry-dock was the fact that a one-and-a-half inch hose was left on and running into the dry-dock.   See id. at 59:9-11.

29

287.    There was damage on the forward part of the dry-dock that needed to be repaired before a surveyor or a purchaser's representative was going to look at the dry-dock. See id. at 59:12-16.

288.    In order to get that repaired, Mr. Payne decided that he needed to be able to get the bow of the dry-dock up, getting the stern down and the bow up.  The reason for this that there were welders that were going to have to work in that area.  They needed to be able to get the bow up high enough to be able to do the welding.  Down-hand-welding, welding when you are facing down, is a lot better that up-hand welding, plus the obvious electrical shock problems had to be avoided.  At that time, the dry-dock was powered by a 440 volt three phase current.  The dry-dock did not have that available.  In order to have the 440 three phase current, Mr. Payne had to rent and bring in a generator.  See id. at 59:12-25; 60:1-5.

289.    San Juan Towing had two metal containers that could be filled with water and a cement block.  Mr. Payne put the cement block on the stern, put the two water containers on either side of the stern, filled the water containers with water from the one-and-a-half inch hose to be able to add weight to the stern of the dry-dock to be able to bring the bow up.  This worked but it was not sufficient.  The bow did come up but not enough.  Consequently, the decision was made to add fresh water from the one-and-a-half inch fire hose into the after tanks, being the number 4 port and number 4 center tanks.  See id. at 60:6-17.

290.    Mr. Camuccio testified that according to Mr. Payne, there was about two-and-a-half feet of water in the dry-dock tanks which made them about half full.  See id. at 60:23-25.

291.    At that point in time it looked like they had sufficient room to be able to do the work on the bow and, around noon, Mr. Payne gave instructions to his personnel and left for a family event.  See id. 61:1-4.

292.    Inside the tanks of the dry-dock there are eight-inch diameter butterfly valves which are moved or actuated by a pneumatic system and an electrical power supply.  See id. at 61:13-17.

293.    These valves allow the transfer of water from one tank to another in certain positions. This is used for the docking procedures to balance out the weight distribution.  It can compensate the buoyancy of the dry-dock by shifting some of the water between the 12 different tanks.  See id. at 61:25; 62:1-9.

294.    In his inspection, Mr. Camuccio found that these valves were open.  See id. at 62:10-11.

295.    The result of this is that when the water would go into the four port, four center, and four starboard tanks, and they were half full, in fact, that water was actually proceeding through the valves which were fairly low in the tanks, and moved to the tanks in front, which would be the number 3 tanks.  See id. at 62:11-18.

296.    The water would go from four starboard into three starboard.  From four center, into four port.  Four port and four center could be looked at being one tank.  And then from four port, it would go into three port and, eventually, two port as time would go on. See id. at 62:19-25.

297.    The number four tanks had more than half the amount of water because some of it would have progressed forward to the other tanks.  When the personnel left the dry-dock, everything was in the proper position.  Probably, there was not more than the

two-and-a-half feet of water because there was water forward of those four tanks. <u>See id.</u> at 63:22-25; 64:1-3.

298.   In Mr. Camuccio's opinion, at some point in time, the valve on the dock that goes to the dry-dock was opened.  <u>See id.</u> at 64:4-6.

299.   On the dock itself, on the pier, there is a standpipe that supplies water to the fresh water system.  <u>See id.</u> at 64:9-11.

300.   On one side of the wye valve was the one-and-a-half inch firehose that was used to fill the tanks.  On the other side, there were some fittings that reduced it down to like a garden hose size, and that would be used by the workers on the dock to clean their hands, wash up, take a drink of water, whatever they were going to be doing.  <u>See id.</u> at 64:21-25; 65:1-2.

301.   There is a valve on the far side of the wye valve.  It is Mr. Camuccio's opinion that at some point in time somebody wanted to wash their hands or get a drink of water and opened the wye valve, but the root valve was closed.  Thus the individual that wants to get water to wash their hand whatever they are going to do, opened the root valve. <u>See id.</u> at 65:8-21.

302.   So at that moment in time we have water flowing from this hose into the dry-dock. As time progresses, the water is going to rise and it is going to proceed to go through these valves that are installed on the dock in the dry-dock down low in order to be able to control how much water is in each tank.  Those valves being left open caused something that is called progressive flooding.  The water is progressing from one bulk into another.  So as this occurs over time, the stern of the dry-dock is going to be going down.  It may be heeling one way or another slightly but she is going to be going down.  <u>See id.</u> at 66:14-25.

303.    On top of the deck of this dry-dock there are manhole covers that have access from the top down into these tanks.  Because of the inspection the next day of these tanks the manhole covers were not in place.  Also on the dry-dock there are the wing walls on either side, the port and starboard side.  See id. at 67:1-6.

304.    When the workers left the dock, they left the hose in one of the tanks.  Eventually, as the stern of the dry-dock is going down due to the water from the hose, seawater would go in.  And then that situation got even worse, even though by that point in time it was a lost cause anyway.  The manhole covers on the sides of the wing walls, which one could go into, those also had water flowing into it.  It is going to accelerate the process, and the dry-dock is going to go down by the stern, maybe slightly heel one way of the other, but she goes down by the stern, and water proceed to progress.  See id. at 67:9-24.

305.    That is called progressive flooding.  See id. at 68:2-3.

306.    The valves at the dry-dock are pneumatically operated and electrically operated or controlled.  There is no reason to believe why those valves would be or would have been moved in any way from the condition that they were during the time it sank.  See id. at 68:9-13.

307.    So whatever position the valves were when it sank, that is the position in which they remained because after the dry-dock sank, the pneumatic and electrical systems were damaged.  So whatever position the valves were in at the time of the sinking, Mr. Camuccio strongly believes that they were in that same position when the dry-dock was raised.  See id. at 68:9-25; 69:1.

308.    There would be no reason to move the position of the valves during the refloating operation.  See id. at 69:2-13.

309. Mr. Camuccio concluded that after somewhere around 26,500 cubic feet of water in the aft area of the dry-dock were added, the dry-dock is going to sink by the stern. See id. at 70:1-4.

310. That is the amount of water you need inside the dry-dock for it to sink under the conditions that it was with the valves open and the stern down, and the manhole covers open and everything else as described by Mr. Camuccio. See id. at 70:19-25.

311. If there are two external tanks full, a concrete block on the deck and then there is a two-and-a-half feet of water in the after tanks and then no more water is pumped with the hose into the dry-dock, the dry-dock would sit there indefinitely without any other forces. See id. at 71:1-7.

312. If the tanks were watertight, the bulkheads separating the number 4 tanks from the number 3 tanks, if they were completely watertight but the valves were open and all of the other conditions were the same and the hose was left open, the dry-dock would sink, due to progressive flooding. See id. at 71:21-25; 72:1.

313. The calculations from Art Darden, the naval architect that helped Mr. Camuccio confirmed, first of all, Mr. Camuccio's beliefs from his initial calculations, and they confirmed that the progressive flooding and the amount of sinking the stern would have to have in order to be able to flood the manhole covers or have water go through the manhole covers, and indirectly confirmed the time frame too. See id. 72:2-11.

314. Mr. Camuccio thinks that it is possible that there would have been a slight list to one side or the other. See id. at 72:18-19.

315. The firehose used to fill the dry-dock's internal tanks was a one-and-a-half inch hose with a system on that pier that was estimated at 100 psi. The amount of water going into any of the four tanks compared to the amount of water that is flowing through the

34

open valve, the amount of water going into the tank from the hose is going to be a lot more.  The volume of water coming through the hose would be greater.  It is under pressure.  The water flowing from the tank through the valve to the other tank is not under pressure other than some head pressure.  <u>See id.</u> at 75:3-20.

316.   As long as the hose is pouring water into the four tank, there will be water flowing into the three tank.  As soon as it gets up to that level of the valve.  <u>See id.</u> at 75:21-25.

317.   A sort of dynamic state where the water would continue to go up in the four tanks at a lower rate than it did before it went, because the water is going up in the four tanks fast, and then it reaches the valve.  Now there is going to be some of the water that is being put into the tank is going to be moving into the three tanks.  So the rate of increase in the four tanks is going to slow down, but it is still going to keep on going.  <u>See id.</u> at 76:1-12.

318.   The accumulation of water in the number four tank would have the effect of causing a trim in the dry-dock by the stern, which is the nautical way of saying that the dry-dock is sinking by the stern.  <u>See id.</u> at 76:15-21.

319.   Mr. Camuccio reduced the amount of steel repairs requirements in his report by $73,800 in comparison with the Merrill report.  <u>See id.</u> at 80:3-6.

320.   While lying on the bottom of the harbor, the deck of the dry-dock was experiencing something around 18,000 tons of pressure, that is, about 18 times higher than what its load would normally handled.  The shape of the dry-dock, which is a box or a rectangle, is the worse shape in order to being able to withstand that kind of pressure.  <u>See id.</u> at 82:18-25; 83:1-8.

321.   That kind of pressure would crush the structure.  <u>See id.</u> at 84:6-7.

322.   Steel is strong for its intended purpose but sinking is not one of them.  <u>See id.</u> at 84:22-24.

323.   The final figure for the cost of repairs deducting the amount deducted by Mr. Camuccio is $2,545,066.00.  <u>See id.</u> at 85:22-24.

324.   This is what Mr. Camuccio believes to be the reasonable cost of repairs for the dry-dock.  <u>See id.</u> at 85:25; 86:1-2.

325.   Mr. Camuccio concluded that the repair cost is significantly greater than the value of the dry-dock, and he was referring to the insurance policy's figure of 1.75 million dollars.  <u>See id.</u> at 86:5-11.

326.   Mr. Camuccio stated that the opinions he expressed during this examination were based on a reasonable degree of scientific certainty.  <u>See id.</u> at 86:12-14.

327.   The way in which the dry-dock sank, the configuration of the dry-dock, the time frame that the dry-dock sank all indicate that what Captain Neftalí Padilla reported was in fact true.  <u>See</u> Trial Transcript, August 15th, 2013 at 36:17-19.

328.   The American Bureau of Shipping has rules for dry-docks.  <u>See id.</u> at 68:1.

329.   The dry-dock was built to ABS standards, but it was not an ABS inspected vessel.  <u>See id.</u> at 68:11-13.

330.   Mr. Camuccio has no evidence that the salvors in any way manipulated the position of the valves.  <u>See id.</u> at 72:20-22.

331.   According to what you are dealing with, if you have a panel full of buttons and you want to make sure if it is working or not, you would move the switches.  <u>See id.</u> at 74:16-20.

332.   That was part of the work that was done by Mr. Merrill to determine if the equipment was working or not.  See id. at 74:21-24.

333.   Mr. Cammuccio testified that Mr. Padilla's statement is consistent with the way that he just explained about the sinking by the stern of the dry-dock.  See id. at 77:1-3; Trial Exhibit DDDDD.

334.   Mr. Camuccio believes that progressive flooding of the dry-dock occurred because of the open valves, in opposition to Mr. Munsch's conclusions.   However, Mr. Camuccio agrees with the volume of water required as expressed by Mr. Munsch. See id. at 78:1-4.

335.   Mr. Camuccio testified that a dry-dock after it sinks and falls 20' to the bottom of the ocean and it subsequently salved would be expected to have its decks deformed.  He also would expect internal damage to longitudinals, various structural members of the dry-dock.  There would be great amount of deformation and breaking and movement. See id. 80:15-25; 81:1-3.

336.   Mr. Camuccio saw all of these conditions during his inspection of the dry-dock Perseverance.  See id. at 81:4-7.

337.   San Juan Towing was not required to keep maintenance records for the dry-dock. See id. at 82:6-8.

338.   There are no Coast Guard regulations regarding the maintenance or the upkeep of a dry-dock such as San Juan Towing's.  See id. at 82:9-12.

339.   Mr. Camuccio cannot identify the pictures he was shown during his cross-examination and say whether they came from any specific tank.  See id. at 83:9-16.

340.   Mr. Camuccio testified from a scientific point of view he could not determine which damage was caused by the sinking and refloating versus the alleged wastage that has been asked of him during the course of the trial.  See id. at 84:17-22.

341.   The photographs shown to Mr. Camuccio during his cross-examination were taken after April 2011.  See id. at 84:24-25; 85:1-2.

342.   Mr. Camuccio is of the opinion that if the hose was not left running, the dry-dock would not have sank.  See id. at 85:11-12.

343.   The value of the dry dock "where is, as is" was estimated to be $1,500,000.00 million as of April 17, 2006.  See Trial Exhibit C at SJT-29.

344.   San Juan Towing paid in full the premium corresponding to Catlin's Policy.  See Exhibit K.

345.   GL Noble Denton, Catlin's surveyors, recommended the hiring of Resolve as the best equipped to assist in the refloating of the dock.  See Exhibits M-E, YY.

346.   GL Noble Denton, Catlin's surveyors, oversaw the entire refloating operation conducted by Resolve.  See Exhibits S-U, CC, 29-32, 36-48; 163-76.

347.   Resolve refloated and redelivered the dry dock to San Juan Towing on October 31, 2011.  See Exhibits HH and 52.

348.   The value of the dry dock "where is, as is" was estimated to be $1,750,000.00 million as of November 21, 2006.  See Trial Exhibit FFFFF at 000646.

349.   Prior to being insured by Catlin, San Juan Towing's dry dock was insured by RLI Insurance Company.  See Exhibit UU.

350.   The stand pipe to which the fire hose was connected, as per the testimony of Mark Payne, the unsworn statement by Captain Neftalí Padilla, and Mr. Robert Camuccio's

testimony is shown on Exhibit VV.  <u>See</u> Trial Exhibit UU; Exhibit 28 at 206:1-3; Exhibit DDDDD at ¶¶ 10-17; Trial Transcript, August 14th, 2013, at 64:9-11, 21-25; 65:1-2.

351.   SJT provided maintenance to the dry dock.  <u>See</u> Exhibits WW; GGGGG; and CCCCC at 24:25, 25:1-11.

352.   The salvage and refloating costs amount to $1,052,125.05.  <u>See</u> Exhibit XX.

353.   As a result of Catlin's decision to rescind and/or cancel the Policy issued to San Juan Towing, and of the complaint brought against San Juan Towing, San Juan Towing was forced to incur in foreseeable legal expenses.  <u>See</u> Exhibit ZZ.

354.   San Juan Towing's floating dry dock suffered damage due to heavy weather while on their way from Louisiana to Puerto Rico in 2006.  Mr. John Kirchhofer was aware of these damages.  <u>See</u> Exhibit BBB.

355.    Mr. John Kirchhofer was well aware of the loss history of San Juan Towing's account while he was working at RLI.  <u>See</u> Exhibits BBB-OOOO.

356.   Mr. Robert Camuccio described the way in which the floating dry dock Perseverance sank in September 29, 2011.  <u>See</u> Exhibit AAAAA.

357.   Mr. Camuccio estimated the repair costs for the dry dock at $1,226,700.00, based on his review and analysis of  J.R. Merrill Damage-Surveyor dated 23/24 January, 2012.  <u>See</u> Exhibits AAAAA and G.

358.   Mr. Camuccio's academic and work background is reflected in his *curriculum vitae*.  <u>See</u> Exhibit BBBBB.

359.   By January 3, 2011, when Mark Payne received a purchase offer for the dry dock of $700,000.00, San Juan Towing was suffering from financial hardships due to lack of business.  See Docket No. 157 at 2-3.

360.   Mr. Toscani told Mr. Kirchhofer that RLI wanted off the account of San Juan Towing because they were no longer interested, and this type of business, being a dry dock, and also from a loss history standpoint.  See Depo. Toscani, at 39:13-16, 19-24, admitted as Trial Exhibit 10.

361.    Mr. Toscani visited the dry dock Perseverance approximately two years prior to the date of his deposition.  This was around June 2010.  See id. at 72:14-23.

362.   The only reason why Mr. Toscani asked Mr. Kirchhofer to consider San Juan Towing's account after the non-renewal or cancellation of the account by RLI was because Mr. Kirchhofer was on the account and he was familiar with it.  See id. at 87:18-22.

363.   Mr. Toscani told Mr. Kirchhofer about the loss ratio for San Juan Towing's account during the period San Juan Towing was insured by RLI.  See id. at 90:18-25; 91:2, 21-25; 98:10-13.

364.   Mr. Toscani took San Juan Towing's account to Mr. Kirchhofer because he already knew San Juan Towing from RLI.  See id. at 98:17-25; 99:2-4.

365.   Mr. Kirchhofer did not request anything from Mr. Toscani, in order to set the process to place coverage for San Juan Towing through Catlin.  See id. at 99:5-9.

366.   Mr. Kirchhofer did not ask for loss history documents from Mr. Toscani.  See id. at 99:10-12.

40

367.   Mr. Kirchhofer was familiar with San Juan Towing's loss history at RLI because he was in charge of San Juan Towing's account during the entire time he worked at RLI from 2005 up to January 2011.  See Trial Exhibit 14.

368.   The dry dock Perseverance was insured with RLI for the Policy period of August 29, 2009 through August 29, 2010 with the declared insured value of $1,750,000.00.  See Trial Exhibit 16.

369.   San Juan Towing was selling the dry dock because there was no business for it.  See Trial Exhibit 28 at 104:11-13.

370.   On the night the dry dock sank, Mr. Payne received a call at 11:59 p.m. from a tug boat captain that tied up next to the dry dock.  This captain stated that Mr. Payne should get over there because the dry dock was sinking.  About 15 minutes later, Mr. Payne received another call and the captain told him that the dry dock was already at the bottom of the water.  Mr. Payne arrived to the peer about 20 minutes after midnight to find the dry dock sunk up to the bottom rung of the handrails, which are on the top of the wingwalls.  The person who called Mr. Payne was Captain Neftali Padilla who works with Puerto Rico Towing.  See id. at 182; Exhibit DDDDD.

371.   Mr. Payne described the process of ballasting the dry dock by the stern in order to perform welding repairs at the front portion of the dry dock.  See Exhibit 28 195:9-25; 196:1-2; 198-207.

372.   After the dry dock sank San Juan Towing tried to raise the dry dock, for the next 2 weeks, with no success.  See id. at 209:7-9.

373.   Mr. Payne provided further disclosure of the ballasting process prior to the sinking of the dry dock.  See id. 210:6-25; 211:1-14.

374. Mr. Payne was told that the under deck compartments were common, which he understood to be that the under deck compartments were broken, and he had not seen those conditions during his time under the deck of the dry dock. See id. at 228:22-25; 229:1-7.

375.  After the dry dock was raised and San Juan Towing took redelivery of it on October 31, 2011, the dry dock did not continue to take on water. See id. 241:21-24.

376. Mr. Payne did not see the conditions depicted in the photographs taken after the dry dock was refloated when he went under deck prior to the sinking. See id. at 273:16-25; 274:1-15.

377. Mr. Payne used external tanks filled with water and a concrete block to aid in the ballasting of the dry dock because there was no standing electricity to operate the pumps, and he could fill the external tanks with fresh water from the fire main on the peer. See id. at 295:14-24.

378. In order to use the pumps of the dry dock, San Juan Towing had to rent a big generator. Thus, in order to avoid renting the generator, San Juan Towing tried to do the ballasting first with the external water tanks and the concrete block. See id. at 295:25; 296:1-6.

379. When Mr. Payne left for the day on the day the dry dock sank, the ballasting operation had ended. By that time, there was not water being pumped into the ballast tanks and the water hose was closed. See id. at 296:7-15.

380. Before Mr. Payne left, he told his employees to close the main hose and secure everything. See id. 296:16-19.

381.    As to the cause of the sinking of the dry dock, Mr. Payne is of the opinion that somebody came to wash their hands and opened the big valve on the water main at the peer and then they closed the small valve, but left the big valve open.  See id. at 206:1-3.

382.    As part of its refloating plan, the salvors from Resolve had to make penetrations in the bulkheads of the dry dock, in order to make several tanks or internal compartments common.  See Trial Exhibit 35 at SJT 530.

383.    The stern of the floating dry dock was subjected to steel renewals totaling 54,062.60 pounds.  See Trial Exhibit 208: at 000031.

384.    On June 5th, 2011, Mr. Richard Ortego, Vice-President and General Manager Repair of Leevac Shipyards, traveled to Puerto Rico to look at the drydock.  See *Depo. of Richard Ortego* at 12-13, admitted as Exhibit CCCCC.

385.    Before working for Leevac, Mr. Ortego was employed for four years at Bender Shipyard in Mobile, Alabama and for over twenty years with Bollinger, first at Bollinger Quick Repair at Harvey, Louisiana, afterwards as manager at Algiers, Louisiana, and finally at the Bollinger Gulf Repair facilities at New Orleans, Louisiana.  See id. at 16:21-25; 17:1-7.

386.    Mr. Ortego inspected, prepared and used five floating drydocks while he worked at Bollinger Quick Repair at Harvey, Louisiana; did the same things with two drydocks at Algiers, Louisiana and with four drydocks while at Bollinger Gulf Repair facilities at New Orleans, Louisiana, including a 22,000-ton drydock.  See id. at 17:18-25; 18:1-2.

387. Mr. Ortego was responsible for the maintenance of those drydocks.  <u>See id.</u> at 18:10-12.

388. Mr. Ortego is currently in charge of two drydocks at Leevac's facilities at Lake Charles, Louisiana.  <u>See id.</u> at 19:1-3.

389. During the next day, Mr. Ortego inspected the drydock and found the drydock to be in good condition.  <u>See id.</u> at 13-15.

390. Mr. Ortego did not find anything bad inside the hold.  <u>See id.</u> at 15:11-12.

391. After Mr. Ortego returned to Louisiana, he gave his report to Leevac's owner and recommended the purchase of the drydock.  <u>See id.</u> at 15:13-18.

392. Negotiations for the sale of the drydock began between Leevac and SJT after Mr. Ortego recommended the purchase.  <u>See id.</u> at 15:15-25.

393. Mr. Ortego recognizes corrosion as a concern in a floating drydock and as something one has to live with when having a drydock.  <u>See id.</u> at 19:4-7, 16-17.

394. Prior to his inspection, Mr. Ortego conducted some research on SJT's drydock and found out that it was a good dock, a workable dock that had the right equipment on it. <u>See id.</u> at 22:8-19.

395. Mr. Ortego reached his conclusion that SJT's drydock was a good dock for Leevac to buy after his visit to Puerto Rico and he did not make any decisions until he visited the drydock.  <u>See id.</u> at 23:1-3.

396. During his inspection, Mr. Ortego talked somewhat to Mr. Payne about the maintenance given to the drydock.  <u>See id.</u> at 24:25; 25:1-5.

397. During his inspection, Mr. Ortego saw that maintenance was done on the drydock. <u>See id.</u> at 24:25, 25:1-11.

398.  As part of his inspection, Mr. Ortego entered into about half of the drydock's holds, which he picked at random, and used a drop light.  See id. at 25:18-25; 26:1-3, 13-24.

399.  During his inspection, Mr. Ortego did not see "a lot of rust that [he] normally would see in a lot of drydocks."  Id. at 26:9-11.

400.  During his inspection, Mr. Ortego saw that the drydock had "some corrosion," but it "was watertight, was in good condition."  Id. at 29:1-13.

401.  Mr. Ortego spent half a day between the drydock and SJT's premises.  See id. at 26:25; 27:1-5.

402.  While inside the holds, Mr. Ortego crawled around them, inspecting them for decay, damage, inspecting the valves and general conditions.  See id. at 27:9-18.

403.  As a result of his inspection, Mr. Ortego determined the dock was suitable for purchase.  See id. at 29:1.

404.  As a result of his inspection, Mr. Ortego determined that the drydock's steel was not all pitted out on the deck, the sides and internally; that the structurals were still there, though with some corrosion, but in good shape; and that the electricals were in good condition.  See id. at 29:8-12.

405.  Leevac planned to take the drydock to Lake Charles, Louisiana and use it as a second drydock.  See id. at 29:15-17.

406.  As a result of his inspection, Mr. Ortego concluded that the drydock was suitable, was not overly worn, and that it did not need any major repairs to become Leevac's drydock.  See id. at 30:1-5.

407.  As a result of his inspection, Mr. Ortego determined that the drydock was made of A36 standard American steel.  See id. at 30:6-10.

408.  When asked about what level of corrosion would he have to see to consider a drydock unacceptable, Mr. Ortego declared 30% under American Bureau of Shipping (ABS) standards and 50% or more outside ABS standards.  Mr. Ortego based his conclusion on 35 years of personal experience climbing tanks and looking at equipment.  See id. at 30:15-25; 31:1-3.

409.  The only repairs to the drydock contemplated by Mr. Ortego were painting and pulling and checking all the pumps.  See id. at 31:4-6.

410.  Mr. Ortego did not consider any repairs were necessary to tow the drydock to Louisiana.  See id. at 33:21-25.

411.  All of the shipyards in which Mr. Ortego has worked were in saltwater environments.  See id. at 35:13-17.

412.  When asked about whether the drydocks he operates had their internals coated, Mr. Ortego declared that the one Leevac just built was coated with paint, the two sections added on an older drydock were also coated with paint and the rest of the drydocks were not coated at all.  See id. at 35:19-25.

413.  When asked about whether he noticed anything on the internals under the drydock's deck Mr. Ortego answered nothing he would have pointed out.  See id. at 36:18-21.

414.  Late on the night of September 28, 2011, Neftalí Padilla, a tug captain in the employ of Puerto Rico Towing ("PRT"), was returning to PRT's dock after providing towage services at San Juan Harbor.  See Neftalí Padilla's Unsworn Statement Under Penalty of Perjury at ¶ 3, admitted as Exhibit DDDDD.

415.  While approaching the dock, Capt. Padilla saw the drydock while it was sinking at its berth.  See id. at ¶ 4.

416.  The drydock's back portion was completely underwater, while its front part was partially underwater.  <u>See id.</u> at ¶ 5.

417.  As soon as Capt. Padilla completed the docking the maneuver of the tugboat, he called Mark Payne on his cell phone to inform him of what he was seeing.  <u>See id.</u> at ¶ 6.

418.  Approximately 10 minutes later, around midnight, Capt. Padilla called Mark Payne again to inform him that the drydock was completely underwater.  <u>See id.</u> at ¶ 7.

419.  Approximately 15 to 20 minutes later, Mark Payne arrived to the pier.  <u>See id.</u> at ¶ 8.

420.  Capt. Padilla went with him to take a look at the sunken drydock from the pier.  <u>See id.</u> at ¶ 9.

421.  While Mark Payne was looking at the drydock, Capt. Padilla noticed that a ball valve on the y-connector at the water main next to the drydock was in the open position.  <u>See id.</u> at ¶ 10.

422.  There was a fire hose connected to the portion of the y-connector with the open ball valve.  <u>See id.</u> at ¶ 11.

423.  Capt. Padilla could see the fire hose going into the back portion of the sunken drydock.  <u>See id.</u> at ¶ 12.

424.  By looking at the surface of the water, Capt. Padilla could see that water was coming out of the fire hose.  <u>See id.</u> at ¶ 13.

425.  Capt. Padilla immediately called Mark Payne over and pointed all of these to him.  <u>See id.</u> at ¶ 14.

426.  Mark Payne immediately closed the ball valve to which the fire hose was connected.  <u>See id.</u> at ¶ 15.

427.     Capt. Padilla saw that that the ball valve on the other portion of the y-connector was

in the closed position.  See id. at ¶ 16.

428.     At that time, anybody with access to the pier had access to the water main valve next

to the drydock.  See id. at ¶ 17.


## II. PROPOSED CONCLUSIONS OF LAW

## A.     CATLIN FAILED TO ESTABLISH SJT MISREPRESENTED OR FAILED TO DISCLOSE THE PHYSICAL CONDITION OF SJT'S DRYDOCK

1.     Marine Insurance is a contract "*uberrimae fidei*" requiring the utmost good faith by both

parties to the contract.  See Thomas J. Schoenbaum, Admiralty and Maritime Law § 19–14 (5th

ed. 2011); Trial Transcript, Volume 1 at 118:17-20.

2.     The assured is bound, although no inquiry be made, to disclose every fact **within his**

**knowledge** that is material to the risk. Id. at 406. (Emphasis ours).

3.     Under the general maritime law doctrine of *uberrimae fidei,* or utmost good faith, "the

insured is required to 'disclose to the insurer **all known circumstances** that materially affect the

insurer's risk, the default of which . . . renders the insurance contract voidable by the insurer.'"

Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006).

4.     "A marine insurance policy is unquestionably '*uberrimae fidei*' and may be avoided by

the injured party where the other fails to exercise the utmost good faith required . . . . The burden

of proof is upon the underwriters when they raise the defense of concealment or non-disclosure".

1 ALEX L. PARKS, THE LAW AND PRACTICE OF MARINE INSURANCE at 216 (1987).

5.     The First Circuit generally applies state law in cases involving a marine insurance

contract "unless an established 'maritime rule controls the disputed issue, *and* that rule is

materially different from state law.'"  Pesante, 459 F.3d at 37.  The Pesante court, when faced

with the question of whether the doctrine of *uberrimae fidei* was an established rule of maritime law chose not to decide the issue because, under state law, the policy in question was voidable as a matter of law due to misrepresentations in the insurance application.  See id. at 38.

6.      Hence, *uberrimae fidei* is not an established rule of maritime law in the First Circuit. Furthermore, the First Circuit has strongly hinted that it would not declare *uberrimae fidei* as an established rule of maritime law because that doctrine "has long been considered to be one of limited applicability . . . in light of the Supreme Court's *Wilburn Boat* decision."  Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 55 (1st Cir. 1995), citing Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310 (1955).

7.      Nevertheless, Catlin has failed to establish that SJT allegedly failed to disclose, concealed and/or misrepresented the drydock was in a state of advanced deterioration and wastage at the time SJT applied for insurance coverage.

8.      Further, Catlin has also failed to establish SJT had any knowledge that the drydock was wasted to the point of losing watertight integrity.  Catlin has offered no evidence to the court to support these allegations.

9.      At the time of the inception of the policy, Catlin did not know, nor did it have in place, guidelines, specifications, or otherwise, on the amount of wastage in a structure that is sufficient to trigger the duty of the insured to notify the underwriter of the wastage.  Catlin's corporate representative did not know.  See Trial Transcript, Volume 1 at 136:5-7; 140:3-6.

10.     Nonetheless, Catlin contends that SJT concealed or misrepresented the condition of the drydock when no one at Catlin knew the amount of wastage in a structure that is sufficient to trigger the duty of the insured to notify the underwriter of the wastage.

11.     Catlin never asked for any information from SJT during the application process and never commissioned a condition and valuation survey.   Hence, Catlin cannot assert that the alleged misrepresentation was material to the issuance of the policy when it had no measure as to what constituted wastage at the time of inception.

12.     Furthermore, SJT's drydock was not in a state of advanced deterioration and wastage at the time SJT applied for insurance coverage.   Mr. Richard Ortego, potential buyer Leevac's representative, testified that the drydock had "some corrosion" but that it "was watertight [and] in good condition", when he inspected it on June 5th, 2011. He further added that he did not see as much rust as he would normally see in a lot of drydocks.   See Trial Exhibit CCCCC at 29:1-

13.     Mr. Ortego is an unbiased third party with no interest whatsoever in the outcome of this case, thus, the Court regards his testimony as entire credible.

14.     Catlin simply has not met the burden of proving that SJT had any knowledge, or that is was a known circumstance, that the drydock had allegedly lost watertight integrity at the time of the inception of the policy.

## B.     CATLIN FAILED TO PROVIDE ANY EVIDENCE OF MARKET VALUE OF THE DRYDOCK TO ESTABLISH SJT MISREPRESENTED THE VALUE AT THE TIME OF INCEPTION OF THE POLICY

15.     In general maritime law, "a constructive total loss occurs when the cost of repairing the ship [or other maritime property] is greater than its fair market value immediately before the casualty." Rev-Lyn Contracting Co. v. Patriot Marine, LLC, 760 F. Supp. 2d 162 (D. Mass. 2010) citing DiMillo v. Sheepscot Pilots, Inc., 870 F.2d 746, 751,(1 Cir. 1989).

16.     Where a vessel is a total loss, the measure of damages is its fair market value at the time of the loss plus interest (less any salvage value). Standard Oil Co. of New Jersey v. S. Pac. Co., 268 U.S. 146, 155-156.

17.     "Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to." F.C. Wheat Mar. Corp. v. United States, 663 F.3d 714 (4th Cir. 2011) (citing Std. Oil Co. v. Southern, 268 U.S. 155; Barton v. Borit, 1969 AMC 216, 220, 316 F.2d 550, 553 (3 Cir. 1963) (Carl Sawyer, Inc. v. Poor, 1950, 180 F.2d 962, 963 (5 Cir. 1950).

18.     Evidence of value other than contemporary sales can be used **only** when it is shown that a vessel's market value cannot be reasonably established. Oliver J. Olson & Co. v. Am. S.S. Marine Leopard, 1966 AMC 1064, 1069, 356 F.2d at 733 (9th Cir. 1966).

19.     A court may permissibly value a vessel for which a market value is not ascertainable by relying upon any number of methodologies, including the vessel's replacement cost depreciated; expert opinion regarding the value of the vessel; the earning capacity of the vessel; and the amount for which the vessel was insured.  Allied Towing Corp., 966 F.2d at 826 (citing Standard Oil, 268 U.S. at 156, 1925 AMC at 783, and Sawyer, 1950 AMC at 874, 180 F.2d at 963).

20.     Catlin does not know what was the fair market value of the dry-dock by April 2011. See id. at 119:16-19.

21.     Fair market value may be defined as what a willing seller would take and a willing buyer would give in a free and open market.  See United States v. Eastern S.S. Lines, Inc., 171 F.2d 589, 1949 AMC 243, 245 (1st Cir 1948).  Catlin has already submitted proof that SJT was not a willing seller.  SJT was forced to put up the dry dock for sale because there was no business for it. See Docket No. 134-1 at ¶ 14.  Hence, none of the advertised amounts reflects what may have been the dry dock's fair market value prior to the inception of the policy in April 2011 because SJT was not a willing seller.

22.     Catlin failed to set forth any evidence to prove SJT misrepresented the market value of the drydock to Catlin.  Catlin offers no evidence to establish the market value of the drydock, nor that it was any different from the value stated by SJT. Catlin quite simply ignores this fundamental step in reaching a valuation of the drydock.

23.     Further, Catlin offers no evidence to bypass the market value test, as it failed to allege that no such market exists or that the market value could not be reasonably established.

24.     Catlin did not retain an expert witness to assess the market value, nor did it enter into evidence any comparable sales study of the drydock market.  Even if this Honorable Court were to understand that that a fair market value could not be reasonably established, Catlin did not provide any evidence to establish the replacement cost depreciated of the drydock.

25.     Furthermore, SJT informed Catlin at the time the policy was being sought that the drydock was for sale and yet Catlin did not even ask for the sales price.  Thus, Catlin deemed that the sales price was not material to the issuance of the policy as it did not seek any additional information.

26.     An underwriter's absolute right to demand disclosure of material facts may be waived by its neglect to investigate certain facts when a basis for inquiry is raised by the information communicated.  Puritan Ins. Co v. Eagle S.S. Co., 779 F.2d 866 (2d Cir. 1985) citing Gulfstream Cargo, Ltd. v. Reliance Ins. Co., 409 F.2d 982 (5th Cir. 1969).

27.     "A minute disclosure of every material circumstance is not required.  The assured complies with the rule if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it".  Puritan at 871 citing M. Mustill & J. Gilman, Arnould's Law of Marine Insurance and Average § 646 at 493 (16th ed. 1981).

**C.   CATLIN FAILED TO SATISFY ITS BURDEN OF PROOF AS TO THE LACK OF FORTUITY OF THE CLAIMED LOSS**

28.   In an action under an all risk policy, the insured is typically required to show that the loss or damage was fortuitous.  See International Ship, 944 F. Supp. at 892.

29.   However, "the rule is that once the insured establishes a loss apparently within the terms of the policy, the burden is upon the insurer to provide that the loss arose from a cause which is excepted."  Id.

30.   The International Ship court remarked that "loss due to the negligence of the insured or his agents has generally been held to be fortuitous and, absent express exclusion, is covered by an all risks policy."  Id. at 893.

31.   Courts "have rejected the notion that the insured must show the precise cause of loss to demonstrate fortuity."  Id.

32.   In the instant case, even though the law does not require it, SJT submitted an explanation of how the sinking of the drydock occurred.  In order to conduct some repairs below the waterline at the front end of the drydock, that front portion had to be lifted clear from the water high enough to build scaffolding for the workers.  See Determinations of Fact ("DOF") at ¶¶ 225-34.

33.   In order to accomplish that, the back portion of the drydock had to be ballasted.  See id. The ballasting was performed by using a fire hose connected to a water valve at the pier next to the drydock to fill up the drydock's compartments at the back portion of the pontoon.  See id. The ballasting process also included placing two separate 175 cubic feet water tanks (each holding up to 5 tons of water) and a 6,000 to 7,000 lbs. concrete block at the back portion of the pontoon.  See id.

34.     During the daytime of the last working day prior to the sinking of the drydock, Mark Payne, SJT's marine manager, was overseeing the ballasting process.  See id.  On that day, while the ballasting process was ongoing, Mr. Payne left work at noon to attend a school function of his son.  See id.  Mr. Payne left clear instructions to SJT's employees to, among other things, close any open manholes.  See id.  Unfortunately, during that night, the drydock sank at its berth.

35.     While Mark Payne was looking at the drydock, it was pointed out to him that a ball valve on the y-connector at the water main next to the drydock was in the open position.  The fire hose was connected to the portion of the y-connector with the open ball valve and it was going into the back portion of the sunken drydock while water was still coming out of the fire hose.  The other portion of the y-connector was in the closed position.  At the time of the sinking, anybody with access to the pier had access to the water main valve next to the drydock.  See id. at ¶¶ 414-28.

36.     This factual account has not been rebutted or refuted by anyone.  In addition, it must be noted that SJT does not have to "show the precise cause of loss to demonstrate fortuity." International Ship, 944 F. Supp. at 893.  Thus, SJT has gone above and beyond what that law requires from it to establish that the sinking of the drydock was due to a fortuitous and, thus, covered event:  somebody left the fire hose and the manholes at the drydock's deck open, even though Mr. Payne and SJT's foreman gave clear instructions to the contrary, and the drydock sank by its back portion.[1]

37.     Catlin may argue that the drydock sank because it was a "bucket of rust," and as such, it was no fortuity that it sank; it would have been a certainty.  As previously discussed, Mr. Ortego, representative potential buyer Leevac, testified that the drydock had "some corrosion" but that it

---

[1] As per Capt. Neftalí Padila's statements, t he drydock's back portion was completely underwater, while its front part was partially underwater  when he first saw the drydock right before it completely sank . See DOF at ¶ 416.

"was watertight [and] in good condition." <u>See</u> DOF at ¶ 400.  He added that he did not see as much rust as he would normally see in a lot of drydocks.  <u>See id.</u> at ¶ 399.  Leevac actually made a purchase offer to SJT and a sales agreement was eventually signed.  <u>See id.</u> at ¶¶ 392, 403, 405. Leevac planned to use SJT's drydock as a second drydock.  <u>See id.</u> at ¶ 405.  The only thing that prevented Leevac from actually getting the drydock was the fact that it sank before it was tendered by SJT.

39.     Whatever corrosion the drydock had was not the cause of its sinking.  The undisputed facts remain that after the drydock was refloated in November 2011, it spent the last month of 2011's hurricane season, and almost the entire next year, including 2012's hurricane season, floating at its berth until it was sold for scrap in December 2012.  It can safely be said that the drydock was in worse condition than it was before its sinking.  Catlin can hardly dispute that. However, the drydock spent more than a year floating at its berth, after it sank, before being sold for scrap.  If would be absurd to argue that the allegedly wasted condition of the drydock was the proximate cause of the drydock's sinking, when the drydock spent a year floating at the same place where it sank in a condition that had to be worse than the one before the casualty.

40.     The expert witnesses for both parties agree, Mr. Munsch to some extent and Mr. Camuccio entirely, that the effective cause of the sinking was that a firehose was left pumping water into the drydock's stern compartments.

41.     Hence, the cause of the sinking was fortuitous.


**D.     TERMS AND CONDITIONS OF CATLIN'S POLICY**

42.     Catlin's Policy was issued to SJT.  <u>See</u> Joint Trial Exhibit 1 at CAT000001.


55

43.     The period encompassed by the Policy was from April 29th, 2011 to April 29th, 2012.
See id.

44.     Catlin is bound to offer coverage under the Policy up to the insured value of the drydock,
$1,750,000.00.  See id. at CAT000053-56.

45.     The Court previously found that the Policy is an all risk policy, as opposed to a named
perils policy.  See Docket No. 157 at 38.

46.     Thus, the claimed loss is covered by the Policy and Catlin breached the insurance
contract by refusing to indemnify SJT.

47.     The Court awards SJT damages amounting to the full insured value of the drydock,
$1,750,000.00.

48.     In relation to the efforts that an insured has to carry out to preserve the insured property,
the Policy intends to cover, it states, in pertinent part:

> TOUCHING UPON THE ADVENTURES AND PERILS which we, the said
> Assurers, are contented to bear and take upon us, they are of the Seas, Rivers,
> Lakes, Harbours, Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons,
> Letters of Mart or Counter Mart, Surprisals, Takings at Sea, Arrests, Restraints
> and Detainments of all Kings, Princes and Peoples, of what nation, condition or
> quality soever, Barratry of the Master and Mariners, Explosions, Riots, or other
> causes of whatsoever nature arising either on shore or otherwise, causing Loss of
> or injury to the Property hereby insured, and of all other Perils, Losses and
> Misfortunes, that have or shall come to the Hurt, Detriment or Damage of the said
> Dock &c., or any part thereof. **And in case of any Loss or Misfortune, it shall
> be lawful for the Assured, their Factors, Servants, and Assigns, to sue,
> labour, and travel for, in, and about the Defence, Safeguard, and Recovery of
> the said Dock, &c., or any part thereof, without prejudice to this Insurance,
> to the Charges whereof the Assurers will contribute according to the Rate
> and Quantity of the sum herein assured.** And it is expressly declared and
> agreed that no act of the Insurer or Insured in recovering, saving, or preserving the
> property insured shall be considered as a waiver or acceptance of abandonment.

See id. at CAT000054 [emphasis ours].

49.     Hence, the Policy covers the salvage expenses incurred into by SJT in order to salvage, refloat and preserve the drydock.

50.     The company called Resolve was recommended by Catlin's surveyor, GL Noble Denton, and hired by SJT to perform the salvage operation of the drydock.  The salvage costs amounted to $1,052,125.05.  Catlin never questioned the amount of the salvage operation and the quality of Resolve's work.  See DOF at ¶¶ 11, 37-40, 164, 345-47, 352.

51.     The expenses incurred by an insured in saving or protecting the insured property from continuing loss or damage due to an inured peril are subject to the supplementary coverage provided by the sue and labor clauses of hull policies.  See Reliance Ins. Co. v. The Escapade, 280 F.2d 482 (5th Cir. 1960).  Sue and labor expenses are covered even where the property, subsequently, is declared a total loss.  See Quigg Brothers-Schermer, Inc. v. Commercial Union Ins. Co., 233 F.3d 997 (9th Cir. 2000).  A covered loss does not have to occur to trigger sue and labor coverage since it exists for expenses incurred to prevent loss from a covered peril from occurring.  See Wolstein v. The Yorkshire Ins. Co., 985 P.2d 400, 1999 AMC 2137 (Wash. Ct. App. 1999).

52.     Hence, the Court awards SJT salvage costs amounting to $1,052,125.05.

53.     Finally, the Court awards SJT interest to be calculated from the date of the breach of the insurance contract, November 9th, 2011, the date of the rescission and/or cancellation letter sent by Catlin to SJT.  See Joint Trial Exhibit 2.

        **WHEREFORE**, defendant, SAN JUAN TOWING & MARINE SERVICES, INC., respectfully prays that this Honorable Court deems its *Order* to submit proposed determinations of fact and conclusions of law as fully complied with.

        **RESPECTFULLY SUBMITTED.**

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 11th day of September, 2013.

> **s/*Ian P. Carvajal***
> Ian P. Carvajal
> Bar Number: 212003
> ***s/Manuel Sosa***
> Manuel Sosa, Esq.
> USDC-PR 218807
> **SALDANA, CARVAJAL & VÉLEZ-RIVÉ, PSC**
> 166 Constitution Ave.
> San Juan, PR 00901
> Tel. (787)289-9250
> Fax. (787)289-9253
> Email: icarvajal@scvrlaw.com
>            msosa@scvrlaw.com